**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Case No. 2:15-CR-080** |
| **Plaintiff,** | : | **Case No. 2:14-CR-127** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **ROBERT B. LEDBETTER,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

This matter comes before the Court on Defendant Robert B. Ledbetter's motion to suppress all evidence seized as a result of a traffic stop on December 18, 2007, as well as various cell phone records obtained without search warrants in 2006 and 2008, (Doc. 600).  Ledbetter argues that the traffic stop and follow-on *Terry* frisk and vehicle search were unlawful.  He also argues that the government's acquisition of his cell phone records in connection with subpoenas (as opposed to search warrants) violated the Fourth Amendment and the Stored Communications Act.  For the reasons that follow, the Court **DENIES** Ledbetter's motion to suppress.

**I.  BACKGROUND**

Ledbetter is one of twenty defendants facing trial for his alleged involvement in the Short North Posse, an alleged criminal organization that operated in the Short North area of Columbus, Ohio, from 2005 until 2014.  He faces nine charges, including one count of RICO conspiracy, four counts of murder in aid of racketeering, two counts of murder through use of a firearm during and in relation to a drug trafficking crime, one count of use of a firearm during and in relation to a crime of violence, and one count of conspiracy to murder a witness.  Ledbetter is scheduled to stand trial with the first group of defendants, beginning April 4, 2016.

1

The Court held a suppression hearing on November 16, 2015, at which the following findings of fact were adduced based on the testimony of Columbus Police Department Detective John Whitacre and Columbus Police Officers Duane Mabry and Kevin George.

## A.  The December 18, 2007 Traffic Stop

The Government named Ledbetter in several overt acts related to the alleged RICO conspiracy, including Overt Act Number Fifty-One, which alleges as follows: "On or about December 18, 2007, near the intersection of Cole Street and Miller Avenue, in Columbus, Ohio, the defendant, **ROBERT B. LEDBETTER** . . . possessed a 9mm Smith and Wesson pistol, $45,000 in US currency, crack cocaine, and marijuana." (Doc. 300).   On May 29, 2015, Ledbetter moved to suppress all evidence related to this overt act.  (Doc. 600).

### 1.  The Initial Traffic Stop

Detective Whitacre, who at the time served on the Columbus Police Department's Strategic Response Bureau, was conducting surveillance at 2595 Nona Road on the evening of December 18, 2007.  Detective Whitacre testified that the residence had been under surveillance for roughly a month due to suspected drug trafficking.  While there, Detective Whitacre observed a man exit a GMC conversion van and enter the residence.  Roughly five minutes later, that man, later identified as Robert Ledbetter, left the house carrying an unknown object and drove away. Detective Whitacre called Officer Mabry, with whom he had worked narcotics details in the past, and requested that Mabry initiate an investigative stop of the van.  Detective Whitacre was driving an unmarked vehicle at the time and thus could not make a stop himself.  Officer Mabry, however, was driving a marked cruiser with his partner, Officer George, and thus, could make a stop.  Detective Whitacre did not relay any pertinent details about his surveillance; he merely requested that Officer Mabry stop the van to see who was inside and what they were doing.

Following this initial communication, Detective Whitacre tailed Ledbetter for approximately two and a half miles before observing the van run a red light at the intersection of Fairwood Avenue and Livingston Avenue. Detective Whitacre again contacted Officer Mabry via cell phone to convey what he had observed. Officers Mabry and George, who were en route based on their initial phone call with Detective Whitacre, then picked up the van traveling northbound on Kelton Avenue. Soon after, the officers observed the van cross a solid divided line without signaling and immediately afterward make a left-hand turn onto Cole Street without properly signaling. At that point, the officers activated their cruiser's lights and siren.

Ledbetter did not immediately stop. Instead, he completed his turn onto Cole Street, slowed down in an apparent feint to pull over, sped up, and then finally pulled over for good at the intersection of Cole Street and Miller Avenue. Officers Mabry and George testified that Ledbetter traveled the length of one city block before finally stopping, although both officers characterized it as an unusually long city block due to its adjacency to the freeway. The Court takes judicial notice that Ledbetter would have traveled approximately one-tenth of a mile before finally stopping based on the officers' testimony regarding initiation and completion of the stop.

The officers approached the van and spoke with the driver (later identified as Ledbetter) and passenger (later identified as Brandis D. Roberts). According to Officer Mabry, Ledbetter was turned toward the passenger seat with his hands near the center console when the officers first approached. Officer Mabry, who approached the driver's side of the vehicle, noticed that Ledbetter was sweating profusely, breathing heavily, and had glassy eyes and shaky hands. Officer George, who approached the passenger's side of the van, observed that Ms. Roberts seemed verbally nervous, would not make eye contact, and became defensive when asked where she and Ledbetter had been that evening.

## 2.  The *Terry* Frisk

In light of the officers' personal observations, including Ledbetter's failure to pull over his vehicle promptly, Officer Mabry ordered Ledbetter to step out of the van.  He then escorted Ledbetter to the back of the police cruiser and conducted a *Terry* frisk for suspected weapons. While conducting the frisk, Officer Mabry felt a large bulge in Ledbetter's front right pants pocket, which the officer believed to be a stack of money.  Officer Mabry then pulled the U.S. currency out of Ledbetter's pocket to ensure there were no weapons under the stack of money. Officer Mabry repeated the same exercise with respect to Ledbetter's other pocket, from which he also removed a large stack of U.S. currency.  In total, Ledbetter had nearly $5,500 in cash on his person.  While continuing the frisk, Officer Mabry felt yet another bulge in Ledbetter's back pants pocket that he believed to be a bag of drugs.  When asked whether he was carrying crack cocaine, Ledbetter replied, "No, it's marijuana."  Officer Mabry then removed a clear plastic bag of marijuana from Ledbetter's pocket and placed him in the backseat of the cruiser.  Officer Mabry testified that he did not place Ledbetter in handcuffs at this time because he was unarmed and had only a minor amount of marijuana on his person.

## 3.  The Follow-On Vehicle Search

After Officer Mabry advised Officer George of the results of the frisk, Officer George began searching the passenger area of Ledbetter's van for weapons and other contraband. Officer George noticed that the entire interior had custom, non-factory upgrades.  Officer George further testified that, based on his training and experience, extensive non-factory upgrades like this often created unnatural voids in vehicles in which drug dealers conceal their narcotics or firearms.  Moreover, while searching the vehicle, Officer George found two plastic grocery bags containing bulk U.S. currency—later counted as $45,820 in cash—inside a brown coat located behind the passenger seat.

4

Officer Mabry then radioed for the assistance of a K-9 unit to perform a drug sweep on the van.  Sometime later, Officer Dollmatsch responded to the scene with his drug-dog, "Benno," who showed a positive "aggressive alert" on the driver's door seam as well as the front passenger door seam.  Benno's alert indicated the odor of one of several specified narcotics.  Officer Dollmatsch then searched the vehicle and found a clear plastic bag of crack cocaine on the rear seat and a freshly torn clear plastic bag and white powder under the rear seat.  Officer George, who continued to search the van, also discovered a loaded 9 mm handgun concealed in a side compartment in the wall behind the driver's seat.

Altogether, the police recovered $51,302 in cash (which tested positive for drug residue), roughly three grams of crack cocaine, approximately eight grams of marijuana, a concealed and loaded 9 mm pistol, and five cell phones.  Upon concluding the traffic stop and vehicle search, which the officers testified lasted at least forty-five minutes, the police took Ledbetter to Columbus Police Department Headquarters.  The police did not, however, file criminal charges or a traffic citation against Ledbetter stemming from the December 18, 2007 traffic stop.

## B.  The Subpoenaed Cell Phone Records

The Government also has charged Ledbetter with several murders, including the April 16, 2006 murder of Allen Johnson (in Columbus) and the November 3, 2007 murder of Rodriccos Williams (in Pickerington).  (Doc. 300).  The Columbus Police Department and the Pickerington Police Department issued multiple subpoenas to obtain cell phone records in connection with these murder investigations.  The subpoenas, each of which was issued to a third-party cell phone carrier like Verizon, Nextel, etc., requested basic subscriber information and records of incoming and outgoing phone calls during specified time periods, as follows:

| Law Enforcement Agency | Third Party | Time Period | Telephone Number | Subscriber/User[1] |
|---|---|---|---|---|
| Columbus PD | AT&T | April 16-27, 2006 | (614)-769-8054 | N/A[2] |
| Columbus PD | Verizon | April 16-17, 2006 | (614)-499-3467 | Robert Ledbetter |
| Columbus PD | Nextel | N/A[3] | (614)-339-6310 | Tony Jones |
| Columbus PD | Nextel | April 16-17, 2006 | (614)-402-4671 | Rico Maye |
| Columbus PD | Nextel | April 16-17, 2006 | (614)-769-8054 | China Hester |
| Pickerington PD | Verizon | November 3-4, 2007 | (614)-499-3467 | Robert Ledbetter |
| Pickerington PD | Revol | November 1-4, 2007 | (614)-622-4582 | Jonathan Brown |
| Pickerington PD | Verizon | November 1-4, 2007 | (614)-365-1344 | Latonia Williams |
| Pickerington PD | Verizon | November 1-4, 2007 | (614)-365-1949 | Rodriccos Williams |
| Pickerington PD | Ameritech | November 1-4, 2007 | (614)-920-1147 | Latonia Williams |

The Columbus Police Department's investigative subpoenas were issued under the authority of the Franklin County Municipal Court. The Pickerington Police Department's grand jury subpoenas were issued under the authority of the Fairfield County Grand Jury. In response to the subpoenas, various custodians of records provided the basic subscriber information and call records requested, as well as some historical cell-site location information.

Ledbetter initially challenged all ten subpoenas identified in the chart above in his Motion to Suppress. (Doc. 600). In its Response in Opposition, the Government argued that Ledbetter lacked a reasonable expectation of privacy in the phone records of other individuals, and thus, argued that he lacked standing to move for their suppression. (Doc. 615). Accordingly, during the suppression hearing, Ledbetter's lead-counsel informed the Court that Ledbetter now sought to challenge only two of the subpoenas: the two subpoenas that targeted telephone number (614) 499-3467, which apparently belonged to Ledbetter.

---

[1] The subpoena responses sometimes indicated a different account holder than the subscriber/user listed in this chart. For example, Robert Ledbetter's line, (614) 499-3467, appeared under the name of his mother, Debra Bankston. This chart reflects the Government's assertions at to whom each phone line belonged, and Ledbetter did not challenge any of these assertions during the suppression hearing.

[2] AT&T informed the Columbus Police Department that the requested number belonged to another carrier, Sprint/Nextel. Accordingly, AT&T could not provide the requested information.

[3] This subpoena sought only subscriber information, without a request for call records.

## C.  The Instant Motion to Suppress

Ledbetter moves to suppress any evidence recovered during the December 18, 2007 traffic stop.  He challenges the initial stop, the *Terry* frisk, and the follow-on vehicle search.  As to the initial stop, Ledbetter argues that his driving complied with all applicable laws and that "[h]e did not commit any traffic violation[s]" that evening.  (Doc. 600).  He thus contends that "the police did not have any legitimate basis to stop [him]" and suggests that the stop must have been a "pretext" for something else.  (*Id.*).  Accordingly, he argues that any evidence seized must be suppressed under the "fruit of the poisonous tree" doctrine.  (*Id.*).  As to the *Terry* frisk, Ledbetter argues that the police "did not have probable cause to order [him] out of his car" and lacked "reasonable suspicion that [he] was armed and dangerous," thus dooming the officers' actions and requiring suppression.  (*Id.*).  Finally, as to the vehicle search, Ledbetter argues that "the police unlawfully extended [his] detention" by forcing him to wait nearly forty-five minutes for arrival of the K-9 Unit.  (*Id.*).  He further contends that, even if the delay were warranted, Benno's alert was insufficient to establish probable cause to search the van because "the K-9 dog and/or its handler were not properly credentialed and . . . the search/sniff was not conducted in accordance with scientifically approved methods."  (*Id.*).

Ledbetter also moves to suppress two cell phone records obtained in connection with the murder investigations described above.  (*Id.*).  He contends that, in the absence of valid search warrants, the police were not entitled to obtain those records because they might contain historical cell-site location information.  (*Id.*).  Ledbetter argues that his cell phone records obtained by the Columbus Police Department under investigative subpoenas must be suppressed for an additional reason because they were not obtained in connection with a "grand jury" or "trial" subpoena, and thus, their collection violated the Stored Communications Act.  (*Id.*).

## II. STANDARD OF REVIEW

The Fourth Amendment protects against unreasonable searches and seizures. To comply with it, law enforcement personnel generally must obtain a warrant, supported by probable cause, from a neutral and detached judicial officer before searching people or their houses, papers, and effects for evidence of criminal wrongdoing. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014); *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). These requirements "guarantee[] the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their discretion." *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 613-14 (1989) (quotation omitted). Searches and seizures conducted without a warrant are presumptively unreasonable. *King*, 131 S. Ct. at 1856. Nevertheless, because "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" the warrant requirement is subject to several exceptions. *Id.* (quotation omitted).

Defendants who seek to suppress evidence allegedly obtained in violation of the Fourth Amendment bear the burden of proof. *See, e.g.*, *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." (quotation omitted)); *United States v. Blakeney*, 942 F.2d 1001, 1015 (6th Cir. 1991) ("In the context of a motion to suppress, the moving party has the burden of establishing that the evidence was secured by an unlawful search."). The Sixth Circuit has made clear that this burden of proof extends to both "the burden of production and persuasion." *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014) ("The defendant who requests suppression bears the burden of production and persuasion.").

### III.  ANALYSIS

Ledbetter challenges three aspects of his December 18, 2007 encounter with law enforcement: (1) the initial traffic stop; (2) the *Terry* frisk; and (3) the subsequent vehicle search. Fairly parsed, each aspect of the encounter complies with the Fourth Amendment. Ledbetter also challenges the warrantless acquisition of his cell phone records. Ledbetter, however, lacked a legitimate expectation of privacy in those records. Accordingly, the Court **DENIES** Ledbetter's motion to suppress in its entirety.

### A.  The Initial Traffic Stop Was Lawful.

Ledbetter's motion to suppress hinges largely on whether the initial traffic stop was lawful. If the initial stop was *unlawful*, then "the evidence and statements obtained from that illegality must be excluded as fruit of the poisonous tree." *United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) (quotation omitted). If, however, the initial stop was *lawful*, then the Court must consider the subsequent frisk and vehicle search. *Id.* Here, the initial stop was lawful.

Ordinary traffic stops constitute a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). As such, "any evidence seized during an illegal traffic stop must be suppressed as fruits of the poisonous tree." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (quotation omitted). Police officers, however, may lawfully stop a vehicle whenever they have probable cause to believe that a traffic violation has occurred. *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012). Under the "probable cause" standard, officers must have "a reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion," that a traffic infraction occurred. *Blair*, 524 F.3d at 748. The severity of the infraction is irrelevant: "officers may stop vehicles for any infraction, no matter how slight." *Id.* (brackets omitted); *see also Jackson*, 682 F.3d at 453.

Based on the uncontroverted testimony of Officers Mabry and George, the Court concludes that the initial traffic stop was lawful due to their independent observations that Ledbetter crossed a solid dividing line and initiated a left-hand turn—both without properly signaling. The Court bases this finding *solely* on the responding officers' personal observations, without resorting to any common knowledge the officers might have gained from their communications with Detective Whitacre regarding his earlier surveillance. Because the arresting officers observed these two traffic violations, the initial traffic stop was lawful, regardless of the officers' subjective intent in effectuating it. *Blair*, 524 F.3d at 748 ("[P]olice officers may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." (brackets and quotation omitted)); *United States v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003) (holding that observation by narcotics agents of a vehicle running a red light justified stopping the vehicle, regardless of the agents' admitted subjective intent to investigate for drug activity).

Officers Mabry and George testified that they witnessed Ledbetter change lanes without signaling (crossing a solid dividing line in the process) while traveling northbound on Kelton Avenue. Ledbetter's actions in so doing provided probable cause for the traffic stop. *See* Columbus Municipal Code § 2131.14(a) ("No person shall . . . move right or left upon a street . . . without giving an appropriate signal . . . ."); *United States v. Akram*, 165 F.3d 452, 455 (6th Cir. 1999) ("[The officer] had probable cause to stop the truck because it failed to signal before changing lanes, in violation of Ohio law." (citing companion state-law provision governing lane changes on state highways)). Put simply, "a driver's failure to use a turn signal provides probable cause to justify a traffic stop irrespective of the officer's subjective intent." *Jackson*, 682 F.3d at 453 (collecting cases).

10

Officers Mabry and George likewise testified that they witnessed Ledbetter initiate a left-hand turn from Kelton Avenue onto Cole Street without signaling first. Instead, Ledbetter activated his turn signal mid-way through the turn, again providing probable cause for the initial traffic stop. *See* Ohio Revised Code § 4511.39(A) ("No person shall turn a vehicle . . . without giving an appropriate signal in the manner hereinafter provided. When required, a signal of intention to turn . . . shall be given continuously during not less than the last one hundred feet traveled by the vehicle . . . before turning . . . ."); *United States v. Ware*, 465 F. App'x 487, 493 (6th Cir. 2012) ("[T]he district court determined that the detectives had probable cause to stop the car when [the defendant] committed a traffic violation by turning right without using a turn signal. Because probable cause existed for the traffic stop, the district court correctly held that the officers' subjective or pretextual motivation for making the stop was not relevant . . . ."); *United States v. Miller*, 413 F. App'x 841, 843 (6th Cir. 2011) (same—failure to signal a turn provided probable cause for traffic stop, regardless of officers' subjective intent).

Because Officers Mabry and George credibly testified that they observed these two traffic violations, they were entitled to initiate a traffic stop of Ledbetter's van, notwithstanding Detective Whitacre's surveillance and his incomplete (and unlawful) request that they conduct an investigatory stop for suspected narcotics trafficking.

**B. The *Terry* Frisk Was Reasonable Under the Totality of the Circumstances.**

Because the initial traffic stop was lawful, the Court next must consider the officers' decision to order Ledbetter out of the van for a *Terry* frisk. *See United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) ("The key issue in the present case, however, is whether [the officer] exceeded the permissible scope of the initial stop by removing [the defendant] from the car and conducting a patdown.").

11

Lawful stops do not necessarily carry with them the authority to conduct a *Terry* frisk. *Id.* Instead, "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009); *see also United States v. Tillman*, 543 F. App'x 557, 560 (6th Cir. 2013). The "reasonable suspicion" standard for a *Terry* frisk requires a lower showing than probable cause: "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Tillman*, 543 F. App'x at 560 (quotation omitted); *see also Campbell*, 549 F.3d at 372 (same).

As the Supreme Court has made clear, Officer Mabry's initial decision to order Ledbetter out of the van does not violate the Fourth Amendment's proscription of unreasonable searches and seizures. *Johnson*, 555 U.S. at 331; *see also United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) ("Once a motor vehicle has been lawfully detained . . . the police officers may order the driver to get out . . . without violating the Fourth Amendment[] . . . ." (quotation omitted)). Rather, under the Fourth Amendment's reasonableness inquiry, "the government's 'legitimate and weighty' interest in officer safety . . . outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." *Johnson*, 555 U.S. at 331 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977) (per curiam)).

Whether Officer Mabry had reasonable suspicion to believe that Ledbetter was armed and dangerous, thus justifying a *Terry* frisk, presents a closer question. The Government argues that the frisk was warranted under the totality of the circumstances, including: (1) Ledbetter's failure to pull over immediately; (2) Ledbetter's nervous behavior; (3) Ledbetter's furtive movements; and (4) contextual considerations. Standing alone, none of these factors is sufficient to justify the frisk. Acting in concert, however, these factors support Officer Mabry's decision.

### 1.  The Government Properly Frames the Reasonable Suspicion Standard.

Under the reasonable suspicion standard, courts must look at "the totality of the circumstances" to determine whether the arresting officer had a reasonable suspicion that the detainee was armed and dangerous.  *See United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *see also United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (holding that reasonable suspicion must be "based on articulable facts, taken as a whole").  Police officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *Shank*, 543 F.3d at 315.  Moreover, officers need not be absolutely certain that the person frisked was armed and dangerous.  *Tillman*, 543 F. App'x at 560.  The Supreme Court has acknowledged that "traffic stops are especially fraught with danger to police officers," *Johnson*, 555 U.S. at 330 (quotation omitted), and this Circuit likewise accepts that officers "must often make split-second decisions, frequently on the basis of incomplete information," *Tillman*, 543 F. App'x at 563.

### 2.  Ledbetter's Failure to Pull Over Immediately Supports the Officer's Reasonable Suspicion.

The Government first points to Ledbetter's failure to pull over immediately to support the *Terry* frisk.  Officers Mabry and George both testified that, when they activated their cruiser's lights and siren, Ledbetter exhibited signs of flight, including completing the turn, pulling over momentarily in an apparent feint, speeding up again, and then ultimately coming to a stop nearly one-tenth of a mile away, at the intersection of Cole Street and Miller Avenue.  Officer Mabry testified that based on his extensive experience, including numerous traffic stops involving weapons and drugs, drivers present a "major red flag" when they first slow down or pull over momentarily only to speed off again.  He indicated that this behavior is consistent with efforts to reach for (or conceal) a weapon or to "plan the next move."

13

The Court takes Officer Mabry's observations seriously: "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). The Sixth Circuit repeatedly has held that "a driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion." *Hoover v. Walsh*, 682 F.3d 481, 495 (6th Cir. 2012) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975)); *see also United States v. McCauley*, 548 F.3d 440, 445 (6th Cir. 2008) ("[T]he failure of the vehicle to pull over once [the officer] activated his lights and the subsequent conduct of [the defendant] provided additional reason for him to conclude that criminal activity was indeed under foot."); *Watkins v. City of Southfield*, 221 F.3d 883, 889 (6th Cir. 2000) ("[T]he fact that [the driver] refused to stop when he was directed to do so contributed to the officers' reasonable suspicion . . . ."); *cf. United States v. Carter*, 558 F. App'x 606, 612-13 (6th Cir. 2014) (holding that defendant's attempt to flee (on foot) when he first saw police cruiser provided additional support "to search him for a weapon").

Here, both arresting officers testified that Ledbetter's driving became erratic once they activated their cruiser's lights and siren, including headlong flight down Cole Street. Indeed, rather than pulling over the van immediately, which was possible given the officers' testimony that traffic was light that evening, Ledbetter first completed his turn and then performed an apparent fake-out pullover before speeding off again. Officer Mabry remains entitled to rely on his experiences and training to make inferences from and deductions about Ledbetter's behavior. *See Shank*, 543 F.3d at 315. This includes Officer Mabry's conclusion that Ledbetter's erratic driving amounted to a "major red flag" that he potentially was armed and dangerous, reaching for or concealing a weapon, or planning his next move.

14

3.  Ledbetter's Nervous Behavior Supports the Officer's Reasonable Suspicion.

The Government next points to Ledbetter's nervous behavior during the initial moments of the traffic stop to support Officer Mabry's *Terry* frisk.  The Government is correct: "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  *See Wardlow*, 528 U.S. at 124.  Nevertheless, the Sixth Circuit has warned that "factors such as a person's nervousness . . . while part of the reasonable suspicion analysis, are given little weight." *United States v. Johnson*, 482 F. App'x 137, 145 (6th Cir. 2012) (quotations omitted); *see also United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2014) ("Time and again, we have said that nervousness—even extreme nervousness—is an unreliable indicator of someone's dangerousness, especially in the context of a traffic stop." (quotation omitted) (collecting cases)).

According to Officer Mabry's testimony, when he first made contact with Ledbetter, he appeared nervous, was sweating profusely (despite it being December in Ohio), was breathing heavily, and had glassy eyes and shaky hands.  These sorts of behaviors lend some support to the officer's reasonable suspicion that Ledbetter was armed and dangerous.  *See, e.g.*, *Tillman*, 543 F. App'x at 562 (defendant was sweating, avoided direct eye contact, and had shaky voice); *United States v. Mays*, 643 F.3d 537, 539, 542 (6th Cir. 2011) (defendant was "scared, nervous, [and] twitching").  That said, because "[m]any citizens become nervous during a traffic stop, even when they have nothing to hide or fear," *United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004), the Court will not place much emphasis on Ledbetter's behavior, especially "where, as here, the 'nervous indicators' [the] officer cites are . . . relatively commonplace behaviors" such as general apprehensiveness, making or avoiding direct eye contact, sweating, or trembling, *see Johnson*, 482 F. App'x at 145.

15

**4. Ledbetter's Furtive Movements Also Support the Officer's Reasonable Suspicion.**

The Government also points to Ledbetter's furtive movements to support the *Terry* frisk. Indeed, "[f]urtive movements . . . may also properly contribute to an officer's suspicions." *See United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (collecting cases). Nevertheless, this factor, like Ledbetter's nervous appearance, should "not be invoked cavalierly" in finding reasonable suspicion. *Id.*

According to Officer Mabry's testimony, when he first approached the driver's side of the van, he noticed that Ledbetter's upper torso was turned toward the passenger seat, with his hands near the center console, out of Officer Mabry's field of vision. Officer Mabry testified that, in his experience, Ledbetter's "bladed" positioning away from the driver's side door was odd and triggered further suspicion. Under analogous circumstances, the Sixth Circuit has found that an officer reasonably could have concluded that the defendant was attempting to reach for a weapon. *See United States v. Bost*, 606 F. App'x 821, 825 (6th Cir. 2015) (holding that defendant who "reached his hand between the center console and a child's seat in the front passenger seat" might be attempting to grasp for weapon, thus justifying *Terry* frisk); *Tillman*, 543 F. App'x at 562 (holding that defendant who "quickly reached over to the passenger side of the car two times" could have could have been grabbing a weapon, thus contributing to reasonable suspicion he was armed and dangerous); *United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007) (holding that officer who learned via tip that defendant was armed and dangerous possessed reasonable suspicion for *additional* reason that defendant "dip[ped] his right shoulder toward the floor as if he was placing something under his seat . . . . [a] furtive movement . . . consistent with an attempt to conceal a firearm"). Thus, this factor also weighs in the Government's favor.

16

### 5.  Contextual Considerations Also Support the Officer's Reasonable Suspicion.

Finally, the Government noted in its briefing that the traffic stop and *Terry* frisk occurred at night, during the winter months of Ohio (when it plainly is dark), in a purportedly high-crime area.  Although Officer Mabry's testimony did not dwell on these factors, he did confirm them.  For example, he testified that the frisk occurred around 8:30 p.m., and that both he and his partner routinely patrolled the south-side precinct in which the traffic stop occurred and had made numerous arrests for drug and weapon offenses on that beat.    These contextual considerations, which the Court must accept as true, provide further justification for the *Terry* frisk.  *See Caruthers*, 458 F.3d at 467 (noting that "contextual considerations" such as the late hour and presence in "a high-crime area" contributed to officer's reasonable suspicion).

In sum, and under the totality of the circumstances, Officer Mabry was justified in conducting a brief *Terry* frisk to ensure his own safety and the safety of his partner.  Recent decisions from the Sixth Circuit support the *Terry* frisk in this case.  *See, e.g.*, *Tillman*, 543 F. App'x at 561-63 (focusing on defendant's furtive movements, nervous behavior, and failure to comply with commands to keep hands in plain view to find reasonable suspicion justifying *Terry* frisk), *Mays*, 643 F.3d at 542 (holding that defendant's brief attempt to turn away from officers, nervous demeanor, placing of hands in pockets, and presence in area in which the crime had reportedly occurred constituted reasonable suspicion justifying *Terry* frisk); *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006) (concluding that reasonable suspicion existed for *Terry* frisk based on defendant's hand movements, efforts to evade police officers, and presence in a high-crime area).  Accordingly, the Court concludes that Officer Mabry had reasonable suspicion to believe that Ledbetter was armed and dangerous, thus warranting the *Terry* frisk.

## C.  The Vehicle Search Was Lawful.

Finally, the Court must consider whether the officers' warrantless search of the van complied with the Fourth Amendment.  There are three aspects to consider: (1) Officer George's limited search of the passenger compartment; (2) the investigative delay in procuring the drug-dog, Benno; and (3) the officers' full-blown search of the van following Benno's alert.

### 1.  Officer George's Limited Search of the Passenger Compartment Was Lawful.

The officers' reasonable suspicion that Ledbetter was armed and dangerous justified not only the *Terry* frisk, but also a limited search of the passenger compartment of the van. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); *Graham*, 483 F.3d at 439-40 ("[I]f an officer possesses a reasonable suspicion that a suspect is armed and dangerous, he may conduct a brief protective sweep of the suspect's vehicle, so long as that search is constrained to places where a weapon may be hidden.").  Accordingly, for the reasons described in Section III.B., *supra*, Officer George was permitted to conduct a limited search of the passenger compartment of Ledbetter's van.

### 2.  The Investigative Delay Was Reasonable Under the Circumstances and Thus Lawful.

Similarly, the roughly forty-five minute investigative delay that occurred while the officers procured the drug-dog was reasonable under the circumstances, and thus lawful, because the officers had reasonable suspicion that criminal activity was afoot—namely, drug trafficking. *See, e.g.*, *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (holding that a "thirty to forty-five minute[]" delay while procuring a drug-sniffing dog does not violate the Fourth Amendment); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (finding a *Terry* investigation reasonable where entire investigation lasted less than one hour with approximately thirty-five minutes spent waiting for the canine unit to arrive).

18

Against this backdrop, Ledbetter points to the Supreme Court's recent decision in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), to support his argument that the officers detained him longer than necessary. In *Rodriguez*, the Court held that while a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop . . . . he may not do so in a way that prolongs the stop, *absent the reasonable suspicion ordinarily demanded to justify detaining an individual*." *Id.* at 1615 (emphasis added). The Court therefore concluded that police officers may not "extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a [drug] dog sniff"—even where the delay for the canine sweep added only "seven to eight minutes" to the traffic stop. *Id.* at 1613-14, 1616.

*Rodriguez*, however, offers no support to Ledbetter's suppression argument. Unlike in *Rodriguez*, where the Supreme Court declined to address whether reasonable suspicion existed, Officers Mabry and George possessed reasonable suspicion to continue their investigation due to their detection of large amounts of cash and marijuana, coupled with Ledbetter's nervous behavior. *Compare id.* at 1616-17 (finding that reasonable suspicion remained an "open" question for consideration on remand), *with United States v. Morris*, 533 F. App'x 538, 541 (6th Cir. 2013) (finding reasonable suspicion due primarily to "a large amount of cash in the vehicle . . . [which the officer believed] was possibly narcotics proceeds"), *United States v. Noble*, 364 F. App'x 961, 964 (6th Cir. 2010) (finding that mere scent of marijuana "constituted a change of circumstances that suggested [defendant] was engaged in illegal activity, which authorized further detention so the officers could investigate"), *and United States v. Davis*, 514 F.3d 596, 609-10 (6th Cir. 2008) (finding reasonable suspicion where police officer "noticed what appeared to him to be bits of marijuana stuck to the thighs and abdomen area of [defendant's] pants").

The absence of reasonable suspicion was critical to *Rodriguez*'s holding.  The Supreme Court not only framed the question presented that way, *Rodriguez*, 135 S. Ct. at 1614 ("We granted certiorari to resolve . . . whether police routinely may extend an otherwise-complete traffic stop, *absent reasonable suspicion* . . . ." (emphasis added)), but also cabined its holding to situations where reasonable suspicion is lacking, *id.* at 1615 ("[Police] may not [conduct unrelated investigative checks during a traffic stop] in a way that prolongs the stop, *absent the reasonable suspicion ordinarily demanded to justify detaining the individual*." (emphasis added)).  Thus, *Rodriguez* offers no support to Ledbetter.  *See United States v. Bah*, 794 F.3d 617, 629 (6th Cir. 2015) (distinguishing *Rodriguez* from the case in-question because "the officers here had reasonable suspicion to continue [the suspect's] detention").

Put simply, the investigative delay, which lasted roughly forty-five minutes, was reasonable under the circumstances given the responding officers' suspicion of drug trafficking activity and their desire to confirm or dispel that suspicion through the use of a drug-dog.  *Davis*, 430 F.3d at 354.

### 3.  The Officers Had Probable Cause for a Full Vehicle Search.

Finally, the officers possessed probable cause to conduct a full vehicle search.  Under the "automobile exception" to the warrant requirement, police officers may perform a warrantless search of a vehicle so long as they "have probable cause to believe the vehicle contains contraband or evidence of criminal activity."  *United States v. Lyons*, 687 F.3d 754, 769-70 (6th Cir. 2012).  This exception applies "even in nonexigent circumstances and even when the officer's decision to stop the vehicle was pretextual."  *Id.*  Here, the officers had probable cause to search the van.

According to his testimony and investigative summary of the incident, Officer Mabry discovered two large stacks of U.S. currency totaling nearly $5,500 on Ledbetter during the *Terry* frisk. Officer Mabry also felt a bulge that he believed to be drugs. Before removing the plastic bag from Ledbetter's pants, Ledbetter apparently admitted that it was marijuana. Then, while performing the passenger-compartment search of the van, Officer George located two plastic grocery bags containing bulk U.S. currency totaling $45,820. In light of this additional evidence, the officers became concerned that Ledbetter was trafficking in drugs or engaging in some other illegal activity. As such, Officer Mabry requested the assistance of a K-9 unit. When the dog handler arrived and ran Benno around Ledbetter's van, Benno alerted to multiple areas of the vehicle, thereby indicating the presence of the odor of one of several specified narcotics.[4]

These facts easily establish probable cause to conduct a warrantless search of the van. *See United States v. Simpson*, 520 F.3d 531, 544-45 (6th Cir. 2008) (holding that probable cause for warrantless vehicle search existed "upon the alert of a trained narcotics-detection dog"); *United States v. McGhee*, 672 F. Supp. 2d 804, 813 (S.D. Ohio 2009) (holding that officers who observed marijuana in plain view and "found a large amount of cash on defendant's person, suggesting that the occupants of the vehicle were involved in drug activity," had probable cause for a warrantless vehicle search). Moreover, such probable cause extends to "every part of the vehicle and all containers found therein in which the object of the search could be hidden." *United States v. Winters*, 782 F.3d 289, 304 (6th Cir. 2015) (quotation omitted). Accordingly, the officers' full-blown search of the van was proper. *Id.*

---

[4] Ledbetter initially argued, with little explanation, that Benno and/or his handler were not properly trained and did not act in accordance with scientifically approved methods. (Doc. 600). Ledbetter's counsel apparently abandoned this attack during the suppression hearing, when he stipulated to entering the drug-dog handler's canine use report and probable cause affidavit into evidence. Such a probable cause affidavit passes muster in the Sixth Circuit. *See United States v. Berry*, 90 F.3d 148, 153-54 (6th Cir. 1996) ("We find that the information contained in the affidavit in this case was sufficient to establish the training and reliability of the drug-detecting dog.").

Every aspect of the December 18, 2007 traffic stop complied with the Fourth Amendment. Officers Mabry and George had legal justification for the initial traffic stop due to probable cause of a traffic infraction. Officer Mabry, moreover, had reasonable suspicion to believe Ledbetter was armed and dangerous, thus warranting a *Terry* frisk and a passenger-compartment search of his van for weapons. Upon completion of the frisk and the limited vehicle search, the officers gained reasonable suspicion that the van may contain evidence of other criminal activity and contraband—namely, drug trafficking. This reasonable suspicion then ripened into probable cause upon the drug-dog's alert, entitling the officers to search the vehicle more thoroughly for evidence of criminal wrongdoing. Thus, the police lawfully obtained evidence from the traffic stop, and Ledbetter's motion to suppress must fail.

### D.  The Court Will Not Suppress the Subpoenaed Cell Phone Records.

Ledbetter next challenges the seizure of his cell phone records in connection with investigations into the Allen Johnson and Rodriccos Williams murders. Ledbetter alleges two bases to suppress those records: (1) neither the Columbus Police Department nor the Pickerington Police Department sought search warrants to obtain the records, thus violating the Fourth Amendment; and (2) the Columbus Police Department's use of "investigative" subpoenas, as opposed to "grand jury" or "trial" subpoenas, violated the Stored Communications Act, 18 U.S.C. § 2703, which governs law enforcement efforts to obtain records of certain electronic communications. Ledbetter's arguments fall short, however, because he lacked a reasonable expectation of privacy in the cell phone records that law enforcement officials obtained. Moreover, suppression is not an available remedy for violations of the Stored Communications Act, assuming a violation even occurred. Accordingly, Ledbetter's efforts to suppress his cell phone records fails.

22

1. Ledbetter Lacked a Reasonable Expectation of Privacy in His Cell Phone Records.

To present a viable Fourth Amendment claim, a defendant must have "a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). As the defendant, Ledbetter bears the burden of establishing that he "had a legitimate expectation of privacy in the area searched or items seized." *United States v. Mathis*, 738 F.3d 719, 729 (6th Cir. 2013). A legitimate expectation of privacy exists when a defendant, "by his conduct, has exhibited an actual (subjective) expectation of privacy—that is, has sought to preserve something as private—and when his subjective expectation of privacy is one that society is prepared to recognize as reasonable." *Id.* (quotation omitted).

Under these principles, Ledbetter cannot challenge the seizure of his cell phone records because he lacked a reasonable expectation of privacy in those records. As the Supreme Court has explained, "only defendants whose Fourth Amendment rights have been violated" should be permitted "to benefit from the [exclusionary] rule's protections." *Rakas*, 439 U.S. at 134. Typically, "the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time the subpoena is issued." *United States v. Miller*, 425 U.S. 435, 444 (1976) (bank records). The reason for this rule is simple: "[W]hen an individual reveals private information to another, he assumes the risk that this confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information." *United States v. Jacobsen*, 466 U.S. 109, 117 (1984). Thus, to assert a Fourth Amendment challenge to a subpoena issued to a third party, a defendant must "demonstrate that he had a legitimate expectation of privacy attaching to the records obtained." *United States v. Phibbs*, 999 F.2d 1053, 1077 (6th Cir. 1993).

23

Under this framework, courts consistently have concluded that individuals lack a reasonable expectation of privacy in basic telephone records. *Smith v. Maryland*, 442 U.S. 735, 745 (1979) (upholding use of pen register because defendant did not have reasonable expectation of privacy "in the phone numbers he dialed"); *United States v. Clenney*, 631 F.3d 658, 666 (4th Cir. 2011) (affirming denial of motion to suppress cell phone records because "phone customers have no constitutionally cognizable privacy interests in basic subscriber information"); *Phibbs*, 999 F.2d at 1077 (holding that defendant lacked standing to challenge subpoenas for telephone records because he did not have a justifiable privacy interest in them).

Applying the "third-party doctrine" from *United States v. Miller* and *Smith v. Maryland*, "most federal judges . . . have concluded that defendants have no reasonable expectation of privacy in historical cell-site data" either. *United States v. Jones*, 908 F. Supp. 2d 203, 211 & n.9 (D.D.C. 2012) (collecting cases); *see also, e.g.*, *United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015) (en banc) ("[Defendant] has no subjective or objective reasonable expectation of privacy in MetroPCS's business records showing the cell tower locations that wirelessly connected his calls at or near the time of six of the seven robberies."); *In re United States for Historical Cell Site Data*, 724 F.3d 600, 615 (5th Cir. 2013) ("Cell site data are business records and should be analyzed under that line of Supreme Court precedent."); *Gipson v. Sheldon*, No. 3:13-cv-1997, 2015 WL 1980244, at *10 (N.D. Ohio May 1, 2015) ("[T]here is no reasonable expectation of privacy in cell phone records . . . or in cell site location information."). A majority of courts follow the "third-party doctrine" when assessing requests for historical cell-site location data because the defendants: (1) voluntarily conveyed their location information to the cell phone company when using their phones; and (2) the companies maintained that information in the ordinary course of business. *Jones*, 908 F. Supp. 2d at 211.

24

Under this line of authority, Ledbetter lacked a reasonable expectation of privacy in his basic cell phone records (including subscriber information and numbers dialed and received), as well as historical cell-site location information voluntarily shared with, and collected by, his cell phone carrier. *See Huon v. Mudge*, 597 F. App'x 868, 875 (7th Cir. 2015) ("Huon had no constitutionally protected expectation of privacy in his subscriber information or the phone numbers he dialed."); *Davis*, 785 F.3d at 511 ("[L]ike the bank customer in *Miller* and the phone customer in *Smith*, [defendant] has no subjective or objective reasonable expectation of privacy in MetroPCS's business records showing the cell tower locations that wirelessly connected his calls at or near the time of six of the seven robberies."). Thus, his motion to suppress must fail.

True enough, as Justice Sotomayor recently observed, "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties." *See United States v. Jones*, 132 S. Ct. 945, 957 (2012) (Sotomayor, J., concurring) (stating that "[t]his approach is ill suited to the digital age"). But the Supreme Court expressly deferred ruling on those "difficult questions" of privacy and voluntary third-party disclosures to another day. *Id.* Until that day arrives, this Court must follow *Miller*, *Smith*, and other "third-party doctrine" cases that foreclose Ledbetter's motion to suppress. *See Davis*, 785 F.3d at 514 ("Justice Sotomayor, writing alone, raised a question, but did not even purport to answer it."); *id.* ("We review the concurrences [in *Jones*] in detail because they leave the third-party doctrine untouched and do not help [defendant's] case.").

Ledbetter's generalized reliance on the *majority* holding in *United States v. Jones* and *Riley v. California*, 134 S. Ct. 2473 (2014), similarly is misplaced. Both cases address different factual scenarios than the subpoena of an individual's cell phone records, and neither case supports the position that Ledbetter asks this Court to adopt.

25

For example, in *Jones*, the Supreme Court held that law enforcement's attachment of a GPS device to the defendant's vehicle, and the related use of that device to track the defendant's movements in real time over the course of twenty-eight days, constituted a "search" under the Fourth Amendment for which a warrant was required.  132 S. Ct. at 949.  The Court rooted its rationale in the doctrine of common-law trespass, a point the majority made efforts to highlight: "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information."  *Id.*; *see also id.* at 957 (Sotomayor, J., concurring) ("[T]he Government's physical intrusion on Jones' Jeep supplies a narrower basis for decision.  I therefore join the majority's opinion.").  Further stressing the importance of the physical nature of the intrusion, the Court expressly declined to address the constitutionality of similar types of surveillance "without an accompanying trespass."  *Id.* at 954 (majority opinion).

In contrast to the conduct at issue in *Jones*, the police officers in this case did not physically invade Ledbetter's property, nor did they conduct any real-time monitoring of his movements.  Instead, the police simply obtained *historical* cell phone information in the form of business records maintained by his cell phone carrier—records that, in any event, cannot "identify [the] user's precise location, but instead only identif[y] the cell phone tower nearest a user at the time of a call," *Jones*, 908 F. Supp. 2d at 206, or even less reliably, the location of a tower selected due to "physical obstructions and topography," "network traffic," or "a variety of [other] factors," *United States v. Evans*, 892 F. Supp. 2d 949, 952 (N.D. Ill. 2012).  *See generally* Douglas Starr, *What Your Cell Phone Can't Tell the Police*, The New Yorker, June 26, 2014 ("[Tower] selection is determined by load-management software that incorporates dozens of factors, including signal strength, atmospheric conditions, and maintenance schedules.").

Post-*Jones* decisions have distinguished the case on similar grounds.  *See, e.g.*, *Davis*, 785 F.3d at 513-16 ("[T]he majority holding in *Jones* turned on the physical intrusion of the government placing a GPS device on a private vehicle.  That is not this case.  The government's obtaining MetroPCS records, showing historical tower locations, did not involve a physical intrusion on private property or a search at all." (citation omitted)); *United States v. Skinner*, 690 F.3d 772, 779-80 (6th Cir. 2012) ("The majority in *Jones* based its decision on the fact that the police had to physically occupy private property for the purpose of obtaining information.  That did not occur in this case." (quotation omitted)); *Gipson*, 2015 WL 1980244, at \*9-10 (distinguishing *Jones* because subpoena for cell phone records and cell site location information in *Gipson* did not involve a physical invasion).  So too, here.

*Riley v. California* offers no refuge either.  There, the Court addressed whether a police officer may, without a warrant, search the digital data on a suspect's cell phone incident to a lawful arrest.  *Riley*, 134 S. Ct. at 2480.  The Court's holding—that police typically require a warrant for such a search, *id.* at 2485—is of little help here, because *Riley* involved a *physical search* of the *contents of a cell phone*, factors that made the police activity more invasive and less consistent with fundamental notions of privacy.  The subpoenas that Ledbetter challenges did not involve a physical search of his property, nor did they seek the digital contents of his cell phone.  Accordingly, *Riley* is inapposite.  *See United States v. Guerrero*, 768 F.3d 351, 359-60 (5th Cir. 2014) (noting that *Riley* did not address "the different question of whether a cell phone owner has a reasonable expectation of privacy in information held by a 'third party' service provider" and noting that Supreme Court may in the future "reconsider the third party doctrine in the context of historical cell site data"); *Gipson*, 2015 WL 1980244, at \*10 (finding that *Riley* did not control because "no information was gathered directly from the phone itself").

27

All told, under the present state of the law, Ledbetter lacked a reasonable expectation of privacy in his cell phone records.  Consequently, the police were not required to obtain a search warrant, and Ledbetter's argument for suppression under the Fourth Amendment must fail. *See Guerrero*, 768 F.3d at 361 ("The district court thus properly admitted the historical cell site location data at trial.").

### 2.  Suppression Is Not a Remedy Under the Stored Communications Act.

Finally, Ledbetter argues that the Court must suppress the cell phone records obtained by the Columbus Police Department for an independent reason—namely, that the Columbus Police Department's investigative subpoenas failed to comply with a provision from the Stored Communications Act, codified at 18 U.S.C. § 2703.  That statute, which Congress since has amended, provided that a government entity may require a provider of electronic communications services to disclose a record or other specified information concerning the subscriber or customer of the service (not including the contents of communications) "when the government entity uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena" or obtains a warrant, court order, or consent of the subscriber/customer.  *Id.* § 2703(c)(1)-(2) (2006).

Although both parties devote a lot of ink to debating whether the investigative subpoenas, issued under the authority of the Franklin County Municipal Court, complied with this provision, the Court need not resolve that issue.  Regardless of whether a violation occurred, Ledbetter's problem "is that suppression is not a remedy for a violation of the Stored Communications Act." *Guerrero*, 768 F.3d at 358.  That Act "has a narrow list of remedies, and—unlike the Wiretap Act, *see* 18 U.S.C. § 2515—suppression is not among them."  *Id.* (citing remedy provisions from Stored Communications Act, 18 U.S.C. §§ 2707-2708).

28

Indeed, because the Stored Communications Act omits suppression as a remedy and seemingly rules out such relief by stating that "[t]he remedies and sanctions described in this chapter are the *only* judicial remedies and sanctions for non-constitutional violations of this chapter," 18 U.S.C. § 2808 (emphasis added), every Circuit to have considered the issue has rejected Ledbetter's argument. *See Guerrero*, 768 F.3d at 358; *Huon*, 597 F. App'x at 875 ("[I]f there was a violation of the Stored Communications Act . . . suppression of the evidence would not have been an appropriate remedy."); *Clenney*, 631 F.3d at 667 ("Congress has made clear that it did not intend to suppress evidence gathered as a result of § 2703(c) violations."); *United States v. Perrine*, 518 F.3d 1196, 1202 (10th Cir. 2008) ("[V]iolations of the [Act] do not warrant exclusion of evidence."); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) ("The SCA creates criminal and civil penalties, but no exclusionary remedy . . . ."); *United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998) ("[T]he Stored Communications Act does *not* provide an exclusion remedy."). Although the Sixth Circuit has yet to weigh-in, the dominant view described above comports with this Circuit's general limitation on the suppression of evidence stemming from statutory violations. *See United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006) ("[T]he exclusionary rule is an appropriate sanction for a statutory violation only where the statute specifically provides for suppression as a remedy . . . .").

Accordingly, and regardless of whether the Columbus Police Department violated the Stored Communications Act through its use of "investigative" subpoenas issued by the Franklin County Municipal Court, Ledbetter is not entitled to the suppression of his phone records.

## IV. CONCLUSION

For these reasons, the Court **DENIES** Ledbetter's motion to suppress, (Doc. 600).

29

**IT IS SO ORDERED.**

                                                    __s/ Algenon L. Marbley_____
                                                   **ALGENON L. MARBLEY**
                                                   **UNITED STATES DISTRICT JUDGE**

**DATED:  December 2, 2015**