UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
    PLAINTIFF,                 )      CASE NO. 2:14-CR-127
                               )
        vs.                    )      MAY 23, 2016
                               )
ROBERT B. LEDBETTER, ET AL.,   )      9:00 A.M.
                               )
    DEFENDANTS.                )      VOLUME 25
_____)


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE, and a jury
COLUMBUS, OHIO


APPEARANCES:

FOR THE PLAINTIFF:

BENJAMIN C. GLASSMAN
United States Attorney
By:  DAVID M. DEVILLERS
     KEVIN W. KELLEY
     BRIAN J. MARTINEZ
Assistant United States Attorneys
303 Marconi Boulevard
Columbus, Ohio  43215


FOR THE DEFENDANT ROBERT B. LEDBETTER:

JEFFREY A. BERNDT, ESQ.
575 South High Street
Columbus, Ohio  43215

AARON G. DURDEN, ESQ.
10 West Monument Avenue
Dayton, Ohio  45402
                        - - -


     Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
   APPEARANCES CONTINUED:



   FOR THE DEFENDANT CHRISTOPHER A. HARRIS:

   Carpenter, Lipps & Leland, LLP
   By:  KORT W. GATTERDAM, ESQ.
   280 North High Street
   Columbus, Ohio  43215

   KEVIN P. DURKIN, ESQ.
   367 East Broad Street
   Columbus, Ohio  43215


   FOR THE DEFENDANT RASHAD A. LISTON:

   ISABELLA DIXON, ESQ.
   98 Hamilton Park
   Columbus, Ohio  43203

   Kegler, Brown, Hill & Ritter
   By:  S. MICHAEL MILLER, ESQ.
   65 East State Street
   Columbus, Ohio  43215


   FOR THE DEFENDANT DEOUNTE USSURY:

   Office of the Ohio Public Defender
   By:  GREGORY W. MEYERS, ESQ.
        KIRK A. MCVAY, ESQ.
   250 East Broad Street
   Columbus, Ohio  43215



   FOR THE DEFENDANT CLIFFORD L. ROBINSON:

   Scott & Nolder Law Firm
   By:  STEVEN S. NOLDER, ESQ.
   35 East Livingston Avenue
   Columbus, Ohio  43215


                          - - -
```

```
                                    TRIAL ONE - VOL. 25 -  4978
```

1                                   MONDAY MORNING SESSION

2                                   MAY 23, 2016

3                                        - - -

4        Thereupon, the following proceeding was held in chambers

5     with one counsel for each defendant present:

6               (Juror 2 in at 9:20 a.m.)

7               THE COURT:  Good morning.  I don't want you to have

8     that look of apprehension on your face.  Everything is good.

9               But, for the record, we have Juror Number 2 with us

10    today, and there's a representative of each of the defendants.

11              There was some concern, I think, that one of the parties

12    thought that when Mr. Andre Brown, also known as Paco, took the

13    stand, one of the parties thought that they saw you lean over

14    and tell one of the other jurors that you knew Mr. Brown.

15              JUROR NUMBER 2:  No.

16              THE COURT:  And, you know, just because it's said,

17    doesn't make it true.

18              JUROR NUMBER 2:  Right.

19              THE COURT:  Then sometimes people can misperceive

20    things, but I just wanted to -- and you had indicated to us

21    during voir dire that you didn't know these people.

22              JUROR NUMBER 2:  I think I said I thought he was dead.

23              THE COURT:  Okay.

24              JUROR NUMBER 2:  From the other testimony because I'm,

25    like, Paco, I thought he died.  Because so many people have.

TRIAL ONE – VOL. 25 –  4979

1      THE COURT:  Yes.  There have been a number of people.

2      All right.  Well, that certainly allays our concern

3  about that.  And, you know, if you thought you saw a ghost, you

4  should have reacted that way.  I certainly understand that.

5      But I want to remind you of one other thing, and this is

6  why we remind you of that because what could conceivably have

7  been an innocent observation could turn into something

8  different.  You are not to discuss any aspect of the

9  proceedings until you begin your deliberations.

10      So, you know, that was almost a Pavlovian response.  If

11  you had been hearing testimony about these vast array of names

12  and street names, that's –– you know, I have a cheat sheet.  So

13  you all don't, and you have to rely on your combined,

14  collective memories.  But, you know, be careful about those

15  kind of reflexive questions because they can lead to a

16  discussion that you don't anticipate when you just make the

17  observation.

18      JUROR NUMBER 2:  Okay.

19      THE COURT:  But under the circumstances, I would have

20  reacted the same way if I thought I had seen a ghost so don't

21  worry about it.  Make sure that you are mindful, you know,

22  sometimes just internalize it.  Just I thought he was dead,

23  make it a thought bubble and don't let it leave your lips.

24      Again, I want to reiterate how much we appreciate the

25  attention that everyone is paying and how hard you guys are all

TRIAL ONE – VOL. 25 – 4980

1    working to, you know, make the right decisions at the

2    conclusion of all of the evidence.

3         So I would ask you not to speak with the other jurors

4    about what we've talked about in here, and that will allay the

5    concern of all of the parties.

6         Thank you very much, ma'am.

7         (Juror 2 out at 9:24 a.m.)

8         (The following proceedings were had in open court.)

9              (Jury in at 9:30 a.m.)

10        THE COURT:  Good morning, ladies and gentlemen, and

11   welcome back.  I hope everyone had a nice and relaxing extended

12   weekend.  As we were meeting today, we were all excited about,

13   you know, the prospect of having, you know, spring being here

14   and there being a long run of sunshine until Ms. Coulter

15   reminded us that it's supposed to rain the rest of the week.

16   So she literally rained on our parade.

17        So we're going to have a good week.  And, as I said, we

18   think that we will conclude the government's case in chief this

19   week, and we still believe that we're going to be on the same

20   schedule that we talked about earlier.

21        Mr. DeVillers, are you ready to continue with the

22   government's case in chief?

23        MR. DEVILLERS:  We are, Your Honor.

24        THE COURT:  Please call your next witness.

25        MR. DEVILLERS:  The United States calls Earl Williams.

TRIAL ONE — VOL. 25 —   4981

1        THE CLERK:  Sir, come forward and be sworn, please.

2     (Witness sworn.)

3        THE COURT:  Mr. Williams, please bend the microphone

4    toward you and speak clearly into it.

5        Thank you.

6        Mr. DeVillers, please proceed.

7                        - - -

8                    EARL WILLIAMS

9     Called as a witness on behalf of the Plaintiff,

10    being first duly sworn, testified as follows:

11                   DIRECT EXAMINATION

12      BY MR. DEVILLERS:

13    Q.   Mr. Williams, please state your full name and spell your

14    last name.

15    A.   Earl E. Williams, W-I-L-L-I-A-M-S.

16        THE COURT:  What does the middle initial stand for,

17    Mr. Williams?

18        THE WITNESS:  Edward.

19      BY MR. DEVILLERS:

20    Q.   You say Edward?

21    A.   Yes, sir.

22    Q.   How old are you, Mr. Williams?

23    A.   I'm 36 -- 37.

24    Q.   Where did you grow up?

25    A.   Columbus, Ohio.

TRIAL ONE — VOL. 25 —  4982

1    Q.   Did you go to school?

2    A.   Yes, sir.

3    Q.   Where did you go to school?

4    A.   Various schools.  High schools, middle schools?

5    Q.   High school.  Where did you go to high school?

6    A.   Linden McKinley, Whetstone.

7    Q.   Where in Columbus did you grow up, what area of town?

8    A.   North side.  Short North.

9    Q.   I'm going to have you speak up a little bit, okay?

10   A.   North side.  Short North.

11   Q.   All right.  Do you know a person by the name of Brandon

12   Ledbetter?

13   A.   Yes, sir.

14   Q.   When did you meet Brandon Ledbetter?

15   A.   We been knowing each other since about fifth grade.

16   Q.   I want to take you back -- move forward and go to 2005.

17   Were you incarcerated in 2005?

18   A.   Yes, sir.

19   Q.   What were you incarcerated for?

20   A.   Involuntary manslaughter.

21   Q.   How much time did you do?

22   A.   Nine years.

23   Q.   When did you get out?

24   A.   June 2006.

25   Q.   All right.  And where did you get out from in June of

1   2006?

2   A.   CRC.

3   Q.   Where were you when you got out?  Where did you go?

4   A.   My mother's house in the beginning.  Maybe within a

5   week, Mr. Brandon helped me with some robberies to get on my

6   feet.

7   Q.   Okay.

8   A.   Yes, sir.

9   Q.   Did you meet Mr. Ledbetter again when you got out of

10  prison?

11  A.   Yes, I met up with him.

12  Q.   Okay.

13  A.   Yes, sir.

14  Q.   Were you in contact with him while you were still

15  incarcerated?

16  A.   Yes, sir.

17  Q.   All right.  You said he helped you get on your feet.

18  Tell us how he helped you get on your feet.

19  A.   He let me rob his cousin Ricco.

20  Q.   Okay.  Let's stop there.  Who's Ricco?

21  A.   It's his first cousin.

22  Q.   Do you know his first name?

23  A.   Ricco.

24  Q.   Do you know his last name?

25  A.   No, sir.

TRIAL ONE – VOL. 25 –  4984

1    Q.    At that time where was Ricco?

2    A.    Ricco was in the Short North with my sister, my baby

3    sister on Fourth and Ninth.

4    Q.    Something happened to Ricco during -- in 2006?

5    A.    I think he end up catching a -- got caught in the Short

6    North 2007, something like that.

7    Q.    2006, was he still out?

8    A.    Yes, sir, he was there.

9    Q.    Now, you said that you robbed his house?

10    A.    I robbed his father's house in Driving Park.  The next

11    day --

12    Q.    Wait a minute.  Let me stop you there.

13         How did you know to rob his father's house?

14    A.    Mr. Brandon sent me there, and we went there together.

15    Q.    How did you get up there?

16    A.    Mr. Brandon's minivan.

17    Q.    Why would Brandon want to rob his own cousin's house?

18         MR. GATTERDAM:  Objection; speculation.

19         THE COURT:  Well, I'm going to overrule it, but I'm

20    going -- because there was -- it appears that he would have had

21    the ability to know why, and I'm going to have Mr. DeVillers

22    establish further the foundation.

23      BY MR. DEVILLERS:

24    Q.    Before you robbed Ricco's house, did you have a

25    conversation with Mr. Ledbetter about it?

TRIAL ONE – VOL. 25 – 4985

1    A.    Yes, sir.

2    Q.    Did he talk to you about why he wanted to rob his own

3    cousin's house?

4    A.    For cocaine and money.

5    Q.    Did he say why he wanted to -- why he wanted to rob that

6    place of cocaine and money?

7    A.    Basically, he was helping me and he was helping hisself.

8    We were splitting it in half.

9    Q.    When you got to the house, what happened?

10   A.    I kicked in the door.  I tied up his father, and I

11   ransacked the house.  And then B told me exactly where the

12   cocaine and money would be at.

13   Q.    Was there cocaine and money there?

14   A.    Yes, there was, sir.

15   Q.    Do you remember how much?

16   A.    Not exactly.  It wasn't what Mr. Ledbetter said was

17   going to be there.

18   Q.    Do you remember how much cocaine was there?

19   A.    Might have been, like, about I think, like, a nine pack.

20   Q.    What's a nine pack?

21   A.    It's cocaine, like, nine ounces.

22   Q.    Did you have a gun with you?

23   A.    Yes, sir.

24   Q.    When you left, what happened?

25   A.    Me and Mr. Ledbetter just split it up, and he dropped me

1    off at home and --

2    Q.    Where was home at that time?

3    A.    I think I was staying with this girl at the time.

4    Q.    In what area of town?

5    A.    It was in Berwick Square.

6    Q.    What area of town is that?

7    A.    East side.

8    Q.    Do you have a nickname or street name?

9    A.    Edub.

10   Q.    When you got out of prison, did Mr. Ledbetter introduce

11   you to anybody?

12   A.    He introduced me to various people.  He introduced me to

13   his cousin Ricco, Schizel.

14   Q.    Do you know Schizel's last name?

15   A.    His last name Reynolds.

16         He introduced me to O-Dog, he introduced me to Buck.

17   Q.    Let's go slower.

18         Schizel, describe Schizel.

19   A.    He's in a wheelchair.

20   Q.    And I believe you said O-Dog?

21   A.    Yeah, Chris Harris.

22   Q.    All right.  Who else?

23   A.    Rashad Liston.

24   Q.    Do you know his real name?

25   A.    Rashad Liston.

TRIAL ONE – VOL. 25 –  4987

1   Q.   I mean, do you know his street name?

2   A.   Buck.

3   Q.   Anyone else?

4   A.   RJ, Robert Wilson.

5   Q.   Anyone else?

6   A.   Nic Nic.  I don't know his real name.

7        Hov.

8   Q.   Do you know Hov's real name?

9   A.   No, sir.

10  Q.   Did you know any of those people before you went away to

11  prison?

12  A.   Nobody but Black Marc, Marcus Peters.

13  Q.   Okay.  Did you reconnect with Marcus Peters as well?

14  A.   Yes, sir.

15  Q.   You indicated that Mr. Ledbetter set up the robbery of

16  Mr. Maye's house.  Did he -- in 2006, that area when you first

17  get out, did he set up any other robberies?

18  A.   Yes, sir.

19  Q.   Tell us about them.

20  A.   I think Ricco went to jail, and B sent us in his baby

21  mom's house.

22  Q.   Whose baby mom's house?

23  A.   Ricco's baby mom.

24  Q.   Speak up.  I can't hear you.

25  A.   Ricco's baby mom.

1   Q.   All right.  Where was that?

2   A.   Morse Creek Apartments off of Cleveland Avenue.

3   Q.   How did you know to go Ricco's baby's mom's?

4   A.   Mr. Ledbetter.

5   Q.   Did you go by yourself?

6   A.   Yes, sir.

7   Q.   Where did you go?

8   A.   I went inside the apartment.

9   Q.   Did you get anything?

10  A.   A safe.

11  Q.   Was anyone home at the time?

12  A.   Yes, sir.

13  Q.   Who was home?

14  A.   His baby mom and kids, and I think it was a man there.

15  Q.   Did you have a gun?

16  A.   Yes, sir.

17  Q.   All right.  How did you get the safe out?

18  A.   I rolled it down the stairs.  I rolled it to the car.

19  Q.   How big was this safe?

20  A.   It was --

21  Q.   Let me ask you this --

22  A.   -- about the size of this trash can by the judge.

23  Q.   Could you carry it?

24  A.   No, I couldn't.

25  Q.   How did you get it out?

TRIAL ONE - VOL. 25 -  4989

1    A.    I rolled it down the stairs, rolled it to the car.

2    Wedged it up on the side of the car and pushed it in.

3    Q.    Did you go there with anybody?  Was anyone in the car,

4    or was it just you?

5    A.    Just me.

6    Q.    Where did you take the safe?

7    A.    I took it to my father's house, and I opened it up.

8    Q.    How did you open it up?

9    A.    With a crowbar and jackhammer.

10    Q.    What was in the safe?

11    A.    Nothing but some coins and a ring.

12    Q.    Did you tell Mr. Ledbetter about it?

13    A.    Yes, sir.

14    Q.    Did you give anything to Mr. Ledbetter?

15    A.    Not at that time.

16    Q.    Do you know a person by the name of Aaron Hughes?

17    A.    Yes, sir.

18    Q.    And who is Aaron Hughes?

19    A.    Some big guy I grew up with.

20    Q.    What did he do for a living?

21    A.    He selled drugs.

22    Q.    Did you ever rob Aaron Hughes?

23    A.    Yes, sir.

24    Q.    Tell us about that.  How did it start?  How did it get

25    set up?

1  A.   Brandon Ledbetter took me and O-Dog up there.

2  Q.   Where is up there?

3  A.   On the east side.

4  Q.   How did you get up there?

5  A.   Mr. Ledbetter.

6  Q.   Do you know what you drove in?

7  A.   It was in Mr. Ledbetter's van again, minivan.

8  Q.   Was it you and O-Dog?

9  A.   Yes, sir.

10  Q.   And did Mr. Ledbetter go with you guys?

11  A.   Yes, sir.

12  Q.   Was there anyone else in the van?

13  A.   We went up there two different occasions.

14  Q.   Okay.  Let's go to the first occasion.  When you went up

15  there, what happened?

16  A.   Me and O-Dog just observed, observed it.  And the next

17  time it was me, O-Dog, Buck, RJ.

18  Q.   I can't hear you.  Who?

19  A.   O-Dog, Buck, RJ.

20       Chris Harris, Rashad Liston, Robert Ledbetter, Robert

21  Wilson.

22  Q.   Okay.  The second time you went up there, what happened?

23  A.   We went inside.

24  Q.   Was anyone inside?

25  A.   No, sir.

TRIAL ONE - VOL. 25 - 4991

1    Q.   Did you have guns?

2    A.   Yes, sir.

3    Q.   Did you get anything out of the house?

4    A.   That particular time we didn't.  I guess they had

5    already went in there once and was going in there again.

6            MR. GATTERDAM:  Objection; foundation.

7            THE COURT:  Well, I'm going to sustain the objection

8    based on the fact that the witness said he guessed.  So you may

9    ask another question, Mr. DeVillers.

10     BY MR. DEVILLERS:

11   Q.   Do you know if those individuals hit that house before?

12   A.   Yes, sir.

13   Q.   How do you know that?

14   A.   Because Robert Ledbetter told me.  They missed what they

15   got -- they said they missed a lot the first time they went,

16   but they got -- so that's why we was going back the second and

17   third time.

18   Q.   All right.  You talked about Marcus Peters.

19   A.   Yes, sir.

20   Q.   Did you ever do any robberies with Marcus Peters?

21   A.   Yes, sir.

22   Q.   Now, when are we talking about?

23   A.   2006.

24   Q.   Okay.  What did you rob?

25   A.   Me, Mr. Ledbetter, Marcus Peters on the west side a

TRIAL ONE – VOL. 25 – 4992

1   little bit past the Waffle House, we go in this -- this house,

2   the doors is open.  Go inside the door, me, Marcus Peters,

3   Ledbetter, and this old lady in there.  And there's an AK under

4   the couch, and we get to it before she get to it and we

5   ransacked the house.  And we were running out on the way out,

6   barely making it past the police.  They on their way there.

7   Q.   Did you get anything?

8   A.   We didn't get nothing that night.

9   Q.   What happened to the AK47?

10  A.   We left it there.

11  Q.   Why did you leave it there?

12  A.   They said it was messed up or something.

13  Q.   Did you do any other robberies with Paco?

14  A.   You mean with Mr.--

15  Q.   Say that again?

16  A.   You mean with Mr. Peters?

17  Q.   With Mr. Peters, yes, I'm sorry.

18  A.   Yes, sir.  We did another home on the west side on the

19  Bottoms.

20  Q.   Was Mr. Ledbetter involved with that one, or was it just

21  you and Marcus?

22  A.   Me, Marcus and Mr. Ledbetter.

23  Q.   What did you get?

24  A.   Some weed, some money, cocaine.  It was by a bridge on

25  the Bottoms at the west side by the swimming pool down there.

TRIAL ONE – VOL. 25 – 4993

1    Go inside, there's a lady upstairs with kids. Bust in

2  the back door, go up the steps, ransacked the house.

3    Q.  How many people were in the house besides you guys?

4    A.  It was, I think, a lady and some kids. It was a lady

5  and some kids, sir.

6    Q.  Do you know a person by the name of Paco?

7    A.  Yes, sir.

8    Q.  Do you know his real name?

9    A.  Andre Brown.

10   Q.  When you first got out of prison, did you have contact

11 with Andre Brown?

12   A.  Yes, sir.

13   Q.  Did you know Andre Brown before you went to prison?

14   A.  I believe I did, but I don't know if it was sure it was

15 him but -- because the same guy named -- a guy named Paco tried

16 to talk to my sister. But this guy was much bigger so I asked

17 Paco about it in an incident that occurred between me and him.

18   Q.  Okay. Let's start -- let's slow down.

19        At least in 2005, do you remember the first time you met

20 Paco?

21   A.  2006.

22   Q.  2006?

23   A.  Yes, sir.

24   Q.  Tell us about it. Where was it?

25   A.  We in the Dream. They called it the Old Marquee. And

TRIAL ONE - VOL. 25 - 4994

1  it was B, me --

2  Q.  Who's B?

3  A.  Brandon Ledbetter.

4  Q.  All right.

5  A.  Reynolds, and just the whole neighborhood there.

6  Everybody there.

7  Q.  What kind of place is this?

8  A.  It's a little bar.

9  Q.  Are you out for a particular reason?

10 A.  Brandon Ledbetter called itself giving me a homecoming.

11 Q.  A homecoming from?

12 A.  Being in prison.

13 Q.  Do you remember about when this was?

14 A.  It's, like, probably, like, the second week, third week

15 of June 2006.

16 Q.  Okay.  What happens there?

17 A.  Schizel passes his back turned, Paco is like walking up

18 on Schizel aggressively looking at him.  I don't know who Paco

19 is, and so we mean mugging each other, we about to fight.

20 Q.  What do you mean mean mugging?

21 A.  Cold stares.

22      Schizel having to turn around and, hold on, this why we

23 out tonight, and he tell Paco that, Andre Brown.

24 Q.  He told him what?

25 A.  He told Andre Brown this is why we out tonight.  We

TRIAL ONE – VOL. 25 –  4995

1  brung Earl out, brung Edub out.

2       So we staying maybe, like, a half hour more.  On the way

3  back we drive -- it's, like, about 30 cars.  We driving down

4  Fifth Avenue.  We get to Nelson when we get to, like, the

5  split, there's like -- it turn into, like, from a two-lane to a

6  one-lane.  And Paco say I try to cut him off, but I don't have

7  no knowledge of this because I don't ever see his car.

8       So when I make -- they go to the neighborhood, everybody

9  go to the neighborhood.  I stopped at the gas station.

10  Q.    Stop you there.  What do you mean by the -- what's the

11  neighborhood?

12  A.    Fourth and Eighth, Fourth and Ninth.

13  Q.    Okay.  Are you by yourself or are you with anybody in

14  your car?

15  A.    I have somebody in there with me.

16  Q.    Do you remember who it was?

17  A.    Not exactly.

18  Q.    All right.  Okay.  Keep going.  So you go to a gas

19  station?

20  A.    So I get to the gas station.  Tommy Coates calls my

21  phone, and he says Paco's down here talking crazy, talking

22  reckless out his mouth about you.  So I say, yeah, I said it's

23  probably because I remembered that name when he tried to talk

24  to my little sister when we was younger but I wouldn't let him.

25       So I get to the neighborhood, I see B by my sister's

TRIAL ONE - VOL. 25 -  4996

1   house like a block from where Paco at.  So I go to -- I get out

2   of my car, I go to -- I go to Paco and I'm, like, what's up,

3   Paco?  How you doing, man?  I'm, like, I'm Edub.  Once again, I

4   didn't mean no harm but, you know what I'm saying, in the bar.

5   We shake hands, I shake hands with a couple of other little

6   dudes that's there.

7        So when I go to turn around, when I did turn around and

8   start walking off, Paco pulled a gun out.  And I hear it clink,

9   clink.  And so I turn around, and he got the gun inches from my

10  forehead.  I have a gun on my waist, he take it off of me.  He

11  point both guns to me no more than, like, 5 inches from my

12  head, and he started shooting one of them at a time boom, boom,

13  boom, boom.

14  Q.   Was he trying to hit you?

15  A.   Just right past my head.  You can just feel it.  Like,

16  it's grazing you almost.  You could feel the heat.

17  Q.   How far was he from you?

18  A.   Right here, and the gun is like that (indicating).

19  Q.   Okay.  About a foot from your head?

20  A.   No.

21  Q.   Closer than a foot?

22  A.   Yes, sir.

23  Q.   All right.

24  A.   So we walk in the middle of the street.  I'm walking

25  backwards now.  Schizel -- Reynolds come out, roll out there in

1    his wheelchair.  And he says Paco, Earl is not trying take

2    your -- Edub is not trying to take your place.  So I said,

3    Paco, I said, man, what you mean?  I said what do you mean?

4    What you mean?  He says, like, you been taking the little

5    homies out with these robberies that Brandon Ledbetter is

6    turning you on to, and this is what Paco usually do.

7        Q.   How does it end?

8        A.   One of the guns run out.  Schizel go back to the side,

9    Paco continues still to shoot.  Somebody say the police coming.

10   Paco finally stop and take off running.

11       Q.   What happens to your gun?

12       A.   Paco has it.  Later on that night Reynolds calls me.

13       Q.   Reynolds is who?

14       A.   Schizel.

15       Q.   All right.

16       A.   He got Paco on the phone with a speaker.  Paco said --

17   Andre Brown said I want to make a public announcement and tell

18   you that I'm sorry, Bro.  He said, I just thought you was

19   trying to take my place.  I want to give your gun back, and I

20   want to get your car fixed.  So I'm, like, you want to get my

21   car fixed?  What you mean you want to get my car fixed?  He's,

22   like, I shot at you on Fifth Avenue at the split.

23       Q.   Is that before you went to the gas station?

24       A.   That's before I went to the gas station.

25       Q.   All right.

TRIAL ONE – VOL. 25 – 4998

1    A.    And he's, like -- he said you tried to run me off the

2    road.  I'm, like, get this, man, I said, I wasn't trying to

3    take your place, and you ain't got to fix my car and you ain't

4    got to make no public announcement.  I said you can have that

5    hood, you can have them dudes, and I'm just going to come down

6    there and get my child and leave it at that.

7    Q.    You want to do what?

8    A.    I told him I was going to come down and get my child.

9    Give me a pass to come through there and get my baby.  I got a

10   kid down there.

11   Q.    So safe passage, is that what you're saying?

12   A.    Yeah.

13   Q.    All right.  Go ahead.

14   A.    So Paco end up getting locked up for something so it end

15   up passing over.

16   Q.    Let me ask you this:

17         Paco told you he shot at your car.  Did you see any

18   damage to your car?

19   A.    Yes, sir.

20   Q.    Is it your testimony you didn't know he was shooting at

21   your car while you were driving?

22   A.    I didn't know because the music was so loud.

23   Q.    After that event, when was the next time you saw Paco,

24   if you can remember?

25   A.    He came in the barber shop where I worked at twice, but

TRIAL ONE – VOL. 25 –  4999

1    I didn't know it was him.  Like, the night I seen him in the

2    club, that was the first time I seen him probably since he was

3    a kid so he was so big and I was a little tipsy so I didn't

4    remember him.  And it might have been over a year.

5         So he send this guy named Mark to me, Mark -- he sent a

6    guy named Mark to me.  I'm trying to remember his last name.

7    Q.   Does Mark eventually get killed?

8    A.   Yes, sir.

9    Q.   And did that whole murder involve you?

10   A.   Yes, sir.

11   Q.   All right.  Let me ask you this:

12        When you saw him in the barber shop the next time, how

13   long after that was -- between the incident where you're

14   shooting and the incident in the barber shop, how long are you

15   talking about?

16   A.   It was within -- within no more than a week-and-a-half,

17   two weeks.

18   Q.   All right.  I think you said Paco ended up going to

19   prison for a while?

20   A.   Yes, sir.

21   Q.   Do you know about how long?  Was there a time period

22   where you didn't see him at all?

23   A.   It might have been close to a year, maybe a little

24   longer.

25   Q.   We'll get back to Paco.

1          Do you know a person by the name of Tabby Brumfield?

2     A.   Tabby, yes, sir.

3     Q.   Describe Tabby.

4     A.   Fat guy about my age.

5     Q.   What did Tabby do for a living?

6     A.   Sold drugs.

7     Q.   Do you know where he lived?

8     A.   He stayed off of Joyce Avenue.

9     Q.   Joyce and what, like what --

10    A.   24, 26.

11    Q.   Did you ever do anything to Tabby?

12    A.   Mr. Ledbetter paid me to shoot his house up.

13    Q.   And how much did he pay you?

14    A.   Nothing but, like, $1200.

15    Q.   What's that?

16    A.   $1200.

17    Q.   Why did he pay you 1200 -- do you know why he paid you

18    $1200 to shoot his house up?

19    A.   I'm not exactly why.  I didn't ask no questions.

20    Q.   Did Brandon have a brother named Elijah?

21    A.   Elijah?

22    Q.   Did Brandon have a brother?

23    A.   Yes, sir.

24    Q.   What's his brother's name?

25    A.   I knew him as White Tone.

1    Q.   All right.  Did something happen to White Tone?

2    A.   He got killed while I was in CRC.  I was in a halfway

3    house on five, and I got violated.  I was only out for, like,

4    two months.  In the process he got -- he got killed.

5    Q.   Let me stop you there.  You testified that you got out

6    of CRC in June of '06.

7    A.   '06.

8    Q.   Did you get out before that for at least some period of

9    time?

10   A.   Yes, sir.

11   Q.   Explain when you got actually physically out of CRC.

12   A.   Okay.  I got out in a halfway house December 2005.

13   Q.   All right.

14   A.   And then I got violated and got right back locked up

15   February or March of 2006.

16   Q.   And then you got out again when?

17   A.   June of 2006.

18   Q.   Okay.  So while you were -- while you were locked up,

19   something happened to White Tone?

20   A.   Yes, sir.

21   Q.   What happened to him?

22   A.   He got -- he got murdered.

23   Q.   You mentioned Marcus.  Have you ever talked to Marcus

24   about what happened to White Tone?

25   A.   Yes, sir.

TRIAL ONE – VOL. 25 – 5002

1    Q.   What did Marcus tell you happened?

2    A.   He told me Brandon, O-Dog, Ledbetter, they caught up

3    with the dude inside of a place, and Mr. Ledbetter wouldn't

4    shoot and so they did it.

5    Q.   Who's they?

6    A.   O-Dog and Marcus Peters.

7    Q.   Was Marcus Peters friends with White Boy Tone?

8    A.   Yes, sir.

9    Q.   Did he tell you anything else about what happened that

10   night?

11   A.   No, sir.

12   Q.   Did he tell you -- do you know the name of the person?

13   A.   I think it was, like, Avery, something like that.  I'm

14   not for sure.  I didn't know this guy.

15   Q.   Did you know him at all?

16   A.   No, sir.

17   Q.   All right.  Did you ever talk to O-Dog about what

18   happened?

19   A.   No, sir.

20   Q.   Did you ever talk to Brandon about what happened?

21   A.   Yes, sir.

22   Q.   What did he tell you?

23   A.   He told me the little homies did it, Marcus and O-Dog.

24   Marcus Peters, Chris Harris.

25   Q.   Do you know a guy by the name of Travis McGinnis?

TRIAL ONE – VOL. 25 –   5003

1    A.   Yes, sir.

2    Q.   Does he have a street name?

3    A.   Trigger Trav.  I met him, and I ain't seen him in years.

4  And I run into him in the county jail, and Mr. Trigger Trav

5  said he was with them when it happened.

6    Q.   Did he say whether he was inside or how he got there or

7  anything like that?

8    A.   He said he went there with them, and he was with them

9  through the whole ordeal.

10   Q.   Did you ask Brandon about that?

11   A.   I never asked Brandon about it while Trigger Trav

12  because when Trigger Trav brung that to me, I was locked up.

13  But Trigger Trav's name came up when we was out there.

14   Q.   Who's they?

15   A.   Travis McGinnis and Brandon Ledbetter brung his name up,

16  and he said he wanted to shoot that bitch, he said his dumb

17  ass.  And that was his words.

18   Q.   Did Brandon ever tell you about what Trav did or didn't

19  do, if he was there or not?

20   A.   No, sir.

21   Q.   Did Marcus Peters ever say if Travis McGinnis was there

22  or not?

23   A.   No, sir.

24   Q.   What's Homo?

25   A.   Repeat that again.

TRIAL ONE - VOL. 25 - 5004

1    Q.    What's Homo or Homicide Squad?  What's that?

2    A.    Fourth and Eighth.

3    Q.    Did you associate with people from Homo or Homicide

4    Squad?

5    A.    Chris Harris, Brandon Ledbetter, Rashad Liston, Marcus

6    Peters, Robert Wilson.

7    Q.    Did something happen to Marcus?

8    A.    Yeah.

9    Q.    Were you at one point asked to -- did Marcus ask you to

10   commit a robbery with him?

11   A.    Yes, sir.

12   Q.    What was that robbery about?  What did he tell you?

13   A.    It was a robbery up north towards the airport.  He said

14   it was like a code you got to get in to get in.  So he called

15   me, and he asked me do I want to get down with it.  And I'm,

16   like, you know, where do you get your sources from?  B; he told

17   me B.  I called B, Brandon Ledbetter.  Brandon Ledbetter tell

18   me about it, he tell me who was going.  And then we was

19   thinking about how we was going to get transportation so we

20   asked B to use his minivan, and he asked me did I want to go.

21   Q.    Did you go?

22   A.    I tell him no.

23   Q.    Why didn't you go?  Why didn't you want to go?

24   A.    Because the last time we went when I went out with

25   Marcus, bad things happened.  And all the guys that he was

TRIAL ONE - VOL. 25 -   5005

1    saying was going with him, it was too much for me.

2        Q.    Who did he say was going with him, if you can remember?

3        A.    I know he said O-Dog.

4        Q.    Okay.

5        A.    I thought RJ and Buck.

6        Q.    You thought who?

7        A.    RJ and Buck.  Rashad Liston and -- and Robert Wilson.  I

8    know I didn't go -- I didn't go that day.  You know, my baby

9    momma that's in this courtroom right now was begging me not to

10   come, not to go with them.

11       Q.    You said something happened with Marcus that also made

12   you not want to go beforehand?

13       A.    The robberies that we did out west, he was bragging

14   about it.

15       Q.    Bragging to who?

16       A.    I guess to -- like, Marcus would rob people, and then

17   the money that he'd get, he'd tell everybody in the world he

18   did it and he didn't care.

19             And B came to me, like, man, listen.  Bro, you need to

20   kill Black Marc.  And I'm, like, man, I'm not killing Black

21   Marc.  He's, like, man, he got this heat on us.  I'm, like, who

22   these guys?  I don't know them.  I don't know them.  They know

23   him, I said.

24             He asked me about two or tree times to handle that.

25             Yeah, you smiling, but it's real.

TRIAL ONE – VOL. 25 – 5006

1    Q.   Pay attention to me.  Mr. Williams, I'm asking the

2    questions.  Mr. Williams, look at me.

3          MR. GATTERDAM:  Your Honor, move to strike

4    Mr. Williams' statement.

5          THE COURT:  Sidebar, gentlemen.

6                        - - -

7      Thereupon, the following proceeding was held at sidebar out

8    of hearing of open court:

9          THE COURT:  Now, throughout this trial, you all have

10   done a good job of maintaining decorum in this courtroom by

11   keeping all of the defendants in check.  The government has

12   kept itself in check, too.  I want that to continue.

13         Now, off the record for a minute.

14    (Thereupon, an off-the-record discussion was held.)

15    (The following proceedings were had in open court.)

16         THE COURT:  Please continue, Mr. DeVillers.

17    BY MR. DEVILLERS:

18    Q.   Mr. Williams, were there a lot of rumors going around

19   about what happened after Marcus Peters was killed?

20    A.   I came to Mr. Ledbetter.

21    Q.   That's not what I asked you.

22    A.   Yes, sir.

23    Q.   Did you tell the police about some of these rumors?

24    A.   Yes, sir.

25    Q.   Have you ever talked to Deounte Ussury?

TRIAL ONE – VOL. 25 – 5007

1   A.   Yes, sir.

2   Q.   Did you talk about what happened to Marcus?

3   A.   Yes, sir.

4   Q.   When was that you talked to him?

5   A.   He came in the county jail.

6   Q.   Do you remember about what year?

7   A.   '09, 2010.  He come in the tank.

8   Q.   He came into what?

9   A.   He came into the facility, the cell.  He was a little

10  nervous, a little scared because the guys is in the tank is

11  from the other side of the tracks.

12  Q.   What do you mean by other side of the tracks?

13  A.   Like, they don't get along with the guys in the tank.

14  They had no respect for them.

15       So in the process he was scared, he was nervous.  And we

16  was talking about a little bit of everything and he was, like,

17  hey, I didn't mean to kill Black Marc.

18  Q.   When he told you that, what did you think?

19  A.   I didn't know he had did it.  I had thought RJ or Buck

20  had did it because I had asked Mr. Ledbetter who did it, and

21  Mr. Ledbetter wouldn't tell me who did it.  He said just leave

22  it alone.

23  Q.   I want to show you Government's Exhibit 46-15-028.  I

24  want you to look at your screen there.

25       Do you see your name there?

TRIAL ONE – VOL. 25 – 5008

1     A.    Yes, sir.

2     Q.    What's that?

3     A.    Yes, sir.

4         MR. DEVILLERS:  Your Honor, may I publish this to the

5     jury?  It's already been entered into evidence.

6         THE COURT:  Yes, you may.

7       BY MR. DEVILLERS:

8     Q.    What's your street name?

9     A.    Edub.

10    Q.    Do you see that phone number?

11    A.    Yes, sir.

12    Q.    Was that your phone number?

13    A.    Yes, sir.

14    Q.    Did we meet last Friday?

15    A.    Yes, sir.

16    Q.    Who was there when we met?

17    A.    You and my lawyer, Mark Collins.

18    Q.    Were there some agents there as well?

19    A.    Yes, sir.

20    Q.    That phone number, was that the phone number you gave

21    Mark Collins?

22    A.    Yes, sir.

23    Q.    Do you know a person by the name of Rodriccos Williams?

24    A.    I don't know him, but I learned the name.

25    Q.    Did you rob Rodriccos Williams?

TRIAL ONE – VOL. 25 – 5009

1    A.   Yes, sir.

2    Q.   Tell us about how that happened.  How did that come to

3    be?

4    A.   Mr. Ledbetter told me about it on, like, three different

5    occasions.

6    Q.   What did he tell you about it?

7    A.   He said his girlfriend that he was in love with,

8    ex-girlfriend, and they had been out to eat a few times, to a

9    hotel, she was telling him how she was just playing in the bed

10   with thousands and thousands of dollars with her new husband's

11   money.

12   Q.   Do you know that girl's name, that woman's name?

13   A.   Tonya Williams.

14   Q.   Have you ever met her before?

15   A.   No, sir.

16   Q.   All right.  What else did Mr. Ledbetter tell you about

17   her?

18   A.   He was -- he was in love with her, and he was crazy

19   about her.

20   Q.   At that time was Mr. Ledbetter seeing anybody else?

21   A.   Yes, sir.

22   Q.   Have you met some of those people?

23   A.   Crystal.

24   Q.   Who's Crystal?

25   A.   That was his girlfriend.

1    Q.    Okay.

2    A.    And Tiffany.

3    Q.    Tiffany?

4    A.    Tiffany.

5    Q.    Tiffany who?

6    A.    I think the last name was Barrett.

7    Q.    Did Mr. Ledbetter have any children?

8    A.    He had one by Tiffany, and he had one by Casey.

9    Q.    Did Mr. Ledbetter live with any of those two?

10    A.    He lived with Tiffany.

11    Q.    Do you know where they lived?

12    A.    They lived various places.  I stayed the night over a

13    couple of them before.

14    Q.    I want to take you to 2007 around the time of the

15    Rodriccos Williams murder.

16          Do you know where Brandon and Tiffany were living?

17    A.    In Gahanna.

18    Q.    Do you know where in Gahanna?

19    A.    In them apartments right by the fire station, the police

20    station right over by the Kroger's.

21    Q.    Okay.  What did Mr. Ledbetter tell you about as far as

22    this robbery?  What was going to happen?  Was there a plan?

23    A.    I'd say, like, he asked me, like, two or three times

24    before.  One time we was going to do it, I was going to do it

25    with this guy named KG, we called him Kevin Green.  But that

TRIAL ONE - VOL. 25 -   5011

1    night B called it off.  So, like, months -- maybe a month or

2    two went past and he called me and, like, man, you know, you

3    want to get down -- get down with this little lick, man?  I

4    just want you to come and see the younger homies, man, make

5    sure nothing crazy happen.

6          So I'm, like, who is you talking about?  So he's, like,

7    my ex-girlfriend's man.  So he told me -- he don't tell me his

8    name.  He just tell me that he was out of town.  And before I

9    was, like, man, I don't know about going all the way out there.

10   Q.   Where was it?  Where was it that he lived?

11   A.   I think it's like -- like, Lancaster, Fairfield.

12   It's -- I know we got on Lancaster 33 to go there.

13   Q.   Okay.  Keep going.

14   A.   And the night he called me, I meet him over there at his

15   aunt's house.

16   Q.   Who's his aunt?

17   A.   His aunt, yes, sir.

18   Q.   Do you know her name?

19   A.   Miss Paulette.

20         And I get there and he's there, and we waiting on O-Dog,

21   RJ and Buck to get there.

22   Q.   Which RJ?

23   A.   Robert Wilson.

24   Q.   Okay.

25   A.   And --

TRIAL ONE – VOL. 25 –   5012

1   Q.   How did you get to Miss Paulette's house?

2   A.   I drove over there.

3   Q.   With anybody?

4   A.   No.  By myself.

5   Q.   All right.

6   A.   I got there and B was already there, Mr. Ledbetter was

7   already there.  And then we waited on O-Dog, Buck.  O-Dog --

8   Chris Harris, Rashad Liston and Robert Wilson to get there.

9         We get in -- and then we finally get ourself together

10   in, like, our clothes, our guns, what we was going to use when

11   we get there.

12   Q.   What sort of clothes did you have?

13   A.   All black hockey -- like them -- one of those ski masks

14   that you put right here over your nose, toboggans.

15   Q.   Any gloves?

16   A.   Yeah, we all had gloves.  We really couldn't see -- see

17   nothing when we had everything on.

18   Q.   Where do you go now?

19   A.   In the process we driving there, and Mr. Ledbetter is on

20   the phone with the lady whose house we going to.

21   Q.   Let me ask you this:

22         How are you getting there?

23   A.   We driving in the car.  Mr. Ledbetter is driving in the

24   car that he usually doesn't have.  It was a rental, from what

25   he had said, like, a white-grayish color, like light color.

1    And --

2    Q.   Was it a four-door, two-door?

3    A.   It was four-door.

4    Q.   And Mr. Ledbetter is on the phone with somebody?

5    A.   He's on the phone with the lady, Tonya.  Yeah, he's on

6    the phone with her and we driving, and he's talking to her the

7    whole time.

8    Q.   What are they talking about?

9    A.   They talking about just a little bit of everything.  She

10   said her husband took the kids to the movie theater so it would

11   be a while before he get back.  So as that came, it affect our

12   plan was to get there, knock on the door and she'd answer and

13   go straight in.

14   Q.   What were you doing while Mr. Ledbetter was on the

15   phone?

16   A.   We all -- he told us to be real, real quiet so we was

17   all real quiet riding the whole time there.

18   Q.   Do you know how long he was on the phone with her?

19   A.   He was on the phone with her all up until the man was

20   coming down the street with the babies.

21   Q.   All right.  So do you go to Mr. Williams' house?

22   A.   Yes, sir.

23   Q.   Once you get to the location, where do you go?  What do

24   you do?

25   A.   We -- we walk -- we ride around the front, we see we

TRIAL ONE – VOL. 25 – 5014

1    couldn't park no where, it was too open.  So we got -- so

2    Mr. Ledbetter got out the car, and he went behind one of the

3    houses and he was, like, oh, I can go back here.  So we came

4    out and we drove all the way around, came over this bridge, and

5    we went to this back area.  And Mr. Ledbetter parked back

6    there, and we all got out.

7         And he's still on the phone with the lady, and we had

8    this -- and we -- we stop at the house right beside the house

9    that we were about to go into.

10        So we start -- all of us start, like, running.  It was

11   kind of bright right there, and it was a shadow so we ran

12   across one at a time until we got to Rodriccos' house on the

13   side of his garage.  So --

14   Q.   Who all is running to the side of the garage?

15   A.   Chris Harris, Rashad Liston, Robert Wilson, myself Earl

16   Williams, and Ledbetter in the back.  So --

17   Q.   Is Ledbetter still on the phone, or does he get off the

18   phone at one point?

19   A.   No, he's still on the phone with her right at that

20   point.

21   Q.   Okay.

22   A.   So the lady say, well, hold on.  So he hold -- he holds

23   on.  Then when she clicked it back over, she say he's coming

24   down the street right now.  I'm going to have to get off of

25   here.

TRIAL ONE - VOL. 25 -   5015

1    Q.    Click over, what do you mean?

2    A.    Like, when somebody call you and you press over.

3    Q.    Okay.

4    A.    Yes, sir.

5    Q.    All right.  And she said what?

6    A.    She told him that her husband was up -- said he was

7    coming up the street right now.  So right then we said that's

8    even better.  We just walk in the house.

9    Q.    Did he tell her that?

10    A.    No.  She didn't have no clue about what was going on.

11    Q.    All right.  So does Mr. Ledbetter relay that information

12    to you?

13    A.    He's right there beside of me.  We can almost hear her

14    talking on the phone.

15    Q.    What happens next?

16    A.    The man pull up and get his kids out the car.  As soon

17    as he get out of sight, we come around the building.  He almost

18    to the door.  As soon as he get to the door and as soon as the

19    key come in and it open, O-Dog -- Chris Harris, Rashad Liston

20    and RJ, they run first and the screen door slam behind them.

21    And me and Ledbetter, we did came around the side of the

22    garage; I'm before Ledbetter.  And so we take -- we take off

23    running all the way to the front door and not come in.  And

24    Mr. Ledbetter stop at the front door, he don't come into that,

25    and I seen him struggling with the man.

TRIAL ONE - VOL. 25 - 5016

1    Q.   Who do you see struggling with the man?

2    A.   Chris Harris, Robert Wilson, Rashad Liston.

3    Q.   What do you do?

4    A.   I went upstairs.

5         I get upstairs, there's a lady up there.  She has the

6    phone in her hand, she has a baby right there.  I told her put

7    the baby under the bed.  I grab the phone.  She's on the phone

8    with the police.  I close it.  I'm asking her for the money.

9    Q.   Let me ask you this:

10        You said she was on the phone with the police?

11   A.   Yes, sir.

12   Q.   How do you know that?

13   A.   Because I hear her talking to them.  She telling them,

14   she giving them the address.

15   Q.   Okay.  Go ahead.

16   A.   And she's, like, it's no money.  It's no money.  Ain't

17   no money up here.  I said, there's money up here.  I said,

18   please, just give me the money.  We just keeping it real

19   simple.  I said -- and I begged the lady.  And then we hear

20   some shooting, dun, dun, dun, dun, dun.

21        So as soon as we heard the shooting, she just, like,

22   here.  She went under the bed and she grabbed this bag, gave it

23   to me.  I didn't know what to do, though.  I was scared to go

24   down the steps because they didn't see me come behind him.

25   Q.   Why were you afraid to go down the steps?

1   A.   Because if they see me coming down the stairs, they

2   going to shoot me because they didn't see me come behind him.

3        So anyway, I come down the stairs.  It's the dog

4   barking, the back door open.  And I go out the front door.  I

5   see a couple people out there running around the side of the

6   house.

7   Q.   Let me ask you this:

8        When you went down the stairs, what did you see?

9   A.   Nothing.  I just went straight to the landing.  I didn't

10  go in none of the rooms.

11  Q.   Okay.

12  A.   I went straight to the landing.  I was going to go out

13  the back, but that dog barking back there and it was big and I

14  didn't know how they got around it so I just opened the front

15  door, and I went out the front door.  And I run around the same

16  way we came in, and they taking off.  They almost gone.  And

17  I'm, like, B.  And he's still moving.  I'm, like, B.

18       So he stop and I get in the front seat and he's, like,

19  what the fuck you calling my name for like that?

20       So we get around that little bend, we about to go over

21  this bridge.  I'm, like, I got her phone.  Mr. Ledbetter take

22  the phone and throw it over, throw it, like, his way out his

23  window that way, like, over the car towards this, like, bridge.

24  Like, I don't know if there's water down there or not.  So we

25  all duck down in the car.  The police is like a police station.

TRIAL ONE – VOL. 25 –  5018

1   It's, like, a thousand police cars coming, and they just

2   letting us go right between all of them.

3   Q.    What do you mean by that?  Tell us what you mean by

4   that.

5   A.    We driving between a thousand police cars.  Like, all

6   the sirens is on and the cars are just moving.

7   Q.    Where are they moving towards?

8   A.    They moving towards the way we just came from.

9   Q.    Did you see the cruisers?

10  A.    Yeah.  It might have been, like, 30 of them.

11  Q.    All right.  Where are they?

12  A.    They right beside us as we go past them, and they coming

13  out some of the parking lot as we going past them and

14  everything.

15  Q.    Are they going the same way you're going?

16  A.    No, they going the opposite direction.

17  Q.    Okay.  I want to show you something.  I want to show you

18  Government's Exhibit 160-48.04.  I think we're starting at

19  20:54:12.  Just look at this for a second, Mr. Williams.

20        Did you see that car go by?

21  A.    Yes, sir.

22  Q.    All right.  Who was in that car?

23  A.    Myself Earl Williams, Chris Harris, Robert Ledbetter,

24  Robert Wilson, Rashad Liston.

25  Q.    Okay.  Where are you heading to now?  The car is

TRIAL ONE - VOL. 25 -   5019

1   driving.  Where are you going?

2    A.   We flying just hoping to get past all these police.  We

3   make it to the freeway, we get off at the Gahanna exit.  We sit

4   there and wait.

5         MR. DEVILLERS:  Your Honor, actually, let me -- I'm

6   sorry.  Mr. Williams, I'm going to have you kind of look at it

7   again.  May I publish this, Your Honor.

8         THE COURT:  Yes, you may.  It's been published

9   already.

10        MR. DEVILLERS:  160-48.04, and could you please start

11  again at 20:54:16?  Or 20:54:05 is fine.

12        Okay.  Stop.

13    BY MR. DEVILLERS:

14    Q.   Do you see that car on the left of the screen,

15  Mr. Williams?  Did you see that car on the left of the screen?

16    A.   That went past?  Yes, sir.

17        MR. DEVILLERS:  Can you go back again?

18        Okay.  Stop there.

19    BY MR. DEVILLERS:

20    Q.   Do you see the car to the left?

21    A.   Yes, sir.

22    Q.   All right.  Keep watching it, please.

23        Does that appear to be the rental car that you were in

24  the evening of the Williams' homicide?

25    A.   Yes, sir.

1          MR. DEVILLERS:  And, Your Honor, for the record we

2   stopped at 20:54:25 of this exhibit.

3          THE COURT:  All right.

4      BY MR. DEVILLERS:

5   Q.   Okay.  Where do you go to next?

6   A.   We get off at the Gahanna exit.  B is on the phone.  He

7   done called Crystal, he done called Tiffany.  He's calling both

8   of them telling them to meet him.

9   Q.   Let me ask you this:

10         Where is Tiffany from?  Do you know where she's from?

11  A.   Akron.

12  Q.   Continue.

13  A.   So we get off at the Gahanna exit, and we turn right

14  there at the gas station where the Frischs Big Boy is at.  Then

15  we make a left, like, diagonal from it.  It's, like, a big

16  parking lot, a big building right behind where we at.  And we

17  sit for Tiffany come.  She comes with the van.  He got a

18  full-sized van.

19  Q.   Describe the van.

20  A.   It's, like, red.  It's a conversion van.

21         So we all get out the car, and we get in the van.  And

22  we sitting there --

23  Q.   Where is Tiffany?

24  A.   She's not there yet.

25  Q.   Okay.

TRIAL ONE – VOL. 25 – 5021

1   A.   So we sitting there so B is like --

2   Q.   Wait.  Wait.  Explain it to me.  You drive there and

3   what?

4   A.   We drive there, we sitting there in the car.

5   Q.   The rental car?

6   A.   Right.

7   Q.   Okay.  What happens next?

8   A.   Tiffany come.

9   Q.   All right.

10  A.   We sit and wait on her.  Then when she come, we get in

11  the van.

12  Q.   Okay.

13  A.   And we get in the van.  B get out of the car and get out

14  the van and give us a bag of clothes.  We all change out.

15  Q.   Where are you changing?

16  A.   Inside the van.

17  Q.   Where is Tiffany at this point?

18  A.   She's outside in the car.

19  Q.   In what car?

20  A.   In the car that we came in.

21  Q.   The rental car?

22  A.   Yes, sir.

23  Q.   Does she stay there?

24  A.   Yes, sir.

25  Q.   Okay.  What happens next?

1   A.   So as we changing the clothes and stuff, B is, like, who

2   was doing the shooting in there?  Who was doing the shooting?

3   So both of the young boys, Rashad Liston on one side, O-Dog in

4   the middle and RJ on the other side, and they just both look at

5   O-Dog in the middle.  And B, like, give me the gun.  Give me

6   the gun.

7   Q.   Who's saying give me the gun?

8   A.   Brandon Ledbetter.  And O-Dog, like, I just got this

9   gun.  I just brought this gun.  He was, like, I'll get you

10  another gun.  He was, like, give me the gun.  So he gave B --

11  Q.   Does he get the gun?

12  A.   He gave B the gun.

13       And then B took the bag of clothes and stuff, and by

14  that time Crystal was there.

15  Q.   Okay.  Wait a second.  How long were you in the van for?

16  A.   We was in the van sitting for a little second waiting

17  for Crystal to get there.

18  Q.   Okay.  Where's Tiffany now?

19  A.   She gone.

20  Q.   Okay.  How did she leave?

21  A.   She left in the car.

22  Q.   So you said you were in the van, you said for a second.

23  Do you mean literally you were there for a second?  How long

24  were you in the van for is my question?

25  A.   We sitting in that van at least -- we first got there,

TRIAL ONE – VOL. 25 – 5023

1    waited a few minutes for Tiffany to get there.

2         Okay.  When she got there, we change -- Brandon give us

3    the clothes.  We change in the clothes and stuff like that.  B

4    talking to Tiffany outside the car.

5         Next thing I know B getting in the van, and he's asking

6    about the stuff about -- asking about what happened in there.

7    And then next thing I know that's when after a little bit,

8    Crystal pulled up.

9    Q.   Okay.  And what happened with Crystal?

10   A.   B give her the bag.

11   Q.   Bag of what?

12   A.   With the clothes and stuff in it.

13   Q.   The clothes that you wore during the robbery?

14   A.   Yes, sir.

15   Q.   All right.

16   A.   And we took off.  We went on, and we headed down the

17   freeway and headed to Miss Paulette's house.

18   Q.   What happened when you got to Miss Paulette's house?

19   A.   We got there, the lady answered the phone -- I mean, his

20   auntie answered the door.  We took the money out, we split it.

21   B is, like, we got some little extra ends.  He was, like, this

22   is for Tiff and this is for Crystal.  So we took the little

23   money.

24   Q.   How much was in the bag?

25   A.   It might have been, like, 60,000.  We got, like, 7500 a

1    piece.

2    Q.    Okay.  Was there anything else in the bag?

3    A.    There was marijuana in there.

4    Q.    Do you remember how much marijuana?

5    A.    Maybe, like, a quarter pound.

6    Q.    Okay.  Was it split evenly?

7    A.    Yes, sir.

8    Q.    The money?

9    A.    Except the loose ends.  B said this is for Tiff and for

10   Crystal.

11   Q.    Do you remember about how much you got?

12   A.    7500.

13   Q.    Did anybody else take anything else from the scene?

14   A.    RJ.

15   Q.    What did he take?

16   A.    He took the man's jewelry, his necklace with an emblem

17   on it with his -- engraved with his initials on it on the back

18   of it.

19   Q.    What do you mean an amulet?

20   A.    I think, like, a cross.

21   Q.    Was there any discussion about that cross?

22   A.    Mr. Ledbetter came to me, like, I want you to kill RJ.

23   I said --

24   Q.    Let me ask you this:

25         He tells you that in Paulette's house?

TRIAL ONE - VOL. 25 -   5025

1   A.   No.  He tells me this, like, within that week it

2   happened.

3   Q.   Okay.  I'm not talking -- while you're in the house, is

4   there any discussion about this chain?

5   A.   No, not at that point, no, sir.

6   Q.   How do you know that he takes it from the house, from

7   the scene?

8   A.   Mr. Ledbetter tell me.

9   Q.   Did you ever see it?

10   A.   No, sir.

11   Q.   What did Mr. Ledbetter say to you?

12   A.   He said that RJ took some jewelry from there and it's

13   got dude's initials in it, and he's wearing it.  And he said I

14   had to make him give it back to me.  And then he said he was

15   bragging about it.  Mr. Ledbetter asked me to kill RJ.  And I

16   told him I wasn't going to do it because that's his cousin, and

17   I don't want him to come back to me once his feelings get to

18   haunting him about me killing his cousin, something like that.

19   Q.   RJ is whose cousin?

20   A.   Mr. Ledbetter's cousin.

21   Q.   Did you find out what happened to Mr. Davis?

22   A.   Mr. Davis?

23   Q.   I'm sorry.  Did you find out what happened to

24   Mr. Williams, Rodriccos Williams?

25   A.   They end up telling me that the man passed away.

TRIAL ONE – VOL. 25 – 5026

1  Q.  Chris Harris, did he end up eventually getting arrested

2  for something different?

3  A.  Yes.  He went with a guy that we know from the

4  neighborhood's house, and they robbed his house and raped his

5  girl and took some money.

6  Q.  Do you know who all went on that robbery?

7  A.  It was O-Dog, Chris Harris, Anthony Turner, Troy

8  Patterson.

9  Q.  Does Troy have a nickname?

10  A.  40.

11  Q.  You ever do anything with 40?

12  A.  No, sir.

13  Q.  Okay.  Continue.

14  A.  Mark got passed away and Andre Brown.

15  Q.  Eventually after the Paco robbery, did you meet up again

16  with Andre Brown?

17  A.  He came to the barber shop with Mark a couple times, and

18  I didn't know who he was.  So Mark come to me, like, man, I got

19  something I want to say to you, man.  He said don't be mad at

20  me.  He's, like, Paco done came here a couple times, and you

21  didn't recognize him.  He said, but we need you.  He said,

22  O-Dog calling on you.  He say O-Dog need you to help him, man,

23  hit these licks so he can get him a lawyer to get up out of the

24  situation he in.

25  Q.  Did you agree to do that?

TRIAL ONE – VOL. 25 – 5027

1    A.    Maybe it took me a few days.

2    Q.    Did you talk to anybody else about that?

3    A.    I talked to Brandon Ledbetter, Joseph Saunders about it.

4    Q.    Who's Joseph Sanders?

5    A.    He's related to B.  He's a cousin of B.  He's a great

6    friend -- was a great friend of mines.

7    Q.    All right.  So was there a man with you and Brandon and

8    Paco?  Or tell us what happened next.

9    A.    Well, I approached Brandon about the situation, and

10   Brandon told me that he wanted him dead.

11   Q.    Let me ask you this:

12         Before that did you do anything with Brandon and Paco as

13   far as robberies?

14   A.    Yes, sir.

15   Q.    Tell us what happened.

16   A.    It was this guy named Denny that B was real tight with.

17   They ran a lot of drugs together.  B sent us up to his house

18   off of Africa Road and tried to get us to run in there, but we

19   was -- we was too scared to because of the area.

20   Q.    Why?  What's wrong -- why not the area?

21   A.    It was, like, too far to get away to any, like,

22   freeways.  It was by Alum Creek, like, no more than, like,

23   three to five minutes from the dam.

24   Q.    Any other robberies?

25   A.    He have -- they had -- B had his money in with these

TRIAL ONE - VOL. 25 - 5028

1    guys on this little club, and the guy Denny, his nephew was

2    this dude named Little Dave.  And B was, like, well, when

3    Little Dave come out with this money, I want you to get it.

4          So we downtown at this club called the Red Zone but it

5    was called the Karma at that time.  And we end up chasing

6    Little Dave trying to get the money.

7    Q.   Who's we?

8    A.   Me, Paco, Mark, and Dre.

9    Q.   A guy named Dre?

10   A.   Yeah.

11   Q.   Do you know Dre's real name?

12   A.   Andre Rafford.

13   Q.   Are you related to Andre Rafford?

14   A.   That's my sister's brother.

15   Q.   Explain that.  Sister's brother?  Would that make him

16   your brother?

17   A.   No, sir.  They ain't got the same dad.

18   Q.   Had you done during that time period any other robberies

19   with Paco or Mark?

20   A.   Me, Paco, Mark, Ledbetter, we go in this dude named

21   Kevin Fowler's home that's out south.  And we in there for a

22   couple hours tearing it apart.  Dude got shot up.

23   Q.   Stop you there.  Where are you going to?

24   A.   We inside out south.

25   Q.   Who goes inside the house?

TRIAL ONE – VOL. 25 –  5029

1   A.   Andre Brown, me, Brandon Ledbetter, Mark and Dre.

2   Q.   Does Brandon go inside the house?

3   A.   Yes, sir.

4   Q.   What happens when he gets inside of the house?

5   A.   We couldn't find nothing, but the guys wanted the rims.

6   Q.   What are rims?

7   A.   Things that go on a car.  So they took the rims off the

8   car, and they put them in Mr. Ledbetter's van.

9   Q.   You said someone got shot?

10  A.   Kevin Fowler got shot.  He was in the hospital.  And

11  Paco, I guess, knew the guy.  And, actually, when we went in

12  his house --

13  Q.   Let me stop you there.  Besides you guys that went in,

14  was Mr. Fowler in the house?

15  A.   No, sir.

16  Q.   So did anyone get shot that night?

17  A.   No, sir.

18  Q.   Okay.  Continue.

19  A.   So I didn't know whose house it was until I got inside

20  the house, and I got in the garage and I seen the car.  It was

21  my guy Luke's half brother's.  But by that time I couldn't do

22  nothing because we was already in.

23  Q.   Did you find anything in the house?  Did you get

24  anything out of it?

25  A.   They took the rims.

TRIAL ONE – VOL. 25 –   5030

1    Q.   Other than that?

2    A.   I didn't take nothing.

3    Q.   During this time period after O-Dog gets locked up, are

4    you doing anything with RJ or Buck?

5    A.   Yeah.  We -- B, like, got his own little missions, you

6    know what I'm saying?

7    Q.   No, I don't know what you're saying.  Explain what

8    you're saying.

9    A.   He is showing us, like, robberies.

10   Q.   Was Buck or RJ involved in some of those robberies?

11   A.   One time we was chasing this guy named Maniac.

12   Q.   Okay.

13   A.   It was me and Buck, RJ, Joseph Saunders, Ledbetter

14   and -- what was dude's name?  I can't remember the other guy's

15   name.  We was in two different cars.

16   Q.   What do you mean chasing him?

17   A.   Dude was at the club, and Joseph Saunders knew the girl.

18   And B had knew this dude and had been wanting to get at him for

19   a long time but we couldn't find a way to him, but Joseph had

20   inside connect with this girl.  And the girl had happened to

21   call Joseph, but she's not knowing what Joseph on.  And we

22   happen to all be together that night, and we end up chasing

23   this dude up in Cross Roads apartment off of Cassady and --

24   Q.   Why were you chasing him?  What were you trying to do to

25   this guy?

1   A.   They said he had a bag full of money on him and was

2   showing off.

3   Q.   Same question.  What were you trying to do to the guy?

4   A.   We was trying to rob him.

5   Q.   All right.  Were you successful?

6   A.   No, sir.

7   Q.   Do you know a person by the name of JP?

8   A.   Jermaine Patterson?

9   Q.   What does Jermaine Patterson do for a living?  Or what

10  did he do for a living?

11  A.   Sold drugs.

12  Q.   Was Mr. Patterson associated with Mr. Ledbetter in any

13  way?

14  A.   A right-hand man.  They grew up together since probably,

15  like, third grade, somewhere around there with each other.

16  Mr. Patterson a little bit older, but we always be tight with

17  DaJuan Patterson that got killed, JP's brother.  That's how I

18  come about meeting Mr. Ledbetter.

19  Q.   Do you know where -- did Mr. Patterson have some houses?

20  A.   Yes, sir.

21  Q.   And what goes on in those houses?

22  A.   Drugs.

23  Q.   All right.  Is there a time where you were with Paco and

24  he talks about those houses?

25  A.   Yes.  Paco takes me to an apartment up north, which is

TRIAL ONE – VOL. 25 – 5032

1    JP's apartment that I didn't know.  Then he take me to JP's

2    house.

3    Q.   Why is he taking you to these places?

4    A.   These are places that he want to rob.  And as he going

5    to them, he don't know that I really kick it with JP.  So as he

6    going to them, it's like, wow, so --

7    Q.   Do you tell him that you know JP?

8    A.   No.

9         So then we go to Mr. Ledbetter's house off of Stelzer,

10   and they wanted to rob it.

11   Q.   Okay.  What do you mean his house off of Stelzer?

12   A.   Where him and Tiffany lay at with his baby.

13   Q.   What did you do with that information?

14   A.   I took it to Ledbetter.

15   Q.   What did you tell him?

16   A.   I told him exactly that they was going to his house and

17   they wanted to rob him, and I stopped them from doing it.  And

18   that's when Ledbetter came to me and was, like, I want them

19   dead.

20   Q.   Did you agree to do that?

21   A.   Immediately because I loved B like he was my brother.

22   His family was my family.

23   Q.   Okay.  Were you going to get paid to do it?

24   A.   Yes.

25   Q.   How much were you going to get paid to do it?

1    A.    Fifty on each head that's there.  Fifty thousand each

2    head.  Whatever it took.  I loved this man like no other.

3    Q.    What happened?  Did you get anyone else involved with

4    you to do it?

5    A.    Andre Rafford.

6    Q.    Mr. Williams, will you look at me?

7          Was there a night when -- tell us what happened.  Tell

8    us what happened the night of the murders.

9    A.    B had presented it to me.  I thought about it, and I

10   told him I was going to do it accordingly when I felt

11   comfortable doing it.  Andre Brown was calling me all day.

12   Hey, man, I got this lick for you, man, because I had been in

13   the streets with him for a few weeks.

14   Q.    I can't hear you.

15   A.    We'd been in the streets a few weeks together.

16   Q.    Who's we?

17   A.    Me, Andre Brown, Andre Rafford and Mark.

18   Q.    Okay.

19   A.    And I had told him, like, man, I'm tired.  I got a

20   family.  I go to work.  I can't be out all night with y'all

21   when we're not getting no money.  Just call me when you really

22   got something.

23         So he told me he had something.  So he kept calling me,

24   kept calling me.  So then Mark called me, the guy that stayed

25   with Paco, Andre Brown.  And he was, like, man, remember them

TRIAL ONE – VOL. 25 – 5034

1   rims you asked me about, he said, like the ones we got that

2   night?  He said I got a pair of them.

3       Q.   What are you talking about?

4       A.   Because I told him I wanted to buy a pair of them.  So I

5   was, like, okay.  I'll see you all tonight when I get off work,

6   and I'm gonna come over there.

7       Q.   And where are you working at this point?

8       A.   Luke's Barber Shop.

9       Q.   Continue.

10      A.   So I get home, get dressed.  I go over there, and it's

11  just Mark there.  I'm, like, it's me and Andre Rafford.  And

12  they had a house where you put your guns on the table so we put

13  our guns on the table.  And I'm, like, well, show me the rims.

14  He's, like, I ain't got the keys.

15      Q.   Let me ask you this:

16           Before you went there -- who did you go there with?

17      A.   I go there with Andre Rafford.

18      Q.   Before you got there did you talk to Andre Rafford about

19  the plan?

20      A.   Yes, sir.

21      Q.   What did you tell him?

22      A.   I told him B about to pay us this money to kill -- to

23  kill Mark and Paco.

24      Q.   Was the plan to kill them that night?

25      A.   If we get a shot at it, yes.

1    Q.    Okay.  Continue.

2    A.    So we get there, we watch some sports.  People keep

3    calling on Mark's phone, he go in the other rooms whispering,

4    come back out.

5          Then finally Andre get there.  He come in with a

6    little -- a little dude that I knew that used to run with my

7    brother, Little Chad.

8    Q.    Do you know this guy well?

9    A.    No.  He seen me, like, twice.  It's my brother's friend.

10   Q.    Okay.

11   A.    And so at that time I'm thinking in my mind it's iffy.

12   Like, know what, this ain't gonna be a good night to do this.

13   So him and Mark get up, and they keep going to room to room to

14   room and whispering.

15   Q.    Who is he?

16   A.    Andre Brown and Mark.  So I'm not thinking nothing of it

17   because I been in the street with these guys two or three

18   weeks.  So Paco, like, he never put his gun on the table when

19   he came in either like he usually do.

20         So Paco, like, come on, let me show you these rims.  So

21   I grab my gun off the table, I put it on my side and just me

22   and him go.  So as we walking to the garage --

23   Q.    Let me ask you this:

24         Are you inside a house at this point?

25   A.    Yes, sir, we inside the house.

TRIAL ONE – VOL. 25 –   5036

1    Q.   Do you exit the house?

2    A.   Yeah, we exit the back of the house.

3    Q.   Okay.

4    A.   There's only one way in, one way out.  They got every

5    house boarded up in the house, every room, every window.

6    Q.   All right.

7    A.   So we go out the back door, I close the screen door.

8    Paco almost to the garage, and I hear the screen door slam.  So

9    I look back.  And when I looked back, I see Chad and Mark with

10   guns out.  So I get to reaching for mines because it's dark

11   back there, and these guys got guns.  People wanted to kill

12   them already.  You understand what I'm saying?  So it was a

13   scary situation being around it, especially where they live at.

14        So as I'm reaching for my gun, I turn around, Paco get

15   to shooting at me, and I'm shooting at him.  And I just

16   remember passing out.  Well, not pass out.  I'm, like, my

17   vision like blurred, and I see Little Chad run past and he's

18   shooting backwards and I see somebody -- I can't see the

19   person's face because they so blurry, and they shooting and

20   just seeing a whole bunch of chi, chi, chi, chi, chi, chi, like

21   a thousand shots.

22   Q.   Where are you?

23   A.   I'm just standing there.  I guess I've been hit, but I

24   don't know I've been hit because I can't move.  It's just like

25   a movie like I'm just stuck.  I can't do nothing.  It's like --

TRIAL ONE - VOL. 25 - 5037

1   so I wake up, and I'm laying there --

2      Q.   Laying where?

3      A.   In the backyard.

4      Q.   Okay.

5      A.   Andre Brown on one side, Mark on the other side.

6      Q.   Where is Andre Brown?  Is he standing up?  What is he

7   doing?

8      A.   No.  He's laying down.

9      Q.   Okay.

10      A.   And Mark is laying down.

11         So I stand up, and I can't remember nothing.  And I'm,

12   like, Andre.  I'm, like, Mark.  I'm, like, Andre.  I'm, like,

13   Mark.

14         Then I hear something moving, and I shoot down.  I had

15   the gun in my hand, and I shot Mark in, like, the bottom of his

16   torso.

17         So at that time I'm, like, my car right there, I'm gonna

18   get in my car.  Like, it's no further than you in the back.

19   But I walk out front, and I get to calling for help.  Help.

20   Somebody help us.  Somebody help us.

21         Paco get up.  Boom, boom, boom, boom.  You bitch-ass

22   nigger.  Boom, boom, boom, boom, boom, boom, boom.  And he

23   shoot my arm off.  So I'm trying to run, but I can't understand

24   why I can't run.

25         And what Paco doing, he going over at an angle and he go

TRIAL ONE – VOL. 25 – 5038

1    in the house.  So I go behind -- I make it across the street.

2    Q.   Let me ask you this:

3         At this time how many times are you shot, do you know?

4    A.   I know I'm shot in the arm.  I don't know I'm shot in

5    the stomach because I can't understand why I can't run.

6    Q.   How many guns do you have on you?

7    A.   I got two.

8    Q.   All right.

9    A.   Only one was used, though.  The other one was fully

10   loaded with the safety on still when they took it -- when they

11   found it.

12   Q.   Okay.  Keep going.  So now are you on the side of the

13   house, front of the house?  Where are you?

14   A.   I went across the street from the front of the house,

15   and then I got in the alley.  And when I get in the alley, I

16   see Andre Brown coming out with an AK, and he's running back

17   and forth to the body and he got a phone that was in his hand,

18   and he's taking something off the bodies.

19        So my main thing is trying to get away.  And then when I

20   make it to Cassady I'm, like, it's too far.  I knew there was a

21   fire station, like, two streets over and I'm, like, I ain't

22   gonna make it.  So I go right behind the store, and there's a

23   trailer back there and it's dark.

24        So when I'm sitting on the trailer, I'm taking my

25   clothes off trying to figure out why I couldn't run, but I

TRIAL ONE - VOL. 25 - 5039

1  can't find it.  But I wrapped my arm up and took the gun and

2  put it in my pocket.  So I look up, and there go Paco with the

3  AK in the alley.  So he don't see me so I'm slowly creeping,

4  and I get in the trash can.  I got this other gun.  And I'm,

5  like, if I shoot this guy and I miss him, he got this K, he

6  gonna kill me.  But he don't see me so he walk back to the

7  building.  And I watch him walk all the way back to the

8  building to the back of the house.  And then I seen him with

9  the phones, and he went back and forth, back and forth out the

10  back to the bodies.

11      So I took off my clothes, and I'm looking for this

12  bullet shot.  I can't find it.  Then finally my fingers go in

13  the back, like, towards the back of my back, and it's just like

14  my whole body just went on fire.

15      By that time I was ass -- I was naked.  And I got out,

16  dropped everything right there.  I didn't care no more.  And I

17  made it to the street and I'm, like, man, I ain't gonna make it

18  to that fire station.  And I just laid there.  But in the

19  process of me getting out that trash can looking over to see if

20  I see Paco anywhere, he done laid in the middle of the street

21  in the front of the house.  And so I just -- so that made me

22  feel a little safe to lay in the middle of the street and cars

23  just going past me for, like, about three, four, maybe five

24  minutes.

25      So this lady come past, older lady, and she's, like,

1    it's a guy in the middle of the road, he's naked.  I don't know

2    what's wrong with them, but he's naked.

3        The emergency squad come.  They sitting right there.

4    And about three minutes later the police come, put both guns on

5    me.  He asked me what happened.  And he's, like, where did the

6    shooting come from?  Where did the shooting come from?  I said

7    right around the corner.  Guys just shot me over there.

8        And the next thing I remember is just waking up in the

9    emergency squad on the floor and them shocking me, driving

10   trying to make it to the emergency room.

11   Q.   Did you go to the hospital?

12   A.   I go to the hospital.  I'm in there.

13   Q.   Do you know how long you're in the hospital for?

14   A.   I can't remember how long I was in there.  I was in and

15   out on that medication.  The police wouldn't let nobody see me

16   because I wouldn't say nothing had happened back there.  So I

17   called my lawyer Mark Collins and --

18   Q.   At the hospital?

19   A.   At the hospital.  They made me take the -- and Mark, I

20   guess, made it where they unarrested me so in the process

21   Mr. Ledbetter came to see me.

22   Q.   Were you still in the hospital?

23   A.   I was still in the hospital.

24   Q.   What kind of shape were you in?

25   A.   I was -- I was 179 pounds before I got shot, all muscle.

TRIAL ONE – VOL. 25 – 5041

1  I lost half my small intestine, half my large intestine, half

2  my pancreas, half my liver.  Had a disc tooken out of my back

3  and a metal plate put in my arm with a whole reconstructive

4  surgery on my arm that night.  I dropped down to, like,

5  37 pounds, and my whole face looked like bones.

6    Q.   You don't remember how long you were in the hospital

7  for?

8    A.   Maybe a month.  Then I kept going back and forth, back

9  and forth in the county jail.

10   Q.   So you were in the hospital for maybe a month.  Do you

11 get out of the hospital?

12   A.   No.  They was going to release me, but then the police

13 came.

14   Q.   Did you get charged with something?

15   A.   Did I get charged?

16   Q.   Yeah.

17   A.   Yes, sir.

18   Q.   What are you charged with?

19   A.   Well, they had to release me first, and then they

20 charged me with murder, aggravated murder, aggravated murder,

21 felonious assault, attempted murder and disuse of a firearm in

22 a habitation area.

23   Q.   When you left the hospital, where did you go to?

24   A.   To Franklin County.

25   Q.   To the jail?

TRIAL ONE - VOL. 25 -  5042

1    A.   Yes, sir.

2         THE COURT:  Mr. DeVillers, is this a convenient place

3    for us to take our morning recess?

4         MR. DEVILLERS:  It would be, Your Honor.

5         THE COURT:  All right.  Ladies and gentlemen, it is

6    10:56.  We'll stand in recess until 11:15.

7    (Jury out at 10:56 a.m.)

8    (Recess taken from 10:56 a.m. to 11:21 a.m.)

9         (Jury in at 11:21 a.m.)

10        THE COURT:  Mr. DeVillers, please continue, sir.

11        MR. DEVILLERS:  Thank you, Your Honor.

12   BY MR. DEVILLERS:

13   Q.   Okay.  Mr. Williams, I think you were testifying before

14   that you were in the hospital.  My question to you is before

15   you went to the hospital in the Franklin County jail, did you

16   get any visitors other than from the police?

17   A.   Yes, sir.

18   Q.   Did Mr. Ledbetter visit you?

19   A.   Mr. Ledbetter visited me, and he was asking me about the

20   night, like, he said what happened?  He said how did you not

21   get them?  How did you not get Paco?  Andre Brown?  And he had

22   a little -- like, a little touch recorder in his hand, but he

23   didn't think I seen it.

24   Q.   What's a touch recorder?

25   A.   It's like a digital little recorder that will record

1    what you saying so I didn't really say nothing to him.

2    Q.    Have you seen him with that recorder before?

3    A.    Yes.  He came to me before all of this happened.  We was

4    in the barber shop, and these dudes named Little Hollywood and

5    Mario had came in the barber shop, and B had ran out to the

6    van, like, hold on with the cape still on him.

7    Q.    What do you mean the cape still on him?

8    A.    The barber smock.

9    Q.    Okay.

10   A.    And he had a gun.  You could see the butt coming out of

11   it.  And he pointing it -- he said turn the chair over there

12   towards them.

13   Q.    Towards who?

14   A.    Towards Mario and Little Hollywood.

15   Q.    Let me ask you this:

16         Is this before or after the Rodriccos Williams murder?

17   A.    This is after.

18   Q.    Okay.  Continue.

19   A.    So I point the chair toward them and I really don't

20   understand why because it's the dude on the barber shop, my guy

21   Luke, it's his cousins.  So I didn't understand it.

22         So after they leave out and I'm done cutting B's hair,

23   we go out to the van and he got this little recorder in his

24   hand.  And he was, like, man, that's Rodriccos' family.  So

25   I'm, like, Rodriccos?  Who's Rodriccos?  And then he explain it

TRIAL ONE – VOL. 25 –  5044

1   to me, like, that night.  So I'm like hmm, okay.  So he's,

2   like, I'm going to get Buck and RJ to kill them.  And that

3   was --

4   Q.   Do you know why he brought that recorder in there?

5   A.   I don't know.  Like -- like, previously before that,

6   before that -- before that day, he had came to me and I was out

7   back of the barber shop and I was doing something to my car,

8   and he was, like -- he was, like, man, the detectives is all

9   over me about that stuff that happened out east.  So I'm, like,

10  yeah.  I was, like, well, I ain't trying to talk about that, B.

11  So he tried to talk to me some more about it, and I wouldn't

12  talk to him.  And I said listen, man, somebody tried to accuse

13  me before and wore a wire on me for something I ain't do, and

14  I'm not going to let you do it, and I hope you understand this.

15       And that's the conversation we had.

16       But he come and see me again in the hospital.  But when

17  he come and see me again in the hospital, he think I'm asleep,

18  but I really just pumped the pump.  So my eyes was closed, but

19  I was awoke.  And he was, like -- and I heard RJ and Buck in

20  there.  He was, like, we can't get him right now.  The police

21  across the hallway.  He was, like, just choke him out.  I'm

22  like -- and I thought I was dreaming.  I thought I was

23  dreaming.  Then I got into -- like, months later, I'm in the

24  tank with RJ.

25  Q.   Months after the hospital?

TRIAL ONE - VOL. 25 -   5045

1     A.    Yes, sir.

2     Q.    Okay.  You're in the tank.  You're in the Franklin

3     County jail?

4     A.    Yeah.  And I'm on the west wing.  And I can hear RJ

5     yelling, he bragging, he yelling, he yelling.  He -- I mean, he

6     screaming about everything we ever did in the streets with the

7     D-Block word for word, got O-Dog's name in it, Buck's name in

8     it.  He telling the whole story like -- and we ain't never been

9     charged with none of this stuff so I --

10    Q.    What stuff was he talking about?

11    A.    He was talking about Rodriccos' murder word for word,

12    step for step, and a whole bunch of other stuff.  So I yelled

13    to him, RJ, shut the fuck up.  I love my kids.

14          So the whole floor get quiet.  RJ was terrorizing them

15    guys around that corner at the time before so when it got

16    quiet, everybody got quiet.

17          So eventually I end up coming in the tank with RJ.  Our

18    little cell got split up.  So this dude named Martinez come to

19    me.  He's, like, man, listen, man, Martinez out there -- he

20    talking about Martinez --

21          MR. GATTERDAM:  Objection.

22          THE COURT:  Basis?

23          MR. GATTERDAM:  Hearsay.

24          THE COURT:  Well, your objection may be premature and

25    so it's overruled because he hasn't said anything about any

1   conversations between he and one Mr. Martinez.  He just said

2   they did time together.  So your objection is overruled.  You

3   may reimpose it at the appropriate time.

4       BY MR. DEVILLERS:

5       Q.   Mr. Williams, I don't want you to tell me what

6   Mr. Martinez said, but as a result of talking to Mr. Martinez,

7   did you have a conversation with Rashad -- or with Robert

8   Wilson?

9       A.   I wake RJ up.  He's excited.  He's happy to see me.

10  I'm, like, no, I'm coming to yell at you.  So we go in this

11  little holding thing.  I said, listen, man.  I know what you

12  been talking about around here.  That's why I yelled at you the

13  first time.  But it's so much that you out here that you don't

14  understand.  I understand what you facing, but you can't be

15  talking about things that you ain't facing.

16      Q.   Let me stop you there.  What's he facing at this time in

17  the Franklin County jail?

18      A.   He's locked up for murder.

19      Q.   Okay.  Continue.

20      A.   He gets mad at me.  And I break it down what I heard

21  somebody else say.  And he wanted me to point him out to him so

22  I wouldn't so for that day I was somebody else that said the

23  same thing to me.

24      Q.   What is it that you told RJ?

25      A.   I told RJ, I said, man, you got to quit talking, man,

TRIAL ONE - VOL. 25 - 5047

1  because we ain't never been charged.  So, you know, we sitting

2  in there a couple days, we get to talking.  And he was, like,

3  yeah, he said, B going to kill Nutty for me; he ain't coming to

4  court.

5  Q.  Okay.  Do you know who Nutty is?

6  A.  He's an old school Crip from the neighborhood.

7  Q.  Did you know him?

8  A.  He stayed next door to my baby mom.  I may have said

9  hello and was introduced to him, but no other than that.

10  Q.  Had RJ gone to trial yet on the murder he was in on?

11  A.  No, sir.

12  Q.  Okay.  Continue.

13  A.  So I tell RJ, I said, man, I said, I don't know B ain't

14  did it yet, it might not get done.  So I said, man, anyway, I

15  said B was trying to have me kill you on the street for wearing

16  Rodriccos chain with the initials in it, act like you want to

17  come off and was bragging about it.

18      So RJ got mad at me and jumped on the phone, and he

19  called B.  And B, like, just admitted it to him, like, that's

20  just what it was.

21  Q.  How do you know that?

22  A.  Because RJ got off the phone and said it.  Like, so at

23  that same time, that wasn't the only conversation.  We talked

24  about Paco, Andre Brown.  And Andre Brown was saying that RJ

25  and Buck was there with me that night.  And I said, no, they

TRIAL ONE - VOL. 25 -   5048

1   wasn't.  And he was, like, yeah, they were.  He was like -- and

2   he said Andre was saying they was.

3      Q.   Let me stop you there.  Where were you talking about?

4      A.   We talking about the night that --

5      Q.   Mr. Ayers and Mr. Colvin were murdered; is that what

6   you're talking about?

7      A.   Yes, sir.

8      Q.   Did Buck and RJ come with you that night?

9      A.   No, sir.

10     Q.   But you and RJ are talking about what Paco is saying, is

11  that what's going on?

12     A.   Yes, sir.

13     Q.   All right.  Continue.

14     A.   So he get on the phone with Paco and telling Paco I

15  wasn't there, I wasn't there, I wasn't there.

16     Q.   RJ is telling this to who?

17     A.   Yeah.  He telling this to Andre Brown on the phone.

18     Q.   Okay.

19     A.   Saying this to Andre Brown.  And the whole tank in there

20  listening.  So RJ seem like a little frustrated and started

21  getting in a couple fights, and that's how we end up getting

22  separated.

23     Q.   At this time while you're locked up, who is your

24  attorney?

25     A.   Mark Collins.

TRIAL ONE – VOL. 25 –  5049

1    Q.    Before you got arrested for the murder, did Mark Collins

2    represent you for –– did you have another case pending?

3    A.    Yes.

4    Q.    What was that?

5    A.    CCW.  Me and Ledbetter, we was meeting a guy to sell him

6    a kilo of cocaine.  And as we getting out the car, we in Bexley

7    and I hit the alarm and ––

8    Q.    The alarm to what?

9    A.    To the car.

10   Q.    Why?

11   A.    I had a gun in there.

12   Q.    So, wait.  Why did you hit the alarm to the car?

13   A.    I hit it for, you know, and lock the doors.

14   Q.    Okay.  Sorry.  Got you.

15   A.    So we walking, and so happened the police just pull up

16   at the corner and they see the lights blinking so, obviously,

17   they think we trying to break in the car.  So we done made it,

18   like, up almost to the apartments, and they, like –– they

19   stopped and look in the car, I guess they see the gun.  They,

20   like, hey, you come here.  We take off.  We get away.  And B go

21   back, he get the drugs.

22   Q.    Okay.  B goes back where?

23   A.    To where he had –– close to them apartments where he had

24   dropped the drugs off at first.

25   Q.    Okay.  Explain this to me.  You're outside of your car.

TRIAL ONE - VOL. 25 - 5050

1   And does Brandon have anything on him?

2       A.   Yeah.  He got a kilo of cocaine on him.

3       Q.   And your gun is in the car?

4       A.   Yes, sir.

5       Q.   What do you guys do?

6       A.   We was -- we was about to meet a guy to give it to him.

7       Q.   Okay.  When the police told you come here, what did you

8   do?

9       A.   We took off running.

10      Q.   Where did you go?

11      A.   I ran maybe about 15 minutes.  And then B, we on the

12  phones with each other, and Crystal had caught up with B.

13      Q.   Where did she catch up with B?

14      A.   Somewhere in Bexley somewhere.

15      Q.   Were you with B when Crystal showed up?

16      A.   No.

17      Q.   Okay.  What happened to the kilo of cocaine?

18      A.   He went back and got it.

19      Q.   Where did he put it?

20      A.   He had put it beside his house.  You know how the houses

21  got, like, the windows in the basement, they got, like, the

22  silver thing, go around it.  He put it in there under some

23  leaves.

24      Q.   Okay.

25      A.   And he went back.

TRIAL ONE – VOL. 25 –  5051

1    Q.   Was this before the cops told you to come here?

2    A.   That was –– that was after.

3    Q.   All right.

4    A.   That was the reason we run, we took off running.

5    Q.   Okay.  Who paid for Mr. Collins for the CCW –– wait.

6    Let me stop you there.

7         Whose car was it that you took there to Bexley?

8    A.   My car.

9    Q.   Eventually were you charged by the Bexley police

10   department?

11   A.   Yes, sir.

12   Q.   All right.  And were you indicted?

13   A.   Yes, sir.

14   Q.   All right.  Did you get an attorney?

15   A.   Yes, sir.

16   Q.   Who was that?

17   A.   Mark Collins.

18   Q.   Who is –– who paid for that attorney?

19   A.   Brandon Ledbetter.

20   Q.   All right.  When you got arrested for the murder, did

21   Mark Collins represent you in that as well?

22   A.   Yes, sir.

23   Q.   Who paid for that representation?

24   A.   Brandon Ledbetter paid my lawyer with a bullet proof

25   vest on and a gun in his lap.

TRIAL ONE - VOL. 25 - 5052

1   Q.   Who told you that?

2   A.   My lawyer.  Brandon told me it as well.  He said he

3   couldn't run around the streets.

4            MR. BERNDT:  Your Honor, may we have a sidebar?

5            THE COURT:  Yes.

6                              - - -

7        Thereupon, the following proceeding was held at sidebar out

8   of hearing of open court:

9            MR. BERNDT:  Thank you, Your Honor.

10       Your Honor, this morning I entered into a stipulation

11   with the government in regard to Mr. Collins and the payment.

12   The bullet proof vest was specifically excluded from that

13   stipulation.  And now Mr. Williams has gratuitously told us

14   that.  Mr. Williams had no personal knowledge of that, and I'll

15   now need to call Mr. Collins as a witness.

16           MR. DEVILLERS:  That's fine.  He said -- he said

17   Brandon Ledbetter told him that as well.  That was the answer I

18   expected.  But Brandon Ledbetter told him about this incident

19   of giving the money to Mr. Collins.

20           MR. BERNDT:  Mr. Collins has been in the courtroom so

21   I would ask for him not to be in the courtroom.

22           THE COURT:  He was in the courtroom this morning,

23   which was entirely permissible because his client is

24   testifying.  For whatever reason he's not in the courtroom at

25   this time and hasn't been since the break so he hasn't heard

TRIAL ONE – VOL. 25 – 5053

1    any of this testimony.

2         I will take under consideration your request to call

3    Mr. Collins because I would need to know from you and

4    Mr. DeVillers what the -- not only what the stipulation

5    entailed but what the negotiations regarding the stipulations

6    entail.

7         And let me be more specific.

8         It's one thing if you all stipulated that the witness

9    would be asked about the vest and the gun, but -- and in that

10   respect, Mr. DeVillers bears a responsibility not to ask the

11   question in such a way as to elicit that testimony.

12        But if there was no agreement with respect to what

13   Mr. Ledbetter had told Mr. Williams, that makes it somewhat

14   different.

15        But I'll tell you what -- no, go ahead, Mr. Berndt.

16        MR. BERNDT:  Your Honor, I do have the discussions

17   that I had with Mr. Kelley on my phone, and I can show those to

18   the Court and make it part of the record.

19        THE COURT:  Okay.  That's fine.  And it will certainly

20   help me determine whether it would be appropriate for

21   Mr. Collins to be called to refute it.

22        Do you expect Mr. Collins to testify that Mr. Ledbetter

23   did not appear to have on a vest and a gun?

24        MR. BERNDT:  Your Honor, the negotiated stipulation

25   was so that that disputed fact would not be mentioned to this

TRIAL ONE – VOL. 25 – 5054

1  jury.

2          THE COURT:  Okay.

3          MR. DEVILLERS:  No.  That --

4          MR. BERNDT:  Yes.

5          MR. DEVILLERS:  The stipulation is that Mark Collins

6  would not say.  There was nothing that Mark Collins would say

7  anyway including through Mr.-- including through Mr. Williams

8  that he wore the vest.  Mr. Ledbetter told him about this

9  incident, too, and that he did wear a vest and I did want to

10 get that out.  But the fact that Mr. Collins told him that was

11 not supposed to come out.  Agreed.

12         MR. GATTERDAM:  Seems like he's waived the privilege

13 at this point in time just throwing it in there because he's

14 now talking about conversations with his lawyer.

15         MR. BERNDT:  These are invited conversations, too.

16         THE COURT:  All right.  I'll take -- I'm going to try

17 to set aside some time over the lunch hour for us maybe to

18 meet.  You can show me what -- you can show me the stipulation

19 and what you all agreed to.

20         MR. BERNDT:  And Mr. Kelley could lend service to the

21 Court, too.

22         THE COURT:  Yes, absolutely.  I'll take it under

23 advisement.

24         MR. BERNDT:  Your Honor, the stipulation has not been

25 filed yet.  The stipulation has not been read, and I don't want

TRIAL ONE – VOL. 25 – 5055

1    it read until we're done with this.

2              THE COURT:  Okay.  That's fine.  Thank you.

3         (The following proceedings were had in open court.)

4              THE COURT:  Mr. Williams, are you all right?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Do you need a break?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  You do?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  All right.  We're going to stand in recess

11   for about 15 minutes.

12        (Jury out at 11:39 a.m.)

13        (Recess taken from 11:39 a.m. to 11:57 a.m.)

14             (Jury in at 11:57 a.m.)

15             THE COURT:  Mr. Williams, are you ready to proceed?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  Please proceed.

18        BY MR. DEVILLERS:

19    Q.   Mr. Williams, you testified earlier about Mr. Ledbetter

20   paying for your attorney Mark Collins.  Have you had a

21   conversation with Mr. Ledbetter about the circumstances of him

22   paying Mr. Collins?

23    A.   Yes, sir.

24    Q.   What did he tell you?

25    A.   First, he took Mark Collins 7500, and he said he had the

TRIAL ONE - VOL. 25 -   5056

1   bullet proof vest on.

2      Q.   Who had the bullet proof vest, Mark Collins or

3   Mr. Ledbetter?

4      A.   Mr. Ledbetter, because it was the first week it

5   happened.

6      Q.   First week what happened?

7      A.   Mark and Chad Ayers died on the case I'm doing time on.

8      Q.   So it was about a week after the murders that

9   Mr. Ledbetter paid Mr. Collins; is that what your testimony is?

10     A.   Yes, sir.

11     Q.   Okay.  Did Mr. Ledbetter visit you when you were in

12  jail?

13     A.   Yes, sir.

14     Q.   What did you talk about?

15     A.   We talked about what I was -- we talked about what

16  happened that night with Chad Ayers and Mark and Paco.  We

17  talked about Larry.

18     Q.   Let me ask you about this.  Did Mr. Ledbetter express

19  any concerns to you that he had about you at that time?

20     A.   At that time we was all -- me and Ledbetter was all

21  right, and he tried to send his lawyer -- he sent his lawyer

22  down to see me, said that he didn't want Mark to represent me

23  no more.  He wanted his lawyer to represent me.

24     Q.   And did his lawyer come see you?

25     A.   Yes, sir.

1    Q.   And who was his lawyer?

2            MR. GATTERDAM:  Objection to the relevance.

3            THE COURT:  Overruled.

4            THE WITNESS:  The guy over there.  The guy --

5        BY MR. DEVILLERS:

6    Q.   Mr. Berndt?

7    A.   Yes, sir.  Yes, sir.

8    Q.   What did Mr. Berndt ask you?

9    A.   He asked me various questions and --

10   Q.   Did you indicate whether you wanted to keep Mark

11   Collins?

12   A.   Yeah, I told him I wanted to keep Mark Collins because

13   he seemed like he was more or less questioning me like a

14   detective than more like trying to be a lawyer.  He was trying

15   to figure out what have I shared with my lawyer already.

16           MR. GATTERDAM:  Objection.  Can we have a sidebar?

17           THE COURT:  Yes.

18                        - - -

19       Thereupon, the following proceeding was held at sidebar out

20   of hearing of open court:

21           THE COURT:  Go ahead, Mr. Gatterdam.

22           MR. GATTERDAM:  Your Honor, my objection to this line

23   of inquiry is that now it makes it seem like the attorneys are

24   basically going and trying to influence witnesses, and I'm --

25   I'm one of the -- you know, now the shrapnel that's going to

TRIAL ONE - VOL. 25 - 5058

1 hit Mr. Harris is that one of the attorneys went there acting

2 like a detective.  I don't see how it's relevant if Mr. Berndt

3 went down there and had this conversation with him.  The

4 impact --

5          THE COURT:  Let me ask you something.  So we have

6 allegation of a conspiracy, right?

7          MR. GATTERDAM:  Not amongst the lawyers.

8          THE COURT:  Well, no.  No.  No.

9          MR. MEYERS:  Not that we know of.

10         THE COURT:  No.  No.  You're going to have to hear me

11 out.  I know it's difficult because I might go around my elbow

12 to get to my thumb.

13         MR. GATTERDAM:  Go ahead.

14         THE COURT:  We have the government's allegation of a

15 conspiracy.  That's what they've indicted; is that right?

16         MR. GATTERDAM:  Correct.

17         THE COURT:  And it's a superseding indictment.  And so

18 one of the things that is alleged is that there's cooperation

19 and collaboration among and between these defendants and

20 others.  It has nothing to do with Mr. Berndt or anybody else.

21 But if one of the defendants who is alleged to be Count 1, or

22 the lead of something with a conspiracy, is alleged to have

23 sent his lawyer to talk to someone who has been involved -- or

24 who has allegedly been involved in some felonious capers of the

25 conspiracy, then you're going to tell me that that's neither

1  relevant to the issues in this case or calculated to at least

2  bespeak some relevance, Mr. Gatterdam?

3      You're a real smart lawyer, and I know that.  But if you

4  want to preserve that for the record, you may, but that's the

5  only reason.

6      I'll hear from you, Mr. Berndt, because you've been

7  implicated.  At this point -- what you say about lawyers plural

8  has no merit at this point because there has not been any

9  testimony about lawyers plural.  There's been nothing about

10  you, Ms. Dixon, Mr. -- Mr. Nolder is on the periphery,

11  Mr. McVay or Mr. Meyers.  The only testimony has been about

12  Mr. Berndt.  And so to the extent that your objection bleeds

13  into other lawyers, you may renew it if they discuss other

14  lawyers.

15      So that's why I'm shifting from you, Mr. Gatterdam, to

16  Mr. Berndt, who has been implicated.

17      MR. GATTERDAM:  Can I also add that the probative

18  value of this is outweighed by the prejudicial effect of even

19  if it doesn't go to other lawyers, the implication is that now

20  these -- I understand the Court's reasoning -- now these

21  defendants are getting their lawyers to do their bidding for

22  them.

23      THE COURT:  All right.  I'll tell you what.  I

24  probably missed something.  Tell me in the record where they

25  talk about other lawyers.

1      MR. GATTERDAM:  No, not other lawyers.

2      THE COURT:  You keep talking about lawyers plural.

3      MR. GATTERDAM:  I'm saying lawyer.  Mr. Berndt is

4  going to go see this person acting like a detective questioning

5  him.  I just don't think that -- I think it has the danger to

6  bleed over into just not just simply Mr. Ledbetter, but into

7  the attorneys now and still Mr. Berndt is still on the case

8  advocating a position beyond just being a lawyer trying to get

9  this man to change counsel, acting like a detective, going to

10 question him that way.  I just think that the problem is it

11 implicates all of us because we're all in the conspiracy.

12     THE COURT:  No, it doesn't.  It has nothing to do with

13 anybody else.

14     Now, if you can -- if you can point me to some testimony

15 in the record where it implicates someone else inferentially or

16 directly, let -- I will be quiet and let you articulate that

17 position.

18     MR. GATTERDAM:  That is my position.  I'm not going

19 to --

20     THE COURT:  Yes, but you don't have any facts.  Yours

21 is what you have objected to periodically.  Yours is

22 speculative.  So I can -- so let me get it straight.

23     You can hand me rules on speculative legal theories

24 unsupported by evidence, but you don't want speculative

25 evidence to come into this record.  And I agree that legally

TRIAL ONE - VOL. 25 -  5061

1   that's improper.

2          So can you tell me the basis -- the factual basis of

3   this speculative objection that I hear from you?

4          MR. GATTERDAM:  I think I've given you my basis,

5   Your Honor, and the probative value --

6          THE COURT:  No, you haven't.  No, you haven't.  That's

7   why I keep asking for the factual basis.  So either as an

8   officer of this court tell me that there is no factual basis

9   for it, or give me a factual basis.

10         MR. GATTERDAM:  I heard the testimony coming in as

11  that Mr. Berndt went there, and then Mr. Williams started

12  talking about how he was questioning him and I --

13         THE COURT:  We heard the same testimony,

14  Mr. Gatterdam.

15         MR. GATTERDAM:  Okay.  So that's the record.

16         THE COURT:  What I'm asking you is where -- what is

17  the factual basis implicating other lawyers?

18         MR. GATTERDAM:  Oh, no, no.  I'm sorry.  I thought I

19  said it.  He's never said anything about any other lawyers.  I

20  was using it plural as in now that one lawyer is implicated, my

21  words, it now has the shroud of other lawyers being --

22         THE COURT:  I understand.

23         MR. GATTERDAM:  I didn't mean there's a record

24  saying --

25         THE COURT:  I want Mr. Berndt to address this because,

TRIAL ONE - VOL. 25 - 5062

1    you know, we -- it's almost like you're not here, Mr. Berndt.

2    We're talking around you, we're talking about you.  I want you

3    to -- do you have any position on this?

4             MR. BERNDT:  Well, Your Honor, for the record, I saw

5    Mr. Williams once.  I saw him with the permission of

6    Mr. Collins, and what Mr. Williams has testified to is

7    absolutely false.

8             THE COURT:  Okay.

9             MR. BERNDT:  I will have to testify in this case now,

10   and I need for everybody to understand that.  I also feel

11   that --

12            THE COURT:  Wait.  Tell me why you think you're going

13   to have to testify in this case.

14            MR. BERNDT:  Because I'm going to have to testify

15   directly opposed to what Mr. Williams just said because he's

16   not going to ever admit these things didn't occur.

17            THE COURT:  You feel the need to testify that you did

18   not go to see him?

19            MR. BERNDT:  No.

20            THE COURT:  You did go to see him.

21            MR. BERNDT:  Your Honor, he's clearly set forth a

22   purpose for me to somehow influence his decisions in this case.

23   That's what I heard.  That is absolutely false.  I want to say

24   I'm totally offended by it, and I think it was purposely done.

25   I do.

TRIAL ONE - VOL. 25 - 5063

1      Your Honor, I discussed this matter with Mr. DeVillers.

2  I was told that they knew that I saw Mr. Williams once.

3  Frankly, before this trial started.  Before this trial started

4  in probably June of 2014, I informed the government of that.

5  And I was told that there's nothing to that.  He's going to say

6  he saw you once.  That's going to be it.

7      And now he's talking about our conversations.  He's

8  clearly implicating me as being some type of Bruce Cutler who

9  is going down there -- Bruce Cutler was Mr. Gotti's lawyer --

10 going down there to intercede in this situation.

11     It's absolutely false, and I promise you I'm done

12 talking to the government about this case and any other case

13 because this is outrageous.

14     THE COURT:  Go ahead, Mr. DeVillers.

15     MR. DEVILLERS:  Mr. Williams testified he came down to

16 see him and asked him questions about the murder.  That's what

17 he testified.  I've known that from the beginning.  I don't

18 understand what's the difference between his testimony and what

19 we've had conversations about.

20     I even called Mr. Berndt on Friday.  I told him he's

21 going to testify you went down, you saw him, and you asked him

22 about what happened.  And that's what he's testifying.  He's

23 testified he asked him questions like a detective.  That's his

24 perception.  And that goes to why, quite frankly, any attorney

25 going down to represent somebody on a crime is going to ask him

TRIAL ONE - VOL. 25 -  5064

1    about the crime.  I'm not alleging that Mr. Berndt did anything

2    wrong.  I understand that's why he would do it.  Mr. Ledbetter

3    sent him.  That's the relevance, that Mr. Ledbetter is the one

4    that sent him down there.  That is the relevance of it,

5    Mr. Berndt being his attorney.

6         Based on what Mr. Williams is saying, he's clearly

7    paranoid because this guy -- according to his testimony, this

8    guy is trying to kill him.  Other people involved.  He's

9    paranoid as heck.  That's one of the reasons he decided I'm

10   going to go talk to the government.  That's why it's relevant

11   for those two reasons.

12        MR. BERNDT:  I saw him in excess of probably two years

13   after he was incarcerated after other lawyers had seen him,

14   which is on the visiting list that the government has.

15        THE COURT:  And here is -- here is the way I see it.

16   I think that you are both right.  I think that you are both

17   right in that the testimony is susceptible to more than one

18   construction.  It probably would not be susceptible to both

19   constructions if the testimony was that Mr. Ledbetter had not

20   sent you.  But because the testimony was that he had sent you

21   then, you know, someone could construe it as Ledbetter trying

22   to influence Williams.  That's possible.

23        In the context of this -- of going down to see a

24   prospective client, it doesn't make sense, you know, and I

25   don't think that -- well, on a personal level, I don't think

TRIAL ONE – VOL. 25 – 5065

1    anybody who knows you would think that any lawyer, much less a

2    lawyer of your repute, would risk his or her license, you know,

3    being an emissary for one of your clients.  You know, I think

4    that's completely absurd if anyone would give it that

5    construction.

6         But in fairness to you, Mr. Berndt, it's possible.  But

7    I think that the more -- I think that the more likely

8    construction is I think that Mr. DeVillers is absolutely right,

9    and I think that you all would agree that when you go down to

10   talk to a prospective client, you have to be like a detective.

11   You have to know the who, what, when, where, and you have to

12   challenge your client on what they're saying to make sure that

13   you're not being sold a bill of goods, to make sure that their

14   story makes sense and holds up.  That's what any good lawyer

15   does.

16        So, you know, before you -- I want you to think about

17   this, Mr. Berndt, before you decide that you need to go off and

18   testify and all that because my Pavlovian response would

19   probably be like yours, I need to protect my good name.

20        I think that this is a matter that can be taken care of

21   on your cross-examination without it having to reach that

22   level.

23        But, again, that's something that I will consider over

24   lunch break.  It's not something -- I mean, this is his

25   testimony.  There was nothing improper about the testimony.  I

TRIAL ONE - VOL. 25 -  5066

1    don't think that -- I don't know, Mr. Gatterdam, that this is

2    an instance in which the prejudice outweighs the probative

3    value because in a conspiracy it is probative.  It is probative

4    if this defendant wants his lawyer to -- you know, maybe to

5    represent the other coconspirators or the other people involved

6    in the alleged enterprise.  You know, that could be something

7    that -- that could be a fact that, you know, the jury could

8    consider.  That could be a fact that maybe the government needs

9    to prove as a part of this conspiracy even though it's not

10   alleged as an overt act.

11       So I'm going to -- in fairness to everyone, I'm going to

12   think about it over the lunch break as I think about all of

13   this testimony and determine whether to instruct the jury to

14   disregard it.  If I determine that I should instruct the jury

15   to disregard it, I will also add, Mr. Berndt, that it is not

16   unusual for a lawyer in interviewing a new client to ask

17   questions about what happened and to probe and to do good

18   detective work because that's part of your job and

19   responsibility.

20       MR. BERNDT:  Your Honor, can I say a couple things?

21       THE COURT:  Sure, absolutely.

22       MR. BERNDT:  Thank you.

23   My concern isn't me.  My concern is Robert Ledbetter.

24   And what's going on here is very simply this:  There is

25   allegations that Mr. Ledbetter can have people do things.

TRIAL ONE – VOL. 25 – 5067

1    Reaching out from jail to kill Crystal Fyffe, having people do

2    robberies, do these things.  The arc which is very short is

3    that now he's sending his lawyer down to influence this person.

4    The government understands that.  That's why they're presenting

5    this.  And what it's doing is it's denigrating me in front of

6    this jury, totally.  Now they think I'm a crooked lawyer.  Now

7    they think I'm doing things for Mr. Ledbetter.  Now I have no

8    credibility in front of this jury, and I can't tell you how

9    professionally disappointed I am at this moment.

10              THE COURT:  Well, listen.

11              MR. BERNDT:  And I'm not going to quit.

12              THE COURT:  Let me just say that I see no evidence

13   that this was anyone on the government's intent.  I can't crawl

14   into the head of any government lawyer, but there is nothing

15   that has happened during the course of this trial that will

16   make me believe this.

17         But I will tell you this:  As one lawyer once told me, a

18   mentor, that he who the Gods wish to destroy they first make

19   angry.

20              Let's break.  Let's go.

21         (The following proceedings were had in open court.)

22              THE COURT:  Please continue, Mr. DeVillers.

23              MR. DEVILLERS:  Thank you, Your Honor.

24         BY MR. DEVILLERS:

25    Q.   Mr. Williams, after talking to Mr. Berndt and

TRIAL ONE - VOL. 25 -  5068

1   Mr. Ledbetter in the Franklin County jail, did you cooperate

2   with the Franklin County prosecutor's office?

3    A.   Not right away.

4    Q.   Did you eventually?

5    A.   Yes, sir.

6    Q.   Do you remember what year that was?

7    A.   '08, '09.  '09.

8    Q.   Do you remember when you entered into your plea

9   agreement?

10    A.   2010.

11    Q.   Was it before that?  Did you sit down with Columbus

12   police and Pickerington police before you entered your plea?

13    A.   Yes, sir.

14    Q.   Let's talk about the plea you entered into.  What did

15   you plead guilty to?

16    A.   Involuntary manslaughter and disuse of a firearm.

17    Q.   Anything else?

18    A.   That was it.

19    Q.   Do you recall pleading guilty to felonious assault?

20    A.   I don't think so.  That was the charges.

21    Q.   You pled guilty to what, then?  As far as your memory

22   goes, what did you plead guilty to?

23    A.   Involuntary manslaughter and disuse of a firearm.

24    Q.   In relation to what?

25    A.   The guys B paid me to kill, Chad Ayers and Mark Coltin

TRIAL ONE - VOL. 25 -  5069

1  (sic).  I don't know his last name.

2     Q.   I want to be clear about something.  When you went to

3  see Paco, Mr. Harris and Mr. Colvin that night, was it your

4  intention, if the opportunity arose, to kill --

5     A.   Yes, sir.

6     Q.   And was Mr. Rafford a part of that as well?

7     A.   Yes, sir.

8     Q.   Did you agree to testify against Mr. Rafford should the

9  Franklin County prosecutor's office ask you to?

10    A.   Yes, sir.

11    Q.   Did you meet with Pickerington detectives?

12    A.   Yes, sir.

13    Q.   Did you tell them what you know about Rodriccos

14  Williams?

15    A.   Yes, sir.

16    Q.   Did they offer you immunity?

17    A.   I believe -- yes, sir.

18    Q.   Have you ever been charged with the Pickerington murder?

19    A.   No, sir.

20    Q.   Do you know if Mr. Rafford has yet to have ever been

21  charged for the murders of Ayers and Colvin?

22    A.   No, sir.

23    Q.   You don't know or he hasn't?

24    A.   He hasn't.

25    Q.   If he does, do you know what you will have to do?

1    A.    I will have to testify.

2    Q.    Who is Crystal Fyffe?

3    A.    Mr. Ledbetter's heart.

4    Q.    Did Mr. Ledbetter ever talk to you about an occasion

5    where he did something to Ms. Fyffe?

6    A.    He told me he shot her in the hand.

7    Q.    In the what?

8    A.    In the hand.

9    Q.    Did he tell you anything else about that event?

10   A.    He just -- Mr. Ledbetter actually asked me to kill

11   Crystal Fyffe.

12   Q.    When?

13   A.    A couple occasions because she was going to tell Tiffany

14   about -- about them being together, and Mr. Ledbetter didn't

15   want that to happen.

16   Q.    And Tiffany is who?

17   A.    Mr. Ledbetter's baby's mother.

18   Q.    When you talked to the police before you signed your

19   plea agreement in 2010, did you warn the police about

20   Mr. Ledbetter?

21   A.    Yes, sir.

22   Q.    What did you warn them he might do?

23   A.    I told them he going to -- didn't anybody get in his

24   way, he going to kill.

25   Q.    Mr. Williams, after you pled guilty to the manslaughter,

1  what did you get sentenced to?

2  A.  Eight years.

3  Q.  Eight years?

4  A.  Yes, sir.

5  Q.  And that's for a case that was two murders and a

6  felonious assault?

7  A.  Yes, sir.

8  Q.  Where did you go to prison after you pled guilty, what

9  institutions?

10  A.  Lebanon, Mansfield, Lancaster, Madison.

11  Q.  Did you ever have any problems in those institutions?

12  A.  Yes, sir.

13  Q.  What kind of problems?

14  A.  All type of threats, fights.

15  Q.  About what?

16  A.  Mr. Ledbetter wanting to -- defending him and wanting

17  things done to me coming through his words, his hands.

18  Q.  I'm going to play for you what's marked as Government's

19  Exhibit 150-31.  I want you to listen to this and see if you

20  recognize the voices.

21      MR. DEVILLERS:  Please start at 7:07.

22    (Audiotape played in open court.)

23      MR. DEVILLERS:  Stop there.

24    BY MR. DEVILLERS:

25  Q.  Do you recognize those voices?

1    A.    Yes, sir.

2    Q.    Who are those voices?

3    A.    Ricky Patterson and Brandon Ledbetter.

4         MR. DEVILLERS:  Continue.

5      (Audiotape played in open court.)

6         MR. DEVILLERS:  Your Honor, we stopped at 9:12.

7         THE COURT:  The record will so reflect.

8         MR. DEVILLERS:  May I have a moment, Your Honor?

9         THE COURT:  Yes.

10        MR. DEVILLERS:  No further questions, Your Honor.

11        THE COURT:  All right.  Thank you.

12       Ladies and gentlemen, it's 12:25.  We're going to stand

13  in recess until 1:45.  We're going to take a slightly extended

14  lunch because we have a couple of legal issues that I need to

15  work through with the lawyers before we return from lunch.  So

16  we're going to take a somewhat abbreviated lunch, and we have

17  these issues that we must address that have nothing to do with

18  your fact finding function.  So that is a convenient way to

19  allow you to enjoy the sunshine and enjoy your extended lunch

20  period and remember the Court's admonition.

21       Thank you, ladies and gentlemen.

22      (Jury out at 12:26 p.m.)

23        THE COURT:  Please be seated, everyone.

24       Now, after lunch we will take up the question of whether

25  the alleged tattoos are testimonial, or at least the Court will

TRIAL ONE - VOL. 25 -  5073

1    rule on that.

2         And, Mr. Berndt, we will take up the issue that you and

3    Mr. Gatterdam raised regarding Mr. Williams' testimony about

4    your having conferred with him.  I will tell you I want to hear

5    what both the government and defense counsel have to say about

6    it.  The more I think and have thought about it, a curative

7    instruction may be in order simply informing the jury that it

8    would not have been unusual for you as a prospective lawyer for

9    Mr. Williams to have asked the kinds of probing questions that

10   might lead a layperson to think that these were detective-like

11   questions because lay people may not understand that that's

12   what we as lawyers do in order to represent someone effectively

13   and to discharge our ethical responsibilities of providing

14   zealous representation.  Part of that zealous representation is

15   to determine what the facts of any particular case might be.

16   And that may serve the dual purpose of making the jury

17   understand why you went down, as well as providing the jury an

18   understanding of why you would ask questions that a layperson

19   may consider detective like.

20        But, I remain open to whatever arguments you may have,

21   but I wanted to provide that to frame your thinking on what a

22   viable alternative may be.

23        MR. BERNDT:  I appreciate that, Your Honor.

24        THE COURT:  And, you know, the last thing I want you

25   to have to do is to be a witness in this case, and I'm going to

TRIAL ONE – VOL. 25 – 5074

1  work mightily to avoid that outcome because I think that there

2  are solutions short of that, and I want to make it clear on the

3  record and publicly that your integrity has been unimpeachable

4  and unassailable in this case, and this in no way implicates

5  you in anything that has to do with the allegations in this

6  case.

7          MR. BERNDT:  I appreciate that, Your Honor.  Thank

8  you.

9          THE COURT:  Is there anything else we need to take up

10  from the government, Mr. DeVillers?

11          MR. DEVILLERS:  No, Your Honor.

12          THE COURT:  Mr. Berndt, is there anything else we have

13  to take up on behalf of Mr. Ledbetter?

14          MR. BERNDT:  No, Your Honor.  Thank you.

15          THE COURT:  Mr. Gatterdam, on behalf of Mr. Harris?

16          MR. GATTERDAM:  No, Your Honor.

17          THE COURT:  Ms. Dixon, on behalf of Mr. Liston?

18          MS. DIXON:  No, Your Honor.

19          THE COURT:  Mr. McVay, on behalf of Mr. Ussury?

20          THE WITNESS:  No.

21          THE COURT:  Mr. Nolder?

22          MR. NOLDER:  Your Honor, if we're going to reconvene

23  at 1:45 with the jury, what time should we come back?

24          THE COURT:  Would 1:30 give you enough time to eat and

25  confer with your clients and each other as well?  I'm sure you

TRIAL ONE - VOL. 25 -  5075

1    talked with them about the motion to have the tattoos being

2    displayed or --

3         MR. NOLDER:  We don't have a tattoo issue, and the

4    issue doesn't implicate us.

5         THE COURT:  All right.  Good enough.  Thank you.

6       (Recess taken from 12:30 p.m. to 1:45 p.m.)

7                             - - -

8                                    MONDAY AFTERNOON SESSION

9                                    MAY 23, 2016

10                            - - -

11      (Thereupon, the following proceeding was held in open court

12    with all defendants and counsel present.)

13         THE COURT:  We have a number of matters to address,

14    but I'm going to first address the issue of tattoos.

15         As you recall, the government has requested that they be

16    allowed to expose the tattoos, if any, of Mr. Harris, Mr.

17    Liston, Mr. Ledbetter and Mr. Ussury.

18         Although evidence of the defendants' gang-affiliated

19    tattoos, to the extent they exist, passes muster under Rules

20    401 and 403, compelling that evidence from the defendants

21    through an in-court display of their bodies to the jury or

22    forced photo session with the United States Marshals Service as

23    the government proposes will violate the Fifth Amendment

24    protection against self-incrimination.

25         To qualify for protection under the Fifth Amendment, a

TRIAL ONE - VOL. 25 - 5076

1   communication must be testimonial.  Federal cases assessing the

2   display of a defendant's tattoos vis-a-vis his Fifth Amendment

3   right against self-incrimination hardly provide a model of

4   clarity as to whether tattoos constitute testimonial

5   communications.  The Sixth Circuit has not weighed in on this

6   issue, and other courts erroneously conflate all evidence of

7   tattoos with evidence of identifying physical characteristics,

8   which receive no Fifth Amendment protection; for example,

9   United States versus Toliver, affirming admission of

10  gang-related tattoos, which were not relevant to identifying

11  the defendant, because, quote, "this case ... is more akin to

12  the physical traits cases," Tattoos which are openly visible on

13  the body are physical traits, as are voice, appearance, and

14  handwriting; and then, in United States versus Nixon, denying

15  the defendant's motion to suppress photographs of his

16  gang-affiliated tattoos, which were relevant only to argue that

17  his tattoos are typical tattoos worn by Vice Lords gang

18  members, because tattoos, like his hair color and height, are

19  physical, non-testimonial evidence.

20      The Second Circuit, however, wisely draws a distinction

21  between cases where a witness relies on a tattoo to identify a

22  defendant and cases where the government relies on evidence of

23  a defendant's tattoo, quote, not as an identifying physical

24  characteristic, but for the content of what was written, close

25  quote.  And that's U.S. versus Greer, which I rely on,

1    principally, in making this decision.

2         In the first category of cases, the tattoo is a physical

3    feature no different from a handwriting or blood sample or a

4    scar.  Accordingly, evidence of the identifying tattoo falls

5    outside the scope of the Fifth Amendment.

6         In the second category of cases, however, cases in which

7    the government relies on the evidence of the defendant's tattoo

8    for the content of the communication, the tattoo is

9    testimonial, under Greer, which held that evidence of a tattoo

10   which in combination with other evidence allowed jurors to

11   infer that the defendant had constructive possession of the

12   ammunition was testimonial, and Slavin, which held that

13   evidence of white supremacist tattoos which were used to

14   establish motive and intent were testimonial because the state

15   relied on the tattoos not as an identifying physical

16   characteristic, but for the content of what was written.

17        In this case, evidence of the defendants' alleged

18   gang-affiliated tattoos, to the extent that it even exists, is

19   testimonial in nature.  The Government does not contend that

20   any of its witnesses will use the defendants' tattoos to

21   physically identify them as participants in a crime.  Thus,

22   this is not a case where the presence of a tattoo stands in for

23   other readily identifiable physical characteristics such as a

24   defendant's height, hair color, voice, or handwriting style.

25   Instead, the Government hopes to introduce evidence of the

1    defendants' tattoos because tattoos that help to establish gang

2    membership are admissible to support a showing of a joint

3    venture or conspiracy, quoting United States versus Suggs, out

4    of the Seventh Circuit.  That is, the Government intends to

5    rely on the challenged communications to, quote, support the

6    charge that the defendants conspired to engage in criminal

7    activity, closed quote.  In the Government's own words, quote:

8    Evidence that these defendants decorated their bodies with

9    tattoos showing their affiliation to the Short North Posse and

10   their loyalty to their co-conspirators goes to the heart of the

11   existence, structure, and operation of the RICO enterprise that

12   was charged in Count One of the Superseding Indictment.

13   Accordingly, evidence of the tattoos is testimonial.

14        To qualify for protection under the Fifth Amendment, a

15   communication must be incriminating.  No use belaboring the

16   point here:  The Government concedes that evidence of the

17   defendants' gang-affiliated tattoos, to the extent that it

18   exists, is incriminating because those tattoos would tend to

19   show the existence of the charged RICO enterprise and the

20   defendants' affiliation with it.  Indeed, that's the whole

21   point of this dispute.

22        Finally, to qualify for protection under the Fifth

23   Amendment, a communication must be compelled by the Government.

24   This issue presents a much closer call.  Indeed, in Greer, the

25   Second Circuit held that, although evidence of the defendant's

1    tattoo was testimonial and incriminating, the Government

2    nevertheless could elicit testimony describing that tattoo

3    because the tattoo was not compelled by the Government.  The

4    Greer court held that testimony concerning the defendant's

5    tattoo did not address a compelled communication for two

6    reasons:  First, the tattoo was plainly visible on the

7    defendant's arm and no evidence suggested that law enforcement

8    officers were able to read the tattoo only by applying physical

9    force during the defendant's arrest; and, secondly, even if

10   physical force were required to view the defendant's tattoo,

11   the voluntary tattooing of an incriminating word on the

12   defendant's arm was not the product of Government compulsion.

13   That's analogizing the voluntary tattooing to voluntary

14   preparation of incriminating tax documents that were held to be

15   outside the protection of the Fifth Amendment in United States

16   versus Fisher, out of the Supreme Court, 1976.  The Fourth

17   Circuit followed similar reasoning in holding that the Fifth

18   Amendment did not protect against photographs of a defendant's

19   gang-related tattoos.  That was in United States versus

20   Toliver, noting that the tattoos were openly visible on the

21   defendant's body.

22        To be sure, the Court can think of no government

23   compulsion in admitting evidence of tattoos that are openly

24   visible on a defendant's body, or that can be read without

25   applying physical force to the defendant.  Thus, tattoos on the

1   defendants' faces, on their necks, on their hands, on arms

2   that -- the lowest portion of their arms, and lower legs

3   ordinarily would be admissible, even against the Fifth

4   Amendment challenge.  Tattoos on the defendants' backs,

5   shoulder, torsos, mid-sections, upper legs, and feet, however,

6   ordinarily would not be admissible against a Fifth Amendment

7   challenge, at least under the openly visible component of the

8   compelled-communication inquiry.

9        I find, moreover, that the Fifth Amendment bars evidence

10  of any purported tattoos which are not openly visible on the

11  defendants' bodies, or that would require the application of

12  physical force to display it to the jury.  Although the Second

13  Circuit correctly reasoned in Greer that voluntarily having a

14  tattoo marked on one's body is not itself a compelled act, the

15  process of sharing that tattoo which is not otherwise openly

16  visible to the Government nevertheless has communicative

17  aspects of its own, wholly aside from the contents of the

18  tattoo.  Put differently, when the government lacks independent

19  knowledge of the tattoo's existence and authenticity, requiring

20  a defendant to appear before the jury or for a photograph

21  session involves testimonial self-incrimination, citing U.S.

22  versus Hubbell, holding that, where it is not a foregone

23  conclusion that incriminating documents exist and are

24  authentic, requiring a defendant to provide those documents by

25  way of a subpoena involves testimonial self-incrimination.

TRIAL ONE — VOL. 25 — 5081

1    That's United States versus Hubbell, which is a 2000 Supreme

2    Court case.  The same is true in United States versus Doe, from

3    1984, requiring a defendant to produce documents to the

4    Government involves a tacit admission that they exist and are

5    authentic, which is sufficient to establish a valid claim of

6    the privilege against self-incrimination.

7        Accordingly, where, as here, the existence and

8    authenticity of a defendant's incriminating, communicative

9    tattoos is not a foregone conclusion, the Government cannot

10   compel that defendant to appear for an inspection to learn, in

11   the first instance, of their existence and authenticity.  Any

12   other rule would require the defendant to tacitly admit the

13   existence and authenticity of his own self-incriminating

14   tattoos and relieve the Government of its own burden for

15   authentication.  The Fifth Amendment, in the Court's view,

16   protects against those twin harms.

17       All told, the government may introduce evidence of the

18   defendants' incriminating, communicative tattoos if those

19   tattoos are plainly visible on the defendants' bodies, as

20   described above.  I agree with the Government's proposal, in

21   light of safety concerns and other logistical matters, to have

22   the defendants made available for photographs by a law

23   enforcement agent in the presence of the U.S. Marshals Service.

24   Those photographs may then be introduced during the

25   Government's case-in-chief.

1          Putting the Fifth Amendment aside, there is another,

2     independent reason for excluding evidence of the defendants'

3     non-openly visible tattoos:  The government could have, and

4     should have, brought this matter to the defendants' attention

5     and the Court's attention much sooner.  Throughout the pendency

6     of this case, the Court has worked assiduously to develop a

7     trial schedule that would accommodate everyone.  This issue

8     could have been raised during the discovery period, and it

9     could have been dealt with then and any objections raised and

10    would not have been raised in the context of this case.  But

11    that being said, we are where we are.  And, so, only those that

12    are visible -- hands, necks, face -- I don't know that, since

13    no one is wearing shorts, whether we have a lower leg issue.

14    But certainly hands, neck, and face would qualify as something

15    that would be admissible.  Otherwise, any tattoos will not be.

16          Now, moving on to the issue of Mr. Berndt and the

17    possible testimony.

18          After consideration, the Court, under Rule 403, is going

19    to exclude that portion of the testimony that talks about

20    Mr. Berndt where Mr. Williams testified that Mr. Berndt

21    inquired of him, quote, as like a detective.  I understand that

22    there is a stipulation.  I understand that the stipulation

23    provides --

24          MR. BERNDT:  I apologize, Your Honor.

25          THE COURT:  Was there a stipulation, Mr. Berndt?

1       MR. BERNDT:  Your Honor, there was a stipulation in

2   regard to the payment of Mr. Collins.  There was not a

3   stipulation in regard to my visit to Mr. Williams.  There was a

4   discussion with Mr. Devillers as to what that testimony would

5   be today, therefore, in my mind, not giving rise to the need

6   for a stipulation.

7       THE COURT:  Well, I'm going to strike that portion of

8   the testimony that was objected to by both you and by Mr.

9   Gatterdam.  I'm going to instruct the jury that it would not be

10  unusual and it would be in keeping with your duties and

11  responsibilities as counsel to ask questions which could be

12  construed as detective in nature because you have the

13  responsibility of finding out the facts, but, with respect to

14  any implication or inference that there was any wrongdoing on

15  your part or that you were acting in furtherance of any

16  conspiracy, that that is not an inference that they are allowed

17  to make out of the testimony provided by Mr. Williams.  So,

18  that is the Court's ruling.

19      MR. DEVILLERS:  May I, Your Honor?

20      THE COURT:  At side-bar, you may.

21                          - - -

22   (Thereupon, the following proceeding was held at side-bar.)

23      MR. DEVILLERS:  Your Honor, I don't necessarily have a

24  problem with the instruction, but the inference that

25  Mr. Ledbetter sent him there --

TRIAL ONE – VOL. 25 – 5084

1    THE COURT:  No.  You probably misunderstood what I

2  said.

3    MR. DEVILLERS:  Okay.

4    THE COURT:  What I said was, they cannot infer that

5  Mr. Berndt was acting in the furtherance of a conspiracy, that

6  he was not involved in the conspiracy based on that testimony.

7    MR. DEVILLERS:  That's fine.  I understand.  Okay.

8    THE COURT:  That's what I thought you -- you know.

9  You got up so quickly, I thought that you were

10  misunderstanding.

11    MR. GATTERDAM:  Not on point, Judge, but for the

12  taking of the pictures, can we have one counsel present --

13    THE COURT:  Absolutely.

14    MR. GATTERDAM:  -- when it takes place?

15    THE COURT:  Absolutely, just as you would if there was

16  a handwriting exemplar or anything like that.

17    MR. DURDEN:  Your Honor, since they've already shown a

18  picture of our client, may we stand on that, versus doing it

19  all over again?

20    THE COURT:  (Nodding affirmatively.)

21    Yes.

22    I'm going to publish that, but I wanted you, for your

23  sake, to know that -- I've kind of read from the highlighted

24  portions, but not published it, but it will be docketed by

25  close of business today, so that you'll have copies of it.

TRIAL ONE - VOL. 25 -  5085

1          MS. DIXON:  You're saying hands, neck --

2          THE COURT:  -- face.

3          MS. DIXON:  -- face, neck and hands?

4          THE COURT:  Things that are visible, you know, that

5   are already --

6          MS. DIXON:  Yeah.

7          THE COURT:  -- because you're not hiding those.

8          MS. DIXON:  Right.

9          THE COURT:  But your body, your --

10         MS. DIXON:  Your butt, yeah.

11         MR. MEYERS:  This may be timely.  Ussury never joined

12  that motion and has asked Mr. McVay and I to make sure his

13  tattoos are displayed.  As we get to the ceremony of

14  photographing, we may add -- we will ask that the marshals

15  undertake the effort to photo his entire torso.  He freely and

16  willingly and tactically wants his torso and any other tattoos

17  displayed.

18         THE COURT:  Any objection to that?

19         MR. DEVILLERS:  No, none, Your Honor.

20         THE COURT:  All right.  Any other defense counsel wish

21  to make any objection on the record?

22         MR. BERNDT:  Your Honor, just before I start

23  cross-examination of Earl Williams, Your Honor, I have a

24  visitation/visitor log from the Franklin County correctional

25  facility showing that Mr. Williams was visited on March 23,

TRIAL ONE — VOL. 25 — 5086

1    2009, June 30, 2010, June 4, 2010, and September 22, 2010, by

2    various members of the Prosecutor's Office, specifically, Jimmy

3    Lowe, Jason Manning, and a person by the name of Jess Williams.

4        I just need the record to indicate that that's four or

5    five visits from the Prosecutor's Office that are not reflected

6    in discovery.  There are no reports on that.  There are no

7    notes given, anything at all like that.  And I don't know why,

8    but those are the visits.  That's what is docketed.  And I just

9    need that on the record before I start the cross-examination.

10       THE COURT:  Any objection, Mr. Devillers?

11       MR. DEVILLERS:  No objection, Your Honor.  I actually

12   did send an e-mail, as part of the exhibits in discovery, that

13   I inquired as to Jason Manning, as to whether there was any

14   notes taken by them in regards to visiting with him.  And I

15   made that part of -- I disclosed that e-mail.

16       THE COURT:  All right.

17       MR. BERNDT:  Thank you.

18     (The following proceedings were had in open court.)

19       THE COURT:  Mr. Stroh, you can bring the witness back

20   in.  Linda, would you get the jury?

21     (Jury in at 1:58 p.m.)

22       THE COURT:  Thank you.

23       Ladies and gentlemen, before we begin with the

24   cross-examination of Mr. Williams, the Court has one

25   instruction to give you.  And that is that you are instructed

TRIAL ONE – VOL. 25 –   5087

1   to disregard that portion of Mr. Williams' testimony wherein he

2   testified that Mr. Berndt had questioned him like a detective.

3   I'm excluding that because I find that that testimony is more

4   prejudicial to the defendants than probative under the

5   applicable -- probative of any of the issues in this case under

6   the applicable federal laws under which this case is being

7   tried.

8        I will further advise the jury that you are not to infer

9   from the fact that Mr. Berndt spoke with Mr. Williams that

10  Mr. Berndt, himself, was either a co-conspirator or was acting

11  in furtherance of any conspiracy.

12       Finally, I will advise you that, as lawyers, we are

13  required, in interviewing clients or perspective clients, to

14  ask probing questions, and sometimes challenging questions, in

15  properly discharging our responsibilities of zealous

16  representation.  And those probing questions can often appear

17  to be detective-like in nature, because you're trying to probe

18  to make sure that your client's rendition of the facts makes

19  sense and would withstand scrutiny.

20       That being said, ladies and gentlemen, Mr. Berndt,

21  cross-examination.

22       MR. BERNDT:  Thank you.

23

24

25

TRIAL ONE – VOL. 25 – 5088

1                                  – – –

2                          CROSS-EXAMINATION

3    BY MR. BERNDT:

4    Q.   Mr. Williams --

5    A.   Yes, sir.

6    Q.   -- can you hear me okay?

7    A.   Yes, sir.

8    Q.   My name is Jeff Berndt.  I represent Robert Ledbetter.

9    Can you hear that?

10   A.   Yes, sir.

11   Q.   Great!

12        If I ask you a question that you don't understand, ask

13   me to rephrase it.  Okay?

14   A.   Okay.

15   Q.   All right.

16        THE COURT:  Ladies and gentlemen down at the end of

17   the jury box, can you hear Mr. Williams?

18        JURORS:  (Nodding affirmatively.)

19        THE COURT:  All right.

20      Please proceed.

21        MR. BERNDT:  Thank you.

22        THE COURT:  Mr. Williams, try to keep your voice up.

23        THE WITNESS:  All right.

24        THE COURT:  Please proceed.

25   BY MR. BERNDT:

1    Q.    Mr. Williams, how many people have you killed?

2    A.    Two.   Three.

3    Q.    You don't remember how many?

4    A.    Two.   Three.

5    Q.    So you're a murderer, correct?

6    A.    Correct.

7    Q.    And you went to prison in the '90s for killing somebody,

8    correct?

9    A.    Yes, sir.

10   Q.    And you're in prison now for killing somebody, correct?

11   A.    Yes, sir.

12   Q.    You're going to be getting out soon, though; aren't you?

13   A.    God willing.

14   Q.    I'm sorry?

15   A.    Yes, sir.

16   Q.    A couple months, right?

17   A.    Yes, sir.

18   Q.    In a couple months, you'll be on the street, correct?

19   A.    Yes, sir.

20   Q.    And you'll be on the street as a result of the deal that

21   you struck in regard to your latest killing, correct?

22   A.    Yes, sir.

23   Q.    Okay.  A deal that was afforded to you by a prosecuting

24   authority, correct?

25   A.    Exactly who?

TRIAL ONE - VOL. 25 - 5090

1    Q.   Well, you were given that deal by a prosecuting

2    authority, correct?

3    A.   Yes, sir.

4    Q.   When you got released from prison in 2006, that was from

5    the murder in the '90s, correct?

6    A.   Yes, sir.

7    Q.   Okay.  And it took you about five minutes to get back

8    involved in crime, correct?

9    A.   You're right.

10   Q.   So you went to prison for killing somebody, correct?

11   A.   Yes, sir.

12   Q.   You served time, correct?

13   A.   Yes, sir.

14   Q.   You asked judges to let you out early because you had

15   learned your lesson, correct?

16   A.   Yes, sir.

17   Q.   They didn't let you out, correct?

18   A.   Yes, sir.

19   Q.   You got out, correct?

20   A.   Yes, sir.

21   Q.   And then you immediately started re-engaging in crime,

22   correct?

23   A.   Correct.

24   Q.   That's who you are, correct?

25   A.   No doubt.

TRIAL ONE - VOL. 25 - 5091

1    Q.    How far did you get in school?

2    A.    G.E.D.

3    Q.    That wasn't my question.  How far did you get in school

4    before you dropped out?

5    A.    Twelfth grade.

6    Q.    Twelfth grade?

7    A.    Yes, sir.

8    Q.    Did you graduate?

9    A.    No, sir.

10    Q.    Okay.  And you got your G.E.D. in prison, correct?

11    A.    Yes, sir.

12    Q.    In 2008, you were charged with two counts of aggravated

13    murder with specification, correct?

14    A.    Yes, sir.

15    Q.    That would be a purposeful killing by prior calculation

16    and design twice, correct?

17    A.    Yes, sir.

18    Q.    Both carry life sentences, correct?

19    A.    Yes, sir.

20    Q.    You were also charged with attempted murder, correct?

21    A.    Yes, sir.

22    Q.    Carries 15 years, correct?

23    A.    Yes, sir.

24    Q.    Let me back up.  The aggravated murder charges also

25    carried gun specifications, correct?

TRIAL ONE – VOL. 25 – 5092

1    A.    Correct.

2    Q.    So that would be three years for each body that you put

3    in the cemetery, correct?

4    A.    Yes, sir.

5    Q.    The attempted murder also carried a gun specification,

6    correct?

7    A.    Yes, sir.

8    Q.    So that would be fifteen, plus three, for the attempted

9    murder, correct?

10   A.    Yes, sir.

11   Q.    Two counts of -- or one count of felonious assault with

12   a gun specification, correct?

13   A.    Yes, sir.

14   Q.    Eleven years, plus three years, correct?

15   A.    Yes, sir.

16   Q.    Actually, it's eight, plus three years.  My mistake.

17         One count of tampering with evidence, correct?

18   A.    Yes, sir.

19   Q.    A third-degree felony, correct?

20   A.    Yes, sir.

21   Q.    At that time carried up to five years, correct?

22   A.    Yes, sir.

23   Q.    And one count of having a weapon under disability,

24   correct?

25   A.    Yes, sir.

TRIAL ONE – VOL. 25 – 5093

1   Q.   Meaning that, because of your history, you were legally

2   not allowed to have guns, correct?

3   A.   Yes, sir.

4   Q.   You started carrying a gun the day after you got out of

5   prison, didn't you?

6   A.   Yes, sir.

7   Q.   So, five more years on that, correct?

8   A.   Correct.

9   Q.   So, by my math, that's two life sentences, plus 35

10  years.  Would you agree?

11  A.   Yes, sir.

12  Q.   And that's also for a guy who is facing his second

13  homicide case, correct?

14  A.   Yes, sir.

15  Q.   And the deal that you struck was for eight years,

16  correct?

17  A.   Yes, sir.

18  Q.   Five years on an involuntary manslaughter, correct?

19  A.   Yes, sir.

20  Q.   Three years for a gun specification, correct?

21  A.   Yes, sir.

22  Q.   Concurrent, meaning at the same time, a five-year

23  sentence on a felonious assault, correct?

24  A.   I'm not for sure how that go, but that's -- that's the

25  number of time I got.

TRIAL ONE – VOL. 25 –  5094

1   Q.   Well, and you also had another case at that time; did

2   you not?

3   A.   Yes, sir.

4   Q.   Another weapons case, correct?

5   A.   Correct.

6   Q.   A weapons case that you were arrested and charged with

7   before the incident that led to the murders, correct?

8   A.   No.

9   Q.   I'm sorry?

10  A.   I was never arrested.

11  Q.   Okay.  You were never arrested.

12  A.   No.

13  Q.   You were charged with it and committed those acts prior

14  to the incident that led to the murders, correct?

15  A.   Repeat that again.

16  Q.   The weapons case, the individual weapons case that you

17  were sentenced with, sentenced for, on the same day that you

18  were sentenced on the murder case, that incident occurred

19  before you were involved in the murders, correct?

20  A.   Yes, sir.

21  Q.   So, just so this jury understands, you got out of jail.

22  You picked up a weapons case.  Correct?

23  A.   Correct.

24  Q.   And then you picked up the murder case, correct?

25  A.   Correct.

TRIAL ONE – VOL. 25 – 5095

1    Q.    Now, on the weapons case, alone, you could have received

2    in excess of eight years in prison, correct?

3    A.    Yes, sir, I believe.

4    Q.    Is there somebody -- Is there something going on over

5    here I need to know about?

6    A.    It's just me and you.

7    Q.    Okay.  Good.  Well, then, I want you to keep your eyes

8    on me.  Okay?

9          So you could have gotten eight years on the weapon case

10   alone, correct?

11   A.    Yes, sir.

12   Q.    Okay.  So, basically, the two murders, the felonious

13   assault, the attempted murder, the weapon under disability, was

14   all for free, correct?

15   A.    Say that again.

16   Q.    You got away with two murders, a felonious assault, an

17   attempted murder and a weapon under disability without being

18   punished for it, correct?

19   A.    I'm being punished.

20   Q.    Now, when you got out, you were sent to a halfway house;

21   were you not?

22   A.    Yes, sir.

23   Q.    And that's when you started committing crimes, correct?

24   A.    Say that again.

25   Q.    You were still at the halfway house when you were

TRIAL ONE - VOL. 25 -  5096

1  committing crimes?

2  A.    No, sir.

3  Q.    No, sir?  How long were you at the halfway house?

4  A.    Like two months, three months, tops.

5  Q.    Okay.  So that would take us into September?

6  A.    No.  I got out December 2005.  I got violated

7  February-March 2006.  Released June 6th, 2006.

8  Q.    Okay. For good, right?

9  A.    Yes, sir.

10  Q.    Until your next crime, right?

11  A.    Yes, sir.

12  Q.    So, when you were in the halfway house before your

13  release, you violated the conditions of the halfway house,

14  correct --

15  A.    Correct.

16  Q.    -- to the extent that you were re-incarcerated, correct?

17  A.    Yes, sir.

18  Q.    So, the first thing you did when you got out on your

19  initial murder charge was to violate the conditions of your

20  release, correct?

21  A.    Yes, sir.

22  Q.    That's who you are, correct?

23  A.    Correct.

24  Q.    Now, I missed something on your indictment for the

25  murders.  You were also charged with another specification;

TRIAL ONE – VOL. 25 –   5097

1    were you not?

2    A.    Can you go forward with it?  I didn't hear you.

3    Q.    Something called a "Repeat Violent Offender

4    Specification," does that ring a bell to you?

5    A.    Okay.

6    Q.    Does it?  "Yes" or "no," sir?

7    A.    I never got to see my indictment.

8    Q.    Would you like to see it?

9    A.    I'm alright without.  I'm listening to you.

10   Q.    And that could add another decade of prison to that

11   indictment, correct?

12   A.    Yes, sir.

13   Q.    So, actually, it was two life sentences, plus about 50

14   years, correct?

15   A.    Okay.

16   Q.    Now, you were arrested in September of 2008, correct?

17   A.    Yes, sir.

18   Q.    And you struck your deal after spending two years in the

19   Franklin County Jail, correct?

20   A.    Yes, sir.

21   Q.    So, your cooperation was something that was far from

22   immediate, correct?

23   A.    Repeat that again.

24   Q.    Well, this incident that led to you being charged with

25   murders was in September, correct?

TRIAL ONE – VOL. 25 – 5098

1    A.    Yes, sir.

2    Q.    2008, correct?

3    A.    Yes, sir.

4    Q.    You first talked to the Pickerington authorities on

5    August 3rd of 2010, a full two years after the incident,

6    correct?

7    A.    Yes, sir.

8    Q.    So you sat in jail, for two years, making your deal,

9    correct?

10   A.    I had decided not for the time.  I decided because it

11   was eating me alive inside, because the person that died on the

12   case that I admitted to, he was related to everybody around me.

13   I didn't know it until after the fact.

14         MR. BERNDT:  Your Honor, I'll move to strike.  That's

15   unresponsive to my question.

16         THE COURT:  Side-bar.

17                              – – –

18    (Thereupon, the following proceeding was held at side-bar.)

19         THE COURT:  Read the question and answer, please.

20    (The last question and answer were read back by the court

21   reporter.)

22         THE COURT:  Overruled, your objection.

23    I was concerned about an earlier question that you asked

24   when you asked about the specs, I think something like "violent

25   offender specs."  And the witness had testified that he didn't

TRIAL ONE - VOL. 25 -  5099

1  see his indictment.  And then you asked that subsequent

2  question.

3       I guess, theoretically, he could know what the specs

4  were without having seen the indictment, but I don't know that

5  it's fair game to cross-examine him without knowing more about

6  it.  You know, maybe his lawyer explained it to him or,

7  somehow, he otherwise found out about it before you can make

8  the inference that, you know, he knew about this when he hadn't

9  seen it.  But I'm going to let it stand because there were no

10  objections.  So, I'm not going to object sua sponte, because

11  maybe he otherwise knew it, and this witness is sophisticated

12  enough that I think he can tell you if he didn't.

13       MR. BERNDT:  Your Honor, I did offer the indictment

14  after he said he'd never seen the indictment, and he rejected

15  my offer.

16       THE COURT:  Yes.  And you could give it to him for him

17  to read here in the court.  Even seasoned criminals may not

18  understand all of the legal nuances of an indictment, which is

19  why they have all of these very sophisticated counsel to

20  explain it to them.  So, that's why that wouldn't work.

21       But I'm going to -- As I said, there was no objection.

22  So the testimony stands.  But the way and the wording of your

23  question didn't just ask for temporal.  What he was answering

24  was, this is what I was doing for those two years in jail.  So,

25  as good as you are, you can rephrase and get what you want.

1   But I'm going to let this answer stand.

2        MR. BERNDT:  Thank you.

3     (The following proceedings were had in open court.)

4        THE COURT:  Mr. Berndt, please continue.

5   BY MR. BERNDT:

6   Q.  Mr. Williams, you've imparted a lot of information to

7   this jury today, and I want to go through it with you.  All

8   right?

9   A.  Yes, sir.

10  Q.  So what I want to talk to you about first is, do you

11  remember making a statement on September 20th, 2008, to law

12  enforcement?

13  A.  I asked for a lawyer.

14  Q.  I'm sorry?

15  A.  I asked them for a lawyer.

16  Q.  So you do remember that statement?

17  A.  Was that the statement?

18  Q.  I asked you a question:  If you remembered making a

19  statement on September 20th, 2008.

20  A.  No, sir.

21  Q.  If I showed you a report that indicates that statement,

22  would that refresh your recollection?

23  A.  Can you just read it?

24        MR. BERNDT:  Your Honor, may I approach the witness?

25        THE COURT:  Yes, you may.

TRIAL ONE – VOL. 25 – 5101

1   BY MR. BERNDT:

2   Q.   Just look at that and see if it refreshes your

3   recollection.  Take whatever time you need.

4   A.   (Witness complies.)

5        Yes, sir.

6            MR. BERNDT:  Your Honor, may I retrieve the statement?

7            THE COURT:  Yes, you may.

8   BY MR. BERNDT:

9   Q.   Mr. Williams, does that refresh your recollection about

10  that statement?

11  A.   At that time -- and I -- I got to be honest with you,

12  like, in the hospital, that first day that they came, I don't

13  remember saying that exactly.  But it sounds about right.

14  Q.   And you were in the hospital, right?

15  A.   Yes, sir.

16  Q.   You were seriously wounded, correct?

17  A.   Yes, sir.

18  Q.   And, in the days and weeks after that incident, you were

19  under a lot of medication, correct?

20  A.   Yes, sir.

21  Q.   And so what you're telling this jury is that that put

22  you into a position where you may not have remembered all of

23  the things that went on during that time frame, correct?

24  A.   I remember.

25  Q.   I'm sorry?

TRIAL ONE - VOL. 25 - 5102

1    A.   I remember.

2    Q.   Okay.  You remember.  Okay?

3    A.   That was, like, my first -- they came, like, that

4    first -- second day, they came.

5    Q.   Okay.

6    A.   All right.

7    Q.   Do you remember telling them you were in fear of your

8    life?

9    A.   I have to be honest, I -- I can't say I do, but I can't

10   say I didn't.

11   Q.   Did you see it in the statement?

12   A.   I seen it in the statement, yes, sir.

13   Q.   And then, after that, you lawyered up, right?

14   A.   Yes, sir.

15   Q.   Remember making a statement on September 2nd, 2010?

16   A.   Can you -- Can you read it for me?

17   Q.   No.

18   A.   Okay.

19   Q.   Do you remember making a statement on September 2nd,

20   2010?

21   A.   I can't never remember the dates.

22   Q.   Do you remember making a statement to Detective Kathy

23   Justee -- Justice -- I'm sorry -- and Alcohol, Tobacco and

24   Firearm Agent Paris Wilson at the Franklin County Jail on

25   September 2nd, 2010, at 10:13 a.m.?  It would have been about

TRIAL ONE – VOL. 25 –  5103

1    almost two years after you were looked up.

2    A.    Okay.

3    Q.    You talked to them about Alan Johnson's murder.  You

4    talked to them about Marcus Peters' murder.  Do you remember

5    that?

6    A.    Alan Johnson?

7    Q.    Alan Johnson is the person that allegedly killed Elijah

8    Ledbetter.

9    A.    Okay.

10   Q.    Do you remember making those statements?

11   A.    Yes, sir.

12   Q.    Okay.  So, you testified on direct examination that

13   Marcus Peters was killed at the request of my client, Robert

14   Ledbetter, correct?

15   A.    Yes, sir.

16   Q.    That's what you testified to, correct?

17   A.    Yes, sir.

18   Q.    You testified that he was set up to be murdered at the

19   request of my client at the robbery, or burglary, that occurred

20   at 2627 Bridgestone Court at or near the airport.  Do you

21   remember that?

22   A.    You said I testified?

23   Q.    You testified to that today.

24   A.    I said Marcus Peters was killed there.  That's what I

25   said.  I told you –– I said that Robert Ledbetter had asked me

TRIAL ONE – VOL. 25 –   5104

1    to kill him.

2      Q.   Okay.

3      A.   Right?  But I didn't testify that he was set up there to

4    kill him.  I told you the guy, D Frog, came and asked me, you

5    know, told me that B had -- there was an accident there, but I

6    knew that B paid him to kill him.

7      Q.   Okay.  So your testimony here to this jury --

8      A.   That's what I'm saying right now.

9      Q.   -- is that you have knowledge that my client paid

10   Deounte Ussury to kill Marcus Peters during that robbery,

11   correct?

12     A.   Correct.

13          MR. BERNDT:  The exhibit is 165-22.05.  We're going to

14   begin at five minutes.

15       (Audiotape played in open court.)

16   BY MR. BERNDT:

17     Q.   Who is that?

18     A.   That's me, sir.

19     Q.   I'm sorry?

20     A.   That's me.

21     Q.   That's you?

22     A.   Yes, sir.

23          MR. BERNDT:  Please.

24       (Audiotape played in open court.)

25   BY MR. BERNDT:

TRIAL ONE – VOL. 25 –  5105

1    Q.    You hear you talking about Lewis Ruffin and Rick Kelton

2    (phonetic), sir --

3    A.    Yes, sir.

4    Q.    -- who didn't like Marcus, correct?  Your words,

5    September 2, 2010, correct?

6    A.    Correct.

7         MR. BERNDT:  Please proceed.

8      (Audiotape played in open court.)

9    BY MR. BERNDT:

10   Q.    Didn't you just tell the police that Lewis Ruffin and

11   Rick Kelly sent Marcus on a mission, sir?

12   A.    You might want to replay that and listen to it one more

13   time.

14        AGENT LAUBER:  Where did we start at?

15        MR. BERNDT:  We started at five minutes.

16     (Audiotape played in open court.)

17   BY MR. BERNDT:

18   Q.    When you said they had a beef about her, you're talking

19   about Marcus Peters and Lewis Ruffin, correct?

20   A.    Right.

21        MR. BERNDT:  Would you please continue?

22     (Audiotape played in open court.)

23   BY MR. BERNDT:

24   Q.    So, Mr. Ruffin sent Marcus Peters on a mission.  Is that

25   what you said, sir?

TRIAL ONE – VOL. 25 – 5106

1   A.   Let me say it to you clearly.  Hear it clearly.

2        I never said Lewis Ruffin or Kelly said anything.  I

3   said "they."

4        So, play it one more time, sir.

5   Q.   Sir, in this statement, 30 seconds before you used the

6   word "they," you were talking of Lewis Ruffin and Rick Kelly,

7   correct?

8   A.   That's the place that they said they was going to rob,

9   was their place, from my information.  That's the place where

10  they was going.

11       I'm saying that they had a beef with them over a girl.

12  But I didn't say that Lewis Ruffin and Rick Kelly sent him over

13  there.  That's whose house that, supposedly, we had information

14  that they was going to go rob.

15       That's what it says, clearly, on there, sir.

16  Q.   Are you all done?

17  A.   Yes.

18       MR. BERNDT:  Play it.

19    (Audiotape played in open court.)

20  BY MR. BERNDT:

21  Q.   Mr. Williams --

22  A.   Yes, sir.

23  Q.   -- I didn't hear Robert Ledbetter's name during that

24  conversation.  Did you?  "Yes" or "no"?

25  A.   No, I didn't hear his name.

TRIAL ONE – VOL. 25 –  5107

1        If you play the whole thing, you'll hear Robert

2   Ledbetter's name come up.

3        Don't miss it.  Don't miss it.  Play it.

4        MR. BERNDT:  Your Honor, could this witness be

5   instructed that I ask the questions and there was no question

6   in front of him right now?

7        THE COURT:  Mr. Williams, there is no question

8   pending.

9        The jury is instructed to disregard Mr. Williams'

10   directive to Mr. Berndt.

11        MR. BERNDT:  Let's go ahead.  And, Special Agent

12   Lauber, keep playing it.

13     (Audiotape played in open court.)

14   BY MR. BERNDT:

15   Q.   So, you just admitted to the police that you really

16   don't know what happened in that apartment on October 6, 2007,

17   correct?

18   A.   Say that again.

19   Q.   You just admitted to the police that you don't know what

20   happened in that apartment on October 6, 2007.

21   A.   My eyes wasn't exactly there.  But my feeling, my ears

22   and my circle, I about knew exactly what happened there.  But I

23   couldn't point the finger at exactly who did it.  But as the

24   tape would show, Marcus called me, Brandon called me.  But I

25   refused to go over there.  I said I wasn't getting down with

TRIAL ONE – VOL. 25 –   5108

1    them.

2         COURT REPORTER:  I'm sorry.  Please repeat after "I

3    said I wasn't getting down with them."

4         THE WITNESS:  I said I wasn't going to go with them.

5    But I was one of the first ones informed by Marc and Ledbetter,

6    because they both wanted me to go on it.  And that's why I knew

7    who was there.  I knew O-Dog was there because he told me O-Dog

8    was there.  I knew Black Marc was going to be there because he

9    told me that Marc was going to go.  Then he mentioned a few

10   other guys, guys I really ain't never done anything with.  So,

11   I can't remember all of that clearly.  But I can remember

12   exactly that -- my three guys would have been Ledbetter, O-Dog

13   and Black Marc.

14    Q.   And you weren't there, correct?

15    A.   Yes, sir.

16    Q.   And you didn't want to go, correct?

17    A.   Yes, sir.

18    Q.   Do you remember telling the police that you didn't want

19   to go because you didn't like how things went at Rodriccos

20   Williams'?

21    A.   I might have said that, but I didn't want to go there

22   because of things that we had did out west together.  And Black

23   Marc was on fire, and B wanted him dead.  And B told me he

24   wanted him dead.  So I didn't want to get down with it, in

25   addition, because I knew something was going to come up.

1    Q.   So you didn't want to go because you didn't like how it

2    went at Rodriccos Williams', correct?

3    A.   I don't remember saying that.  But if you want to play

4    it, you can, sir --

5    Q.   Sir, I'm not playing.  Okay?

6    A.   -- because I don't remember that, either.

7    Q.   Well, let's go back to September 2, 2010.

8    A.   Yes, sir.

9    Q.   You also spoke to the police about Alan Johnson,

10   correct?  Do you remember that?

11   A.   Okay.

12   Q.   Do you remember that, sir?

13   A.   Some of the names, you have to explain it to me in

14   detail, and I can basically tell what I said.

15   Q.   Do you remember speaking about the murder of the person

16   who supposedly murdered Robert Ledbetter's brother?

17   A.   Okay.  Yes, sir.

18   Q.   Thank you.  And you were in jail when that murder

19   occurred, correct?

20   A.   Yes, sir.

21   Q.   And you were telling the police what you had heard from

22   other people, correct?

23   A.   Let me say this to you:  Melissa Leslie, I called her.

24   She told me Brandon Ledbetter's brother got killed.

25        I called Brandon Ledbetter.  I told him to wait for me

1    to come home.  Before I got home, it was done.  When I got

2    home, Brandon Ledbetter told me exactly what happened.  And

3    Black Marc told me exactly what happened.

4      Q.    And that's what you told the police, right?

5      A.    That's what I said.

6            MR. BERNDT:  Okay.

7            Could I have the same exhibit, at 22 seconds?

8            COURTROOM DEPUTY CLERK:  165-22.05.

9        (Audiotape played in open court.)

10           MR. BERNDT:  Maybe 21:30 would do it.

11       (Audiotape played in open court.)

12   BY MR. BERNDT:

13     Q.    Did you hear the male voice, Mr. Williams?

14     A.    I didn't hear nothin'.

15     Q.    Didn't hear the male voice?

16           MR. BERNDT:  Could we back up to 21:30?

17       (Audiotape played in open court.)

18   BY MR. BERNDT:

19     Q.    Is that male voice on there you, Mr. Williams?

20     A.    Yes, sir.

21     Q.    Okay.

22           MR. BERNDT:  Please continue.

23       (Audiotape played in open court.)

24   BY MR. BERNDT:

25     Q.    Did you hear that, sir?

TRIAL ONE — VOL. 25 —  5111

1    A.    Yes, sir.

2    Q.    Did you hear you telling the police that this homicide

3    occurred in the Short North?

4    A.    Yes, sir.

5    Q.    And that is your testimony before this jury today,

6    correct --

7    A.    No, sir.

8    Q.    -- that Alan Johnson was killed in the Short North,

9    swear to God, under oath, according to Earl Williams, correct?

10   A.    I said that's what they said to me.  Now, if they told

11   -- Now, if it happened at a different location, I can just tell

12   you that the person said this is what was done and this is who

13   did it.

14       Now, as far as location, I just gave you what was given

15   to me.

16           MR. BERNDT:  Please continue.

17      (Audiotape played in open court.)

18   BY MR. BERNDT:

19   Q.    "I know that it happened in an apartment building," is

20   that you?

21   A.    Yes, sir.

22   Q.    Thank you.

23      (Audiotape played in open court.)

24   BY MR. BERNDT:

25   Q.    So, according to you, Brandon Ledbetter, Marcus Peters,

TRIAL ONE – VOL. 25 –  5112

1   and somebody else told you this identical story, correct?

2   A.   Brandon Ledbetter, Marcus Peters, Travis McGinnis, all

3   three of these guys told me the story about that night.

4        MR. BERNDT:  Would you continue, please?

5     (Audiotape played in open court.)

6        MR. BERNDT:  Thank you.

7   BY MR. BERNDT:

8   Q.   So, how they found Mr. Johnson was that they were both

9   in the neighborhood, your statement.  Correct?

10  A.   My statement is what somebody said to me.

11  Q.   Okay.  And your statement could be wrong, correct?

12  A.   It came out of the words of Brandon Ledbetter -- Brandon

13  Ledbetter, Marcus Peters, and Trigger Trav.

14       Now, if it varied, how they related to me, I just gave

15  it to you exactly how I heard it from these three individuals.

16       Getting on point, my eyes wasn't there.  But, right in

17  front of them, right beside them, these are my guys, and this

18  is what they said to me.

19  Q.   And you've testified a lot, today, about what people

20  said to you, correct?

21  A.   I'm here.

22  Q.   Sir, correct?

23  A.   Yes, sir.

24  Q.   And you're telling us, now, that sometimes people aren't

25  telling you the truth, correct?

TRIAL ONE – VOL. 25 –   5113

1    A.    No, I'm not saying that.  I'm saying this man told me

2    his side of the story, this man told me his side of the story,

3    and this man told me his side of the story.  And that's exactly

4    how I said it throughout this whole thing.  Everybody got their

5    own story, and they get twisted around, true enough.  But with

6    Brandon Ledbetter, this was my everyday guy.  And this is what

7    he delivered to me about his brother.  And as far as Black

8    Marc, that's what Black Marc said to me.  And Trigger Trav said

9    the same thing.

10   Q.    And these are all very close people to you, correct?

11   A.    Yes, sir.

12   Q.    And if Alan Johnson was not murdered in the Short North,

13   they told you things that were false, correct?

14   A.    Yes, sir, if that's -- if that's how you want to put it.

15   But, in this life, you don't never get all the details and the

16   full details, because that could lead back to them.  You only

17   get a little bit of it, just a little bit.

18   Q.    Does that include you?

19   A.    If that's what you -- I'm not lying here today.  I done

20   told you everything -- I told this district attorney everything

21   I know.

22   Q.    Now, you're angry at Mr. Ledbetter; are you not?

23   A.    I'm not angry.  Mr. Ledbetter, he is a brother of mine.

24   He always will be.  I always will love him.  I mean, that's

25   through God.  But we both was lost out there.  We had that

TRIAL ONE - VOL. 25 -  5114

1  cloud over us real heavy, you know.  So, getting -- you know,

2  we can find that within ourselves to be able to forgive others.

3  Some of us can't.  I had to find myself.  I don't know if

4  Mr. Brandon Ledbetter found his.  But everything I did in my

5  life, I'm sorry for.  Being mad at Mr. Ledbetter is done and

6  over with.

7  Q.   Who is Tijuana Campbell?

8  A.   That's my baby's mom.

9  Q.   Okay.  And what was your issue with Mr. Ledbetter in

10 regard to Tijuana Campbell?

11 A.   Let me say this:  Me and Ledbetter never had no issue

12 with my baby's mom.  Mr. Ledbetter got with my baby's mom maybe

13 after, I guess, after I got locked up.  But I didn't find out

14 until three years later.  So, that was way after the

15 investigation.  So that can never play any part with it, when I

16 found that out.

17      And then, after that, it didn't make a difference,

18 because I kept on calling my baby's momma and communicating

19 with her.  And I let that go.  But she was in this courtroom

20 this morning, standing back there, supporting him.  But I asked

21 for some protective custody because I still cared about her

22 because I still loved her behind this whole situation.

23      I ain't got no regret, no anger, in me.  It's in the

24 past, man.

25 Q.   Were you angry at Mr. Ledbetter for having a sexual

TRIAL ONE – VOL. 25 –   5115

1   relationship with Tijuana Campbell?

2   A.   I wasn't angry at Mr. Ledbetter.  I couldn't be mad at

3   him.  I couldn't be mad at her.  You know, we deal with

4   emotions when it comes to love, but sometimes you gotta let go

5   and let God.

6        MR. BERNDT:  May I have 165-22.06?  Begin about 2:45.

7     (Audiotape played in open court.)

8   BY MR. BERNDT:

9   Q.   What did you say there?

10  A.   I said he's fucking my baby's momma.  That's the truth.

11       MR. BERNDT:  Will you continue?

12    (Audiotape played in open court.)

13       MR. DEVILLERS:  Objection.  We need a context of when

14  this was.  We don't have a foundation laid.

15       THE COURT:  Sustained.

16     Establish a foundation, Mr. Berndt.

17       MR. BERNDT:  Certainly, Your Honor.

18  BY MR. BERNDT:

19  Q.   Do you remember speaking to a detective by the name of

20  Kessler (phonetic) and --

21  A.   Yes, sir.

22  Q.   I'm sorry?

23  A.   Yes, sir.

24  Q.   Do you remember speaking to them while you were in

25  prison?

TRIAL ONE - VOL. 25 -  5116

1    A.    Yes, sir.

2    Q.    Do you remember speaking to them on October 18th, 2012?

3    A.    I can't recall the dates, but I remember that -- I

4    remember that.

5         MR. BERNDT:  Why don't we go to the beginning of that?

6      (Audiotape played in open court.)

7    BY MR. BERNDT:

8    Q.    Do you remember talking to the police?

9    A.    Talking about this right here, what you just played?

10   Yes, sir.

11   Q.    And you immediately referenced to them two things:  That

12   Mr. Ledbetter was having a relationship with your girl,

13   correct?

14   A.    Yes, sir.

15   Q.    And that Mr. Ledbetter was telling people that you were

16   telling, correct?

17   A.    Correct.

18   Q.    Well, you were telling, correct?

19   A.    What?  At this time?

20   Q.    In 2012, you were telling, correct?

21   A.    Correct.  This was about Rodriccos.

22   Q.    Now, you also talked about how, somehow, Mr. Ledbetter

23   has placed you in some type of state of fear or some type of

24   state of peril, correct?

25   A.    Okay.

TRIAL ONE – VOL. 25 –  5117

1    Q.   Is that accurate?

2    A.   Yes, sir.

3    Q.   Okay.  Now, you were arrested in September of 2008,

4    correct?

5    A.   Yes, sir.

6    Q.   Okay.  And you spent two-plus years in the Franklin

7    County Jail, correct?

8    A.   Yes, sir.

9    Q.   During that time period, were you taken to the hospital

10   to get any type of medical treatment because you were assaulted

11   in the Franklin County Jail?

12   A.   Yes, I went to the hospital a few times.

13   Q.   You went to the hospital for the wound that you

14   sustained in your shootout with Mr. Brown, correct?

15   A.   Yes, sir.

16   Q.   Were you ever taken to the hospital because you were

17   physically assaulted while you were in the Franklin County Jail

18   from September of 2008 through September of 2010?

19   A.   I don't recall that.

20   Q.   Okay.  You then went to prison, correct?

21   A.   Yes, sir.

22   Q.   You went to the Corrections Reception Center in Orient,

23   correct?

24   A.   Yes, sir.

25   Q.   Okay.  And were you physically assaulted in the

TRIAL ONE – VOL. 25 –  5118

1   Corrections Reception Center while you were there awaiting your

2   classification after you were sent to prison after you pled

3   guilty after you left the Franklin County Jail?

4   A.   Yes, sir.

5   Q.   You were?

6   A.   Yes, sir.

7   Q.   And who was that that assaulted you?

8   A.   I don't know who that was.

9   Q.   What were your injuries?

10  A.   I don't know.  The police stumped me out.

11       I don't know what you mean.  What you leading to,

12  because I'm not understanding you?

13  Q.   Okay.  I asked you do you remember when you were at the

14  Corrections Reception Center in Orient, Ohio, after you were

15  sent to prison for your shootout with Paco.

16  A.   Okay.

17  Q.   Do you remember that?

18  A.   All right.

19  Q.   Do you remember being physically assaulted in the

20  Corrections Reception Center before you were sent to a prison?

21  A.   I had somebody stealing in the chow hall, and the police

22  were standing there.

23  Q.   You said somebody stole on you?

24  A.   Yes, somebody stole on me.

25  Q.   Okay.

TRIAL ONE – VOL. 25 –   5119

1    A.   Somebody swung on me in the chow hall, and the police

2    beat me up.

3    Q.   Okay.  So somebody took a swing at you and missed, and

4    then the police beat you up?

5    A.   Oh, he didn't miss.

6    Q.   So, he hit you --

7    A.   Yeah.

8    Q.   -- and then the police beat you up?

9    A.   Right.

10   Q.   Left the other guy alone, correct?

11   A.   Yes, sir.

12   Q.   All right.  You don't have any information to tell this

13   jury that Mr. Ledbetter was in conspiracy with the police to

14   beat you up in the chow hall at the Corrections Reception

15   Center, correct?

16   A.   No, sir.  I never said that.

17   Q.   Okay.  So, where did you go after you left the

18   Corrections Reception Center?

19   A.   I went to Lebanon Correctional.

20   Q.   Okay.  And how many times were you physically assaulted

21   in the Lebanon Corrections Center?

22   A.   One time.

23   Q.   And that was because somebody down there was a relative

24   of somebody that got killed on your case in 1997, correct?

25   A.   Two different cases.

TRIAL ONE – VOL. 25 – 5120

1   Q.   Okay.

2   A.   Three different cases.

3   Q.   Okay.

4   A.   I got jumped down there, mauled down there, by three

5   different family members.

6   Q.   All from people from your prior case, correct?

7   A.   Correct.

8   Q.   Not people sent by Brandon Ledbetter, correct?

9   A.   Correct.

10  Q.   Okay.  Where did you go next?

11  A.   Mansfield.

12  Q.   Okay.  Did you get physically assaulted in Mansfield?

13  A.   Yes, I did.

14  Q.   And who physically assaulted you in Mansfield?

15  A.   L'il Keefee (phonetic) and –– What's the dude's name?  I

16  can't remember the other guy's name, but this was through

17  Ledbetter.

18  Q.   Okay.

19  A.   This was through Ledbetter, because they was in the

20  holding cell –– They was in the county jail with him.  And when

21  they was in the county jail with him, they said Mr. Ledbetter

22  was charged with Rodriccos' murder with the State, and he was

23  saying that I was telling.

24       And we had cell phones, down there, illegally.  So, in

25  the process of that, they get on the cell phones and said:

TRIAL ONE – VOL. 25 – 5121

1  Produce the paperwork that you got Mr. Williams telling on you;
2  you got to produce it.
3       But this is after I got in a fight with these guys and
4  got assaulted and got jumped by them.
5  Q.  What were your injuries?
6  A.  My injuries?
7  Q.  Yeah.
8  A.  I had some black eyes, busted lips, just normal little
9  things.
10  Q.  Were you sent out for medical attention?
11  A.  No, I wasn't.
12  Q.  And tell the jury again, specifically, the names of the
13  people that assaulted you?
14  A.  L'il Keefee.  I don't remember the other guy's name.
15  Q.  Where did you go next?
16  A.  I went to Lancaster.
17  Q.  Okay.  And were you physically assaulted at Lancaster?
18  A.  I got into it.  B sent his -- B had a cousin down there
19  named Nic Nic.  He had a guy down there named Uncle P, Jermaine
20  Patterson's uncle.
21       Jermaine Patterson's uncle come to me.  He let me know
22  that B had said to do something to --
23       MR. GATTERDAM:  Objection to what he said.
24       THE COURT:  Just a second, Mr. Williams.
25       Rephrase your question, Mr. Berndt.

TRIAL ONE – VOL. 25 – 5122

1    BY MR. BERNDT:

2    Q.    You were physically assaulted in Lancaster, correct?

3    A.    Yes, I was.

4    Q.    And what injuries did you incur?

5    A.    Injuries I incurred?  You know, I healed up.  This one

6    fight occurred.

7         You understand, I have everything tooken out of me.  I

8    got a disk tooken out of my back.  So, when I was in there

9    fighting and got slammed and stuff like that, I didn't run to

10   the police.  I couldn't run to the police down there because

11   all they're going to do is put you right back out on the

12   compound.  So, you gotta fight your fight, win, lose or draw.

13   That's just how it go.

14   Q.    So no medical attention, correct?

15   A.    No, no medical attention.  I had enough of that through

16   Mr. Ledbetter.

17   Q.    No medical attention, correct?

18   A.    No, sir.

19   Q.    Okay.  Where did you go next?

20   A.    I went to Madison.

21   Q.    Okay.  Get physically assaulted in Madison?

22   A.    No.  Just a lot of threats.  A lot of threats.

23   Q.    When you were in prison in the 1990s, 1997 through 2006,

24   do you remember that time?

25   A.    I ain't have no problems.

TRIAL ONE - VOL. 25 - 5123

1   Q.   You never got into a fight in prison?

2   A.   I got into small little fights, but I ain't had no

3   problems.

4   Q.   Fights that didn't involve medical attention?

5   A.   Every time you get into it and you get caught in front

6   of the police, that's the only time you go see Medical.  But

7   most of our fights in prison, we're going to the bathroom; we

8   go to the back wall; we hide behind the building.  We don't do

9   nothin' in front of the police, because you know why.  You're

10  going right to the hole.  And when you go in the hole, them

11  guys are right in the hole with you, and you can be touched

12  anywhere inside them walls at any time.

13  Q.   So what you experienced after you went to prison after

14  the shootout with Paco was exactly what you experienced when

15  you were in prison for your first murder, correct?

16  A.   Wrong.  This time around, sir, I've been in fear of my

17  life, prison -- prison to prison, checking in, you know, what

18  you call it, locking down in the hole, people threatening me.

19  I'm around 120 pounds.  Can't fight.  People at me, threatening

20  me.

21       If I wasn't an ex-gangbanger, a Crip, the Short North

22  and an upstanding reputation and the things that I did that was

23  unspeakable, then I wouldn't have been safe.  And if I wouldn't

24  have crossed over and become a Muslim, I probably would have

25  been dead in there.

TRIAL ONE – VOL. 25 –   5124

1   Q.   Tell us about some of the unspeakable things that you've

2   done?

3   A.   We just spoke about them today in here.

4   Q.   You remember talking to the police about Rodriccos

5   Williams, correct?

6   A.   Yes, sir.

7   Q.   Do you remember your first statement, being August 3rd

8   of 2010?

9   A.   Okay.

10   Q.   Do you remember that, sir?

11   A.   I never remember the date.

12   Q.   Do you remember it being almost two years after you were

13   arrested?

14   A.   Okay.

15   Q.   Is that a "yes"?

16   A.   You've got the date.  I'm following with you, sir.  Yes,

17   sir.

18   Q.   Is that a "yes"?

19   A.   Okay.

20   Q.   You testified on direct examination that Mr. Ledbetter

21   was involved in a sexual relationship with Rodriccos Williams'

22   wife, correct?

23   A.   Yes, sir.

24   Q.   You testified that he had seen her, secretly, from her

25   husband, correct?

TRIAL ONE - VOL. 25 - 5125

1    A.    Yes, sir.

2    Q.    You testified that he knew where she lived, correct?

3    A.    Yes, sir.

4    Q.    And had known where she lived for quite some time,

5    correct?

6    A.    He told me he followed her home.

7    Q.    So he wouldn't have the need for anybody to look up her

8    address, correct?

9          At me, Mr. Williams.

10   A.    I was looking at you.

11   Q.    Okay.  So, he wouldn't have the need to have anybody

12   look up her address, because he knew where she lived, correct?

13   A.    I don't know nothin' about that.

14   Q.    Didn't you just testify that he knew where she lived?

15   A.    That's what -- exactly what I just said.

16   Q.    Didn't you just testify that he followed her home?

17   A.    Yes, I did.

18   Q.    So, he knew where she lived.  He didn't need to be told

19   where she lived, correct?

20   A.    Not to my knowledge.

21   Q.    Okay.  You claim that you met at Paulette Maye's house

22   prior to this robbery, correct?

23   A.    Yes, sir.

24   Q.    You testified that -- clothing, guns, gloves, masks, all

25   of that, correct?

TRIAL ONE – VOL. 25 – 5126

1   A.   Yes, sir.

2   Q.   Okay.  You testified that Mr. Ledbetter was on the phone

3   with Latonia Williams the entirety of the trip, correct?

4   A.   Yes, sir, the majority of the trip.

5   Q.   Okay.  And you testified as to those conversations,

6   correct?

7   A.   Yes, sir.

8   Q.   How could you hear what Latonia Williams was saying?

9   A.   I didn't never say I heard her.  I said B was on the

10  phone with her and told us to be quiet while he was talking to

11  her all the way.

12       The only time I said you could hear her is when we were

13  outside, and she said the dude was pulling up.  I said you

14  could almost hear it because he was talking to her.  That's the

15  only time that I said that.

16  Q.   Do you remember telling the police that when this

17  incident or this situation was brought to your attention first

18  by Mr. Ledbetter, that he told you that he knew this person,

19  correct?

20  A.   Repeat that again.

21  Q.   When you went out to do Rodriccos Williams' robbery,

22  that was not the first time this subject had come up, according

23  to you, correct?

24  A.   Correct.

25  Q.   It had actually been discussed previously, correct?

TRIAL ONE - VOL. 25 - 5127

1    A.    Yes, sir.

2    Q.    And when he explained it to you previously, he told you

3    it was going to be right in and right out, correct?

4    A.    He told me that -- He told me the person -- He told me

5    that it was far out, and that's about it.  I don't remember him

6    saying no right in or no right out.

7    Q.    He told you that he knew the wife, correct?

8    A.    Yes, sir.

9    Q.    He told you that that would make it easier, correct?

10   A.    He never said that, either.

11   Q.    Okay.  So it's your testimony to this jury that

12   Mr. Ledbetter is talking to the people in that house on the way

13   out there to do the robbery, correct?

14   A.    Yes, sir.

15   Q.    You're also telling this jury that he is hearing from

16   that person, Latonia Williams, or Boyce, that there are people

17   in the house, correct?

18   A.    He's talking to her.

19   Q.    Yes.

20   A.    I'm not asking about people in the house.  He's talking

21   to her.

22   Q.    Okay.  And isn't Mr. Ledbetter telling you that she is

23   at home?

24   A.    Yes, sir.

25   Q.    Isn't Mr. Ledbetter telling you that she's also there

TRIAL ONE – VOL. 25 –  5128

1    with other people?

2      A.   He ain't never said that.

3      Q.   Okay.  But at some point you're informed that

4    Mr. Williams is coming home, correct?

5      A.   Yes, sir.

6      Q.   So, in the face of all of that, Mr. Ledbetter says,

7    Let's go forward with this robbery, correct?

8      A.   Repeat that again.

9      Q.   Mr. Rodriccos Williams is coming home, correct?

10     A.   Right.

11     Q.   You're made aware of that, correct?

12     A.   Right.

13     Q.   That's your testimony?

14     A.   He already there.

15     Q.   Right.  So, you just go ahead and do it anyways, right?

16     A.   What you mean?

17     Q.   You do the robbery in spite of the fact that Rodriccos

18   Williams is pulling into the driveway, correct?

19     A.   He's getting ready to get out of the car, and he walked

20   up, and he opened the door and go inside.  As he walked in the

21   door, that's when they run up.

22     Q.   That's when you ran up, too, correct?

23     A.   Wrong.

24     Q.   I'm sorry?

25     A.   Wrong.

TRIAL ONE – VOL. 25 –  5129

1    Q.   Wrong?

2    A.   Wrong.

3    Q.   Okay.  When did you run up?

4    A.   O-Dog, Bucc -- Well, Chris Harris, Rashad Liston and

5   Robert Wilson, all three of them ran first.  Me and Ledbetter

6   stood at the corner of the garage.  And when they got inside,

7   we ran up, over to the doorstep.  Robert Ledbetter, he had

8   poked his head -- He had came to the landing, with the screen

9   door open.  And that's where I left him, and I took off

10  upstairs, because they were downstairs, struggling with the

11  guy.

12   Q.   And you had testified to this jury that you were to be a

13  lookout, correct?

14   A.   Be a lookout?  No.  He asked me to come and oversee it,

15  make sure they don't do nothin' crazy.  That's the whole point:

16  I didn't want to go with them because, with these three guys,

17  shhhh.  But I went anyway because my man asked me to.

18   Q.   And you went upstairs, correct?

19   A.   Yes, I did.

20   Q.   And you held a gun on Latonia Williams, correct?

21   A.   Actually, I never pointed it at her.  I came up with the

22  gun on my side, and she had the baby in her hand.  And as soon

23  as I seen the baby, I told her to put the baby under the bed.

24  And I took the phone from her.  I never pointed the gun at her

25  the whole time.  There wasn't no need to.  It was a woman and a

TRIAL ONE – VOL. 25 –   5130

1   kid.

2       Q.   And your testimony is that she was on the phone with the

3   police at that point?

4       A.   Yes, she was, sir.

5       Q.   And then you asked her for the money, correct?

6       A.   Yes, sir.

7       Q.   You heard a shot, correct?

8       A.   Yes, sir.

9       Q.   Several shots, correct?

10      A.   Yes, sir.

11      Q.   Okay.  How many shots did you hear?

12      A.   I can't recall.  It's been so long ago, but I heard

13  them.

14      Q.   More than one, though, correct?

15      A.   I can't recall if it was one or two or three.  I just

16  know, when I heard it, it scared the living shit out of me and

17  her.

18      Q.   But you're a murderer, right?  So, you've heard guns go

19  off, correct?

20      A.   Listen, man, this is the first thing I've been involved

21  in and the only thing I've been involved in, but what I'm doing

22  time is, since I've been home, as far as somebody getting

23  killed.

24           Things I did in my past, I did when I came home, it was

25  like I was forced in the street.  I didn't have no home to go

1    to, nowhere to go, nothin'.

2         Mr. Ledbetter, he swooped me up.  And that's how I came

3    right back under that brim.  I tried to ask him for some money

4    to help me to do the right thing.  He didn't want me to do the

5    right thing.  He wanted me to do what he knew I was good at.

6    Q.   So you're saying that Mr. Ledbetter forced you into a

7    life of crime after you were let out of prison for murder?  Is

8    that what you're saying?

9    A.   He's a hell of a manipulator, swallowed me all the way

10   up.

11   Q.   When the gunshots went off, you told the police and you

12   told this jury that you waited several minutes to go

13   downstairs, correct?

14   A.   Yes, sir.

15   Q.   Because you were afraid that you might get shot,

16   correct?

17   A.   Yes, sir.

18   Q.   Because nobody saw you go upstairs, correct?

19   A.   Nobody but Brandon Ledbetter.

20   Q.   Nobody inside that house saw you go upstairs, correct?

21   A.   Brandon Ledbetter.  He came to the landing.  His foot

22   was on that landing of that door.  He didn't come all the way

23   in, but he was halfway in.  You hear me?

24   Q.   There were other people actually in the house?

25   A.   Never seen them.

TRIAL ONE – VOL. 25 –  5132

1    Q.   You never saw the people --

2    A.   Only the lady upstairs and the baby.

3    Q.   You didn't see Mr. Williams in the house?  You didn't

4    see the three other people that you say attacked Mr. Williams?

5    A.   That was the only people.

6    Q.   That's who I was speaking of.

7    A.   Right.

8    Q.   So you stayed upstairs for several minutes after the

9    gunshots, correct?

10   A.   Yes, sir.

11   Q.   Okay.  And then you came downstairs?

12   A.   Yes, sir.

13   Q.   Okay.  And then you testified that they were leaving you

14   there, correct?

15   A.   Yes, sir.

16   Q.   But you screamed the name "B," correct?

17   A.   Correct.

18   Q.   Okay.  Screamed it loud enough for anybody out there to

19   hear, correct?

20   A.   Yes, sir.

21   Q.   Okay.  And then my notes say that a thousand police cars

22   and sirens and then 30 cruisers.  Is that accurate?

23   A.   It's about how it seemed.  They're coming down the

24   street.  They're coming over the bridge.  And there is, like,

25   cars just -- All you see is, like, police cars just coming

TRIAL ONE – VOL. 25 – 5133

1   past, coming past, coming past.  I think there was, like, a

2   police station right down there on that lane.  And they were

3   all --

4       Q.    Go ahead.

5       A.    And they was going farther and farther, and they -- they

6   was gone.

7       Q.    And you estimate there was about 30 cruisers?

8       A.    That might have been a little exaggeration, but it was

9   enough.  It was enough.  It was enough to scare all of us.  We

10  couldn't believe we made it through it.

11      Q.    Was "a thousand police" also a little exaggeration?

12      A.    Yes, sir.  I'd say there was a good ten to fifteen

13  cruisers, though, or more.

14      Q.    You then talked about how you stopped somewhere, some

15  parking lot somewhere near a hotel or near --

16      A.    Correct.

17      Q.    Frischs, something like that, correct?

18      A.    Yes, sir.

19      Q.    And it's your testimony that one of Mr. Ledbetter's

20  girlfriends, Tiffany Berry, came out in a full-sized van,

21  correct?

22      A.    Yes, sir.

23      Q.    Okay.  And that she had a bag of clothes, correct?

24      A.    Yes, sir.

25      Q.    Okay.  And that she gave you guys these clothes,

TRIAL ONE – VOL. 25 – 5134

1    correct?

2    A.    She gave them to Mr. Ledbetter.  Mr. Ledbetter gave them

3    to us to change.  She didn't hand it to us.  He did.

4    Q.    Okay.  But you saw her, correct?

5    A.    Yes, sir.

6    Q.    She saw you, correct?

7    A.    Yes, sir.

8    Q.    Okay.  She saw everybody, correct?

9    A.    I know she saw me.

10   Q.    Okay.  And then you also testified that Tiffany Berry

11   left, but that Crystal Fyffe showed up to take the crime

12   clothes away, correct?

13   A.    Correct.

14   Q.    So your testimony is that, after this occurred,

15   Mr. Ledbetter had one of his girlfriends come out to deliver

16   the van and to deliver clean clothes, correct?

17   A.    Wrong.  He called them both at the same time, and it was

18   about who could meet us first.  We was trying to get about that

19   car.  And I guess we got off at the Gahanna exit.  I didn't

20   know he stayed over there at that time, but I guess that's

21   where he got that outfit, because it was the closest to it.

22   So, Tiffany was the closest to him, coming from where they was

23   coming from.

24   Q.    Tiffany was gone by the time Crystal got there?

25   A.    Yes, sir.

TRIAL ONE – VOL. 25 – 5135

1  Q.   So why didn't –– If that's true, why didn't

2  Mr. Ledbetter give Tiffany Berry the clothes?

3  A.   I'm pretty sure he was going to have her take them to

4  her house.  With her house and he staying right there and, I

5  mean, yelling his name at the crime scene, and he –– he had got

6  his phone at the crime scene, talking to her the whole time.

7  So why would he take the crime clothes to his home?

8  Q.   You just testified that he called both women to see who

9  got out there first because he needed to get out of that car

10 quickly, correct?

11 A.   Yes, sir.

12 Q.   You testified that Tiffany Berry got there first and

13 brought a change of clothes, correct?

14 A.   With the van, the full-sized conversion van.

15 Q.   Understood.  Did Crystal Fyffe bring a change of

16 clothes?

17 A.   No.  B gave her the bag.

18 Q.   Correct.  But Crystal Fyffe was also told to get there

19 very quick, correct?

20 A.   Yes, she was.

21 Q.   Just like Tiffany Berry was told, correct?

22 A.   Correct.

23 Q.   Because it was first come, first serve.  Ledbetter was

24 so freaked out, he called both girls to get there quickly,

25 correct?

1    A.    Yes, sir.

2    Q.    But Crystal Fyffe didn't bring a change of clothes,

3    correct?

4    A.    Not to my knowledge.

5    Q.    Tiffany Berry wasn't given the supposed evidence of the

6    crime scene to go destroy, correct?

7    A.    Repeat that again.

8    Q.    Crystal Fyffe did not bring a change of clothes like you

9    claim Tiffany Berry did, correct?

10   A.    Correct.

11   Q.    Tiffany Berry, who got there first, wasn't given the

12   change of clothes that you gave to Ledbetter that were used at

13   the scene to get rid of, correct?

14   A.    Correct.

15   Q.    Okay.  So, basically, this rush to the scene wasn't

16   really all that important to Mr. Ledbetter, correct?

17   A.    Everything was a rush to Mr. Ledbetter.  That's not

18   making sense, what you're saying.

19   Q.    Right, it's not making sense.

20         Now, you then returned to Paulette Maye's house,

21   correct?

22   A.    Yes, sir.

23   Q.    Okay.  And that's where things were, supposedly, divided

24   up, correct?

25   A.    Correct.

TRIAL ONE – VOL. 25 –  5137

1    Q.   Okay.  Now, you claim that there was some jewelry that

2  was taken, correct?

3    A.   Yes, sir.

4    Q.   Okay.  Have you ever seen that jewelry?

5    A.   No, sir.

6    Q.   Okay.  You say that there was a phone that was taken,

7  correct?

8    A.   Yes, sir.

9    Q.   Do you know if that phone has ever been recovered?

10   A.   No, sir.  I really don't know too much about the case,

11  other than what's, really, going on here today.

12   Q.   Now, you learned how to be a barber when you were locked

13  up on your first murder, right?

14   A.   Correct.

15   Q.   Okay.  And you had a chair at a barbershop at Huey Road

16  and Cleveland Avenue, correct?

17   A.   Correct.

18   Q.   And that barbershop was run by a gentleman by the name

19  of Luke Estice, correct?

20   A.   Correct.

21   Q.   And Luke Estice is a relative of Rodriccos Williams,

22  correct?

23        (Whereupon, the witness speaks privately to the Court.)

24          THE COURT:  Just a second.

25                        – – –

TRIAL ONE – VOL. 25 – 5138

1      (Thereupon, the following proceeding was held at side-bar.)

2            THE COURT:  He turned to me, Mr. Berndt, and asked if

3   he can use the restroom.  I don't want to announce that in open

4   court, so we're going to take a –– It's 3:20.  We've got to let

5   him go to the bathroom.

6            Let's take a 15-minute recess.

7       (The following proceedings were had in open court.)

8            THE COURT:  Ladies and gentlemen, we're going to take

9   our afternoon recess a little early.  We'll take a 15-minute

10  recess now.

11           (Recess at 3:25 p.m. to 3:40 p.m.)

12                          – – –

13           THE COURT:  Mr. Berndt, please continue.

14           MR. BERNDT:  Thank you, Your Honor.

15  BY MR. BERNDT:

16  Q.   Mr. Williams, I believe we were speaking of Luke Estice.

17  Do you remember that?

18  A.   Yes, sir.

19  Q.   And Luke Estice is the gentleman who either owned or had

20  control of the barbershop at Huy and Cleveland, correct?

21  A.   Yes, sir.

22  Q.   And Luke Estice is somebody who gave you the opportunity

23  to work up there, correct?

24  A.   Yes, sir.

25  Q.   And Luke Estice is a relative of Rodriccos Williams,

TRIAL ONE – VOL. 25 –   5139

1    correct?

2    A.   No, sir.

3    Q.   Do you know if they have any relationship at all?

4    A.   I know they know each other, I believe.  That's about

5    what it is.

6    Q.   Now, you know Mario Gibbs?

7    A.   No, sir.  I've seen him but I don't know him.

8    Q.   Do you know if Mario Gibbs knows Luke Estice?

9    A.   Yes, sir.

10   Q.   And you know that Mario Gibbs thought that Rodriccos

11   Williams had taken his drugs, correct?

12   A.   Repeat that again.

13   Q.   You know that Mario Gibbs had thought that Rodriccos

14   Williams was complicit with Rodriccos Williams's sister Leslita

15   Williams, Mario Gibbs's girl, in stealing Mario Gibbs's

16   marijuana?

17   A.   I don't know nothing about that.  I still didn't

18   understand what you said, though.

19   Q.   Do you know if Mario Gibbs had a girlfriend?

20   A.   I don't know nothing about Mario.  I just know I had a

21   relationship when he came to the barbershop.  That's it.

22   That's all.

23   Q.   Let me ask you this.  You're at Luke Estice's barbershop

24   at times, correct?

25   A.   Yes, sir.

TRIAL ONE – VOL. 25 –  5140

1   Q.   Luke Estice is at Luke Estice's barbershop at times,

2   correct?

3   A.   Yes, sir.

4   Q.   You have seen Mario Gibbs there, correct?

5   A.   One time.

6   Q.   And you've seen Robert Ledbetter there, correct?

7   A.   Yes, sir.

8   Q.   I want to talk to you about Paco.  Okay?

9   A.   Okay.

10  Q.   Do you know who I'm speaking of?

11  A.   Yes, sir.

12  Q.   Now, you came home in the summer of 2006, right?

13  A.   Yes, sir.

14  Q.   And I think that you testified on direct examination

15  that Mr. Ledbetter had supposedly had some coming-out party for

16  you at this Dream Lounge?

17  A.   Yes, sir.

18  Q.   And that you and Paco had some issue at the Dream

19  Lounge, correct?

20  A.   Yes, sir.

21  Q.   And that that issue was that you had thought that Paco

22  was kind of stepping on your toes in regard to speaking to

23  Schizel, correct?

24  A.   Wrong.  I said that Paco was eyeing Schizel.  Schizel

25  wear a lot of diamonds, jewelry, as if he wanted to snatch them

TRIAL ONE – VOL. 25 –  5141

1    up off of him.  And I pulled on Paco real close.  And people

2    kind of like froze up and looked at us because Paco, he an idol

3    God, as far as in our community.  And Schizel just happened to

4    look back because he seen how people was looking.

5        Q.    So you're saying that that didn't have anything to do

6    with a relationship that you had with Schizel that you thought

7    was being compromised by Paco?

8        A.    I just met Schizel.

9        Q.    I'm sorry?

10       A.    I just met Schizel.

11       Q.    Okay.

12            So there's an incident in the Dream Lounge where you

13   believe that Paco is eyeballing Schizel to rob him, correct?

14       A.    Yes, sir.

15       Q.    And everybody leaves the bar at closing time, correct?

16       A.    That was before closing.

17       Q.    It was before closing?

18       A.    Yes, sir.

19       Q.    And everybody leaves in a big caravan, correct?

20       A.    Correct.

21       Q.    And the road narrows down into one lane, correct?

22       A.    Yes, sir.

23       Q.    And that's when there was some issue between yourself

24   and Paco again, correct?

25       A.    No.  I never had any issue with him.  I never even knew

TRIAL ONE – VOL. 25 – 5142

1   until later on that night what the issue was about.

2      Q.   So you go to the Short North, correct?

3      A.   Yes, sir.

4      Q.   And you see Paco, correct?

5      A.   Yes, sir.

6      Q.   If Paco testified that he saw you go under your hood and

7   get your gun out, would that be true or false?

8      A.   That would be false.

9      Q.   Okay.  Paco then says that when he saw you get your gun

10  out, he got his gun out.  True or false?

11     A.   That's false.

12     Q.   Okay.  Yet within seconds of what I just described, you

13  and Paco were face to face, correct?

14     A.   When was this?

15     Q.   You and Paco were face to face that evening within

16  minutes of what I just described, correct?

17     A.   At what time?

18     Q.   That evening after the Dream Lounge, after the driving

19  back in a caravan, after parking in the Short North.

20     A.   Yes, sir.

21     Q.   And at that time you had a gun on you, right?

22     A.   Correct.

23     Q.   And Paco had a gun on him, correct?

24     A.   I didn't know until that point.

25     Q.   Okay.  And Paco took your gun, correct?

TRIAL ONE - VOL. 25 - 5143

1    A.    Right.  Because it was right there to the eye.  It was

2    right on my waistline where you could see it.  If I had a beef

3    with Paco, it would have been pulled before I even got up on

4    him.

5    Q.    And Paco then discharged both weapons within inches of

6    your head, correct?

7    A.    Yes, sir.

8    Q.    And that was all because you thought Paco was eyeballing

9    Schizel for a robbery?

10   A.    I don't know what his motives was, what he was thinking.

11   I'm telling you what happened.

12   Q.    What other reason would there be?

13   A.    Well, like Schizel said, when he came in the street in

14   his wheelchair, he said, Edub ain't trying to take your place,

15   Paco.

16   Q.    I understand that.

17   A.    So that's the only thing.

18   Q.    There were other people out there when this happened,

19   was there not?

20   A.    There was a lot of people out there.

21   Q.    You were pretty embarrassed, weren't you?

22   A.    Me?  Embarrassed?  If I was embarrassed, I would have

23   killed Paco.  If I was embarrassed, I step up as OG; I couldn't

24   let this go.  You can have that hood.  You can have those guys.

25   I said I just came home.  Dude apologized to me.  We left it

1    that at.  And that's where it was at.

2    Q.   And then months later, you were at his house, correct?

3    A.   I might have been -- it might have been a year or two

4    later.

5    Q.   Sure.  With your brother, correct?

6    A.   With my brother?

7    Q.   Andre Rafford.  Yes, your brother.

8    A.   Yes, I was there.

9    Q.   You both brought guns, correct?

10   A.   Correct.

11   Q.   You both waited for Paco to get home, correct?

12   A.   Correct.

13   Q.   Paco came home with Chad Ayers, correct?

14   A.   Correct.

15   Q.   So Taron Colvin was already there, correct?

16   A.   Yes, sir.

17   Q.   You consider yourself a friend of Taron Colvin, correct?

18   A.   I consider myself friend of all of them.

19   Q.   You consider yourself a friend of Chad Ayers, correct?

20   A.   I didn't know him.  He was my brother's friend.

21   Q.   Why were you there?

22   A.   Why was he there?

23   Q.   Why were you there?

24   A.   I was there because Colvin -- Mr. Colvin told me he had

25   a pair of rims that I wanted.  And they called me over to their

TRIAL ONE - VOL. 25 - 5145

1    home that night.

2        Q.   Okay.

3        A.   I told them like I'm not going to be in the streets with

4    you all no more unless you really got something.  Because we

5    was in the streets trying to get money for O-Dog to get out of

6    jail.  And the next thing we was hitting was coming up short.

7    So it's like when I work, I got a family.  I can't be out in

8    the streets with you all every day.  So --

9        Q.   Whose car did you drive to Paco's house?

10       A.   Which night?

11       Q.   The night that you shot him.

12       A.   The car that JP gave me.

13       Q.   Whose car was it?

14       A.   I don't know.

15       Q.   When did JP give it to you?

16       A.   That night.

17       Q.   Where did he give it to you?

18       A.   At my house.

19       Q.   What kind of car was it?

20       A.   A little small car.

21       Q.   Who was with Jermaine Patterson when he dropped it off?

22       A.   He got a ride through B.  And JP jumped in the car and

23   B's with him.

24       Q.   So you're at Paco's house, right?

25       A.   Pretty much.

TRIAL ONE - VOL. 25 - 5146

1    Q.   Sitting inside, correct?

2    A.   Yes, sir.

3    Q.   You're there to kill him, correct?

4    A.   Let me say this to you like I said last time.  If the

5    opportunity present itself, I was.  But that night, when the

6    third party came, it wasn't going down like that.  It didn't

7    happen like that.  Telling you a story, get there --

8    Q.   Sir, I haven't asked that question yet.

9    A.   Okay.

10   Q.   Are you finished answering?

11   A.   I'm waiting on you, sir.

12   Q.   So you just testified that you're a friend of Paco's,

13   right?

14   A.   Yes, sir.

15   Q.   You were a friend of Chad Ayers, correct?

16   A.   Yes, sir.

17   Q.   You were a friend of Mark Colvin's, correct?

18   A.   Mark Colvin and Paco.  I didn't really know Chad.  I

19   seen him twice in my life.

20   Q.   Okay.  Had nothing against him, though, correct?

21   A.   No.

22   Q.   You showed up because Mr. Colvin said that he had some

23   rims, correct?

24   A.   And Paco told me and kept calling me -- he kept calling

25   me he had a lick for me, so that's why I came over.

TRIAL ONE – VOL. 25 –   5147

1    Q.   And you came over with your brother, correct?

2    A.   Yes, sir.

3    Q.   With guns, correct?

4    A.   Yes, sir.

5    Q.   And at some point everybody went out to the garage to

6    look at the rims?

7    A.   No, sir.

8    Q.   No?

9    A.   No, sir.

10   Q.   So, if there was testimony previously in this case that

11   all five people in that house -- Mr. Colvin, Mr. Ayers,

12   Mr. Brown, Mr. Williams, being you, and your brother Andre

13   Rafford all left the house at the same time in a line, that

14   would be a lie, correct?

15   A.   Whose testimony?

16   Q.   Sir, that would be a lie, correct?

17   A.   My testimony?

18   Q.   Not your testimony.  Prior in this case.  That would be

19   false, correct?

20   A.   Right.

21   Q.   Because it was just you and Paco outside, correct?

22   A.   In the beginning, yes.  We walked out the door.  I

23   walked -- Paco walked out first.  I walked out behind him.  I

24   shut the screen door.  I heard the screen door slam.  I looked

25   back, reaching for my gun and Mark and Chad both had both guns

TRIAL ONE – VOL. 25 –  5148

1    out.  When I turned around, Paco got to shooting at me.  And I

2    shot back at him.  And then the next thing I know, I couldn't

3    move.  And I just see people running past me.  And I'm seeing,

4    fire, fireworks.  That's what happened that night.

5      Q.   So I just need to go through this slowly with you, okay?

6    You and Paco are outside, correct?

7      A.   Correct.

8      Q.   You hear the screen door slam, correct?

9      A.   Yes, sir.

10     Q.   And you see Mark and Chad with guns pointed at you?

11     A.   No.  I didn't say they was pointed.  They had them out.

12     Q.   They had them out?

13     A.   Yes, sir.  As they had them out, I was reaching -- they

14   had them out.  I'm walking.  Paco is walking.  I'm walking.

15   And I hear the screen door and I go like this.  (Indicating.)

16   When I go like this, I turn around, Paco, boom, boom, boom,

17   boom, boom.  And I remember shooting at him and that was it

18   until I woke up.

19     Q.   So where were you at in relationship to the back door of

20   the house when all of that happened?

21     A.   Repeat that again.

22     Q.   Where were you physically in relationship to the back

23   door of that house when all of that occurred?

24     A.   I was like almost halfway to the garage when that

25   happened.

TRIAL ONE - VOL. 25 -  5149

1    Q.    And Mr. Ayers was closer to the house than you, correct?

2    A.    He was behind Mark, yes, sir.

3    Q.    And as well, Mr. Colvin was closer to the house than

4    you, correct?

5    A.    Yes, sir.

6    Q.    Okay.  So how do you explain Mr. Colvin being next to

7    the garage when he's found murdered?

8    A.    Mr. Colvin found next to me in the middle.  He was in

9    the middle of the yard.

10   Q.    And how did he get there if he was nearer to the house

11   than you?

12   A.    Their backyard ain't no bigger than from like me to the

13   other side of that desk right there.

14   Q.    That's not my question.  Did you see how he got there?

15   A.    I told you I looked back.  They was right there.

16   Q.    And how did Ayers wind up in the yard next to

17   Mr. Brown's house?

18   A.    That I can't say.  I told you when I turned back around,

19   Paco was shooting at me, and I shot at him.  When I woke up,

20   all I seen was Paco right here and Mark right here.  I didn't

21   even see Chad.

22   Q.    How many times did you shoot Mr. Colvin?

23   A.    Mr. Colvin?  I don't know.  When I woke up, and I said

24   Mark -- I said Paco.  I said Mark.  I said Paco.  I said Mark.

25   And I heard something.  And the gun was already pointed down,

TRIAL ONE – VOL. 25 –  5150

1    and it went right in his waistline.  So it might have been two,

2    three times I think at the most.  Because it was a light

3    trigger.  And I shot out of fear.  I didn't shoot to kill him.

4    It was out of fear.  I don't even know if he was dead or not

5    already.

6      Q.   So I just want to make sure again that I understand what

7    you're telling us all.  That Mr. Colvin was on the ground,

8    correct?

9      A.   Yes, sir.

10     Q.   You were not, correct?

11     A.   Yes, I was at one point.

12     Q.   I'm talking about right before you shot Mr. Colvin.

13   Were you standing up?

14     A.   Yes, sir.

15     Q.   And you heard a noise, correct?

16     A.   Yes, sir.

17     Q.   And then you shot Mr. Colvin in his lower torso several

18   times, correct?

19     A.   Yes, sir.

20     Q.   Because you were in fear of your life from Mr. Colvin,

21   correct?

22     A.   No.  I shot out of fear because I didn't know what was

23   going on.  I got no memory of what was going on.  If I had

24   memory of what was going on, I would never have walked up

25   front.  I would have got right in my car and kept it moving.

TRIAL ONE – VOL. 25 – 5151

1   My car was right there inches away from me.  I walked in the

2   front calling for help.  And Andre Brown got up and started

3   shooting at me.

4   Q.   So you shot Mr. Colvin out of fear, correct?

5   A.   Yes, sir.

6   Q.   Mr. Colvin was on the ground, correct?

7   A.   At that time, yes, sir.

8   Q.   Mr. Colvin did not have a gun pointed at you, correct?

9   A.   I don't remember.  They had two guns out.  And I looked

10  back, that's all I could see about me, seeing him with a gun.

11  Him and Chad Ayers both had two guns out.  And when I looked

12  back around and Paco got to shooting at me.  And that's what I

13  remember.  We was all up and moving around.

14  Q.   This Paco incident is really the one incident that you

15  have a lack of memory of.  Would that be accurate?

16  A.   No, it wouldn't.

17  Q.   Where was your brother?

18  A.   I never even see him.  So he had to be still in the

19  house.

20  Q.   Who killed Chad Ayers?

21  A.   I can't tell you.

22  Q.   Who are the candidates?

23  A.   Actually, you know what happened that night, I think we

24  all killed each other.  We all got to shooting out of nowhere.

25  Paco shooting at me.  I'm shooting at him.  And I don't know

TRIAL ONE – VOL. 25 –  5152

1    what they doing behind me because I can't see behind me.  When

2    I woke up, I'm just there by myself.  Them two laying there.  I

3    don't know what to do.  I can't even think straight.  I don't

4    know what happened.  I just start walking forward, calling for

5    help.  Otherwise, I would have got in my car and took off.  I

6    wasn't even -- I wasn't even knew I was shot in the side until

7    minutes and minutes later.

8        Q.   Do you know who Quan Tatum is?

9        A.   Yes, sir.

10       Q.   You write Quan Tatum letters?

11       A.   I write him a couple.

12       Q.   You write him a letter about this incident?

13       A.   I may have.

14       Q.   What did you tell him?

15       A.   I gave him the basics of it, if I did.

16       Q.   Did you tell him that I told the prosecutor if it was

17   another N there, I will admit it, but I didn't see him with a

18   gun or shoot anybody?

19       A.   Repeat that again.

20       Q.   Sure.  I told the prosecutor if it was another N there,

21   I will admit it, but I didn't see him with a gun or shoot

22   anybody.

23       A.   Of course I told him that.

24       Q.   So that's why the other N never got charged?

25       A.   Never got charged?

TRIAL ONE - VOL. 25 -  5153

1    Q.    Right.  Your brother.

2    A.    Because at the time I wasn't saying who was there.

3    Q.    This letter is written in 2011, sir, after your --

4    A.    Quan is the OG of the Short North.  He's one of the

5    first ones that started this shooting stuff around here.  You

6    know what I'm saying?  I gave him the basics because the word

7    around Quan Tatum is he tell everybody.  He's telling everybody

8    in the joint to try to get back off the cases he on.  He is a

9    shot caller in the joint.  Whatever he say goes from any joint

10   that you in, you touch.

11          MR. DEVILLERS:  Your Honor, can we approach?

12          THE COURT:  Yes, you may.

13                         - - -

14      (The following proceeding was held at side-bar.)

15          MR. DEVILLERS:  Mr. Berndt is talking about a letter

16   written by Quan Tatum.  I haven't seen the letter.  I have no

17   idea what it's about.

18          MR. BERNDT:  I was about to give it to you but the

19   reason why I didn't is because he said he knew about the

20   letter.  He said that he knew what the contents of it were and

21   then he testified to that.  So I didn't think there was going

22   to be an issue with that.  But --

23          THE COURT:  If you're going to cross-examine him on

24   it, under the rule, you don't have to show it to the witness,

25   but you have to show it to counsel upon request.  The better

TRIAL ONE – VOL. 25 –  5154

1   practice is also to show it to the witness also, if requested.

2   But I'm going to give you an opportunity to look it over and

3   then we can resume.

4           MR. DEVILLERS:  Okay.

5           THE COURT:  Take your time.

6           MR. DEVILLERS:  Thank you.

7       (Short recess taken.)

8           THE COURT:  Mr. DeVillers, have you completed your

9   review?

10          MR. DEVILLERS:  I have not, Your Honor.  It's a few

11  pages.

12          THE COURT:  All right.  Take your time.

13      (Short recess taken.)

14          THE COURT:  Mr. DeVillers, anything further?

15          MR. DEVILLERS:  No, Your Honor.

16          THE COURT:  Mr. Berndt, please continue.

17          MR. BERNDT:  Thank you.

18   BY MR. BERNDT:

19   Q.   Do you remember writing a letter?

20   A.   I recall writing Quan Tatum.

21   Q.   Do you remember telling him about the situation at

22   Paco's?

23   A.   I told him briefly.  I didn't give him exactly what

24   happened.

25   Q.   Do you remember writing that Paco had already told him

TRIAL ONE - VOL. 25 -  5155

1   there was somebody else out there?

2   A.   I probably told him that.

3   Q.   And that you told the prosecutor, if there was another N

4   there, I will admit it, but I didn't see him with a gun or

5   shoot anybody.  Do you remember saying that?

6   A.   I didn't.

7   Q.   So that's why the other N never got charged.  Do you

8   remember that?

9   A.   Say that again.

10  Q.   So that's why the other N -- the N-word, never got

11  charged?

12  A.   No.  They never charged him -- because they didn't

13  charge him.  But I told him exactly what happened back there

14  that night.  I don't know why they didn't charge him.  They

15  asked me for the name.  I gave them the name.  They said --

16  Q.   Go ahead.

17  A.   They had one guy -- one gun that I had.  And all the

18  bullets that was back there that night, connect up to that one

19  gun or two guns or three guns or maybe even four guns.  It can

20  add up to what happened.  There was like a hundred and some

21  shells back there that night.

22  Q.   Do you remember saying:  And the only reason I said that

23  because it was the deal to tell them and the family what

24  happened back there, a misunderstanding?

25       Do you remember saying that?

TRIAL ONE – VOL. 25 – 5156

1    A.   Say that again.

2    Q.   And the only reason I said that because it was the deal

3    to tell them and the family what happened back there, a

4    misunderstanding.

5    A.   You said misunderstanding?

6    Q.   I'm reading your words.

7    A.   Like I told you, like -- let me say this to you again.

8    The night I went over there, if the opportunity to present

9    itself, it was going to happen.  But when Chad Ayers came, the

10   whole thing changed because that wasn't part of the plan.  So

11   when they went out there that night, me and Paco went out there

12   that night, it was like somebody had gave him up, or he was

13   thinking something.  I don't know because I reached for my gun.

14   When I heard that screen door slam out of fear and he got to

15   shooting at me and everything went haywire and we got to

16   shooting at each other.

17        But that was the thought process for that night.  If

18   Chad Ayers wasn't there, it was going to happen.  But of the

19   results, things still happened.  And to this day, I didn't

20   understand how and why did it happen like that because

21   everybody started shooting.  It got to be because all the

22   shells they said was back there.  I couldn't see what happened

23   behind me, when I looked back and seen who it was behind me,

24   and seen the screen door was slammed, was shut.

25   Q.   You continue and you said, the N had two years to get at

TRIAL ONE – VOL. 25 – 5157

1   Paco but he didn't.  You're the first person I told that.

2   A.   Ledbetter.  He had two years.

3   Q.   How about Andre Rafford?

4   A.   Andre Rafford?

5   Q.   Two years?

6   A.   It was never him.  B contracted us.  B had put the hit

7   out.  B told us to go kill Paco and Mark.  It's not me or Andre

8   Rafford's fault about those two getting killed.  It's B's fault

9   because he the one who sent us to kill him.  We took it as a

10  job.

11  Q.   Your plea agreement with the government talks about how

12  you have to testify against Andre Rafford, correct?

13  A.   Correct.

14  Q.   You brought Andre Rafford to Paco Jones' –- to Paco

15  Brown's, Andre Brown's house, in September of 2008, correct?

16  A.   We was together several times together.

17  Q.   Correct?

18  A.   Correct.

19  Q.   September 2008, correct?

20  A.   Yes, sir.

21  Q.   Both with guns, correct?

22  A.   Yes, sir.

23  Q.   Two people end up dead, correct?

24  A.   Yes, sir.

25  Q.   You killed one of them, correct?

TRIAL ONE – VOL. 25 –   5158

1   A.   To my statement, to this day I'm saying I didn't kill

2   him.  He was already dead.  He was already laying on the

3   ground.  I jumped out of fear and shot.  To this day, they got

4   two different bullets and two different guns going to Taron

5   Colvin.  So to me, I think he was already dead.  And I shot

6   down out of fear.  The only person that I can say I truly shot

7   was Paco.

8   Q.   So you're innocent is what you're saying?

9   A.   No, I'm not saying I'm innocent because my thought

10  process was –– was on doing things.  But it didn't go out how

11  it was supposed to go, and it didn't go all the way through

12  like how it was supposed to go.  It was more or less like I was

13  planning to do this, but if someone came in I stopped.  When

14  Chad Ayers was there –– it was just me and Paco that went out

15  to that garage.

16  Q.   How did Chad Ayers fair during this engagement?

17  A.   Say that again.

18  Q.   How did Chad Ayers do during this engagement?  When you

19  said because you saw Chad Ayers everything stopped, right?

20  A.   Right.

21  Q.   Chad Ayers is dead, right?

22  A.   Right.

23  Q.   Chad Ayers got killed that night, correct?

24  A.   Right.

25  Q.   Chad Ayers got killed that night when you and your

TRIAL ONE – VOL. 25 – 5159

1   brother were there, correct?

2   A.   Correct.  We was all a part of a -- of a criminal act

3   crew.  We all had guns.  We was all robbing stuff.  We all

4   would go out there and kill.  We all have killed.  So he wasn't

5   innocent, baby.  You know what I'm saying?  He was part of a

6   crew.  Things happen.  I'm sorry it happened.  I can't change

7   that it happened.  But it happened.  And he was living that

8   life, and he was in that life like that.  And things come with

9   that life.

10  Q.   But you can't tell the authorities that Andre Rafford

11  killed Chad Ayers, can you?

12  A.   No, I can't.

13  Q.   Because he's your brother, correct?

14  A.   Well, I took a polygraph test on that.

15  Q.   Let me ask you this.  You agreed to testify against

16  Andre Rafford as part of your eight-year deal, you know, when

17  your 150-year --

18  A.   Saying that he was there.

19  Q.   So you get eight years because you can say that Andre

20  Rafford was there, correct?

21  A.   That wasn't all of it.

22  Q.   Of course it wasn't all of.  Paco identified Andre

23  Rafford as being there.  Are you aware of that?

24  A.   Did he?

25  Q.   So what could you testify to since you didn't see

TRIAL ONE - VOL. 25 -  5160

1  anything happen as part of your deal against Andre Rafford?

2  A.   What the prosecution do with Paco.  They let him go and

3  it was just me and him that got caught like day.  He had like

4  over 15 assault rifles in there, 15 handguns, drugs, a house

5  full of stuff, bulletproof vests, on parole, and you tell me

6  about the prosecution.

7  Q.   Sir, you just testified that there were 15 assault

8  rifles in that house, correct?

9  A.   Yes, sir.

10  Q.   You just testified that there were 15 other firearms in

11  that house, correct?

12  A.   Yes, sir.

13  Q.   Now, do you realize they did a search warrant on that

14  house?

15  A.   It might have been a little exaggeration when I said

16  there was a whole bunch of guns and bulletproof vest in there.

17  When they came, them guys had guns on them as well as I did.

18  Q.   Is there any other testimony you want to take back?

19  A.   I'm not going to take none of it back.

20  Q.   So part of your deal is to tell the government nothing

21  about Andre Rafford, correct?

22  A.   No.  I told them that Andre Rafford was there, and I

23  told him what our thought process was, and I told them exactly

24  what happened.  And I told the government I'd take a polygraph

25  test on exactly everything that happened that night.

1    Q.    You also had some other portions of your deal.  Do you

2    remember that?

3    A.    I'm listening.

4    Q.    Do you remember it?

5    A.    You have to explain it to me.

6    Q.    Well, who's La'Vint Walton?

7    A.    La'Vint Walton?

8    Q.    Uh-huh.

9    A.    Oh, yeah.  Big Mike and La'Vint?

10   Q.    Who is La'Vint Walton, sir?

11   A.    Some guys from the neighborhood.

12   Q.    Could you go into a little bit more detail than that?

13   You agreed to testify against this person, so I assume you

14   know -- or in regard to the murder of this person?

15   A.    Okay.

16   Q.    So I assume that you know a little bit more about him.

17   A.    You say I agreed to testify?

18   Q.    Further, the defendant agrees to fully cooperate with

19   the Columbus police regarding the homicide of La'Vint Walton

20   and Michael Sydnor and testify truthfully against Lamont Brown

21   and any other co-conspirators involved in the homicide.  Is

22   that clear enough for you?

23   A.    What cleared it up was they asked me about it.  And when

24   they asked me about it, they had been investigating me about it

25   and investigating Lamont Brown about it.  And they was

TRIAL ONE - VOL. 25 -   5162

1   investigating both of us.  And everybody was pointing the

2   finger at him, and basically he's pointing the finger at me.

3   And basically, they don't know who did it.  But they was

4   pointing at us because we was the guys from the neighborhood

5   that was making a mess and making the noise around that time.

6     Q.   So, once again, you're telling this jury that you got

7   this eight-year deal because you don't have information about

8   Lamont Brown and whether he was involved in the murder of

9   La'Vint Walton and/or Michael Sydnor.  Is that what you're

10  telling them?

11    A.   Say that again.

12    Q.   You just told me and this jury and this Court that you

13  don't know anything about that homicide, correct?

14    A.   I didn't say I didn't know about it.  I said it was

15  rumors of it about it, that people was pointing a finger at me

16  and was pointing a finger at Lamont Brown.

17    Q.   Okay.

18    A.   And he sent them at me back in like '95, '96.  So when

19  they came to holler at me, I pointed them at him.

20    Q.   What do you know about Lamont Brown killing those

21  fellows?  That's my question.

22    A.   Lamont said he did it.

23    Q.   How do you know that?

24    A.   Off his word.

25    Q.   I'm sorry?

TRIAL ONE – VOL. 25 – 5163

1    A.   Off his word.

2    Q.   So once again, he admitted something to you, correct?

3    A.   Correct.

4    Q.   Okay.  And has this gentleman been prosecuted?

5    A.   I don't know.

6    Q.   Have you ever been asked to testify about it?

7    A.   No.

8    Q.   So maybe your word is not so good?

9    A.   Maybe it's not.  Look at my criminal history.  Who going

10   to really believe me?  But I'm going to tell you everything I'm

11   telling you today is real.  All the evidence is adding up to

12   it.

13   Q.   So you got out of jail 2006, right?

14   A.   Yes, sir.

15   Q.   And within the first week you were doing robberies to

16   quote/unquote get on your feet, correct?

17   A.   The second time you done asked me that.

18   Q.   Yes or no, sir?

19   A.   Yes, sir.

20   Q.   Thank you.  And so the first thing that you testified to

21   was that you committed a home-invasion-type robbery with

22   Mr. Ledbetter, correct?

23   A.   Yes, sir.

24   Q.   At Ricco Maye's father's house, correct?

25   A.   Yes, sir.

TRIAL ONE – VOL. 25 – 5164

1    Q.   Where was that located?

2    A.   Driving Park off of Livingston.

3    Q.   What's the name of the street?

4    A.   I don't know the name of the street.

5    Q.   When did it happen?

6    A.   2006.

7    Q.   When in 2006?

8    A.   June.

9    Q.   I'm sorry?

10    A.   June.

11    Q.   Okay.  Tell me how it happened.

12    A.   B told me, he said he got a lick for me, told me what

13 was in there, took me there.

14    Q.   Yep.

15    A.   Kicked the door in.  Tied the man up.

16    Q.   Yep.

17    A.   Went to where his dope was at.

18    Q.   Yep.

19    A.   And came out back out and B took on off.

20    Q.   So you went in.  Is that what you said?

21    A.   Yes, sir.

22    Q.   And this is something that was between you and

23 Mr. Ledbetter, correct?

24    A.   It was Ledbetter's thing.  I took it on.

25    Q.   And nobody else can verify what you're saying about

TRIAL ONE – VOL. 25 –  5165

1   this, correct?  Correct?

2   A.    Hold on.  Correct.

3   Q.    So they didn't charge Lamont with those other killings,

4   correct?

5   A.    You jumped from one thing to another.

6   Q.    Sir, under your deal when you told the police that

7   Lamont admitted that he was involved, Lamont Brown admitted to

8   you, according to you, that he killed La'Vint Walton and

9   Michael Sydnor, correct?

10  A.    Okay.

11  Q.    To the best of your knowledge, your promise that that's

12  true has never been acted upon, correct?

13  A.    I ain't heard nothing about it.

14  Q.    And this is an identical situation to the one you just

15  described in regard to this alleged home invasion of Ricco

16  Maye's father, correct?

17  A.    Say that again.

18  Q.    It's based upon your word only, correct?

19  A.    Me and him was there together.  I ain't got to make

20  something up.  The police reports do it all.  I didn't know

21  Ricco Maye when I got out of jail.  I didn't know his father.

22  That was B's peoples.

23  Q.    According to you, correct?

24  A.    Correct.

25  Q.    And we already know who you are, right?

TRIAL ONE – VOL. 25 – 5166

1    A.   Yes, sir.  You said that a thousand times.

2    Q.   Did I really say it a thousand times?

3    A.   It's on you.

4    Q.   Sir, you're under oath.  You're testifying in a very

5    serious trial.  You seem to freely exaggerate things.  Would

6    you agree with me?

7    A.   No, I'm not.

8    Q.   You said that a thousand police were at Rodriccos

9    Williams's crime scene.  That's an exaggeration, is it not?

10   A.   Okay.

11   Q.   You just said I asked you the same question a thousand

12   times.  That's a gross exaggeration, is it not?

13   A.   Okay.

14   Q.   You exaggerate a lot, correct?

15   A.   That's just a figure of speech.  It won't happen again.

16   Q.   When you testified about this coming-out party, I heard

17   your testimony to be that my client, Mr. Ledbetter, held this

18   party for you, correct?

19   A.   Correct.

20   Q.   And that he introduced you to various people at that

21   party, correct?

22   A.   Okay.

23   Q.   Is that what you said?

24   A.   Yes, sir.

25   Q.   Okay.  Ricco, correct?

TRIAL ONE – VOL. 25 –  5167

1      A.    I met Ricco before then.

2      Q.    Schizel, correct?

3      A.    Met him before then.

4      Q.    O-Dog?

5      A.    Met him before then.

6      Q.    Buck?

7      A.    Met him before then.

8      Q.    RJ?

9      A.    Met him before then.

10     Q.    Hov?

11     A.    Met him before then.

12     Q.    Nic Nic?

13     A.    Met him before then.

14     Q.    And my memory also is that you only knew Marcus Peters?

15     A.    Pretty much.

16     Q.    But you just testified that you knew those six other

17  people before that party, correct?

18     A.    No.  You mixing up what you saying.  You said at that

19  homecoming.  I met them before they gave me that homecoming.

20  You hear me?  I met them when I got out.  That homecoming was

21  like a week or two later.  I had already met them.  Correct?

22     Q.    Where did you meet them?

23     A.    On the streets, B taking me to their homes and meeting

24  them.  And the streets, Sixth Street, Grant Street, Fifth

25  Street, Eight Street, Fourth Street, Ninth Street, all through

TRIAL ONE – VOL. 25 – 5168

1   the neighborhood.

2   Q.   And you remember that specifically?

3   A.   Yes, sir.

4   Q.   You're not just exaggerating again?

5   A.   No, sir.

6   Q.   You said that my client, Robert Ledbetter, gave you a

7   target of Ricco's baby's mom's house, correct?

8   A.   Yes, sir.

9   Q.   The one with the safe, correct?

10  A.   Yes, sir.

11  Q.   And you did that by yourself, correct?

12  A.   Yes, sir.

13  Q.   So where was this located?

14  A.   Morse Creek Apartments off of Cleveland Avenue.

15  Q.   When did it happen?

16  A.   I can't remember the year, but between -- it had to be

17  like end of '06, the beginning of '07.

18  Q.   Any other witnesses?

19  A.   Sure.  The witnesses -- the police came.

20  Q.   You ever get questioned about it?

21  A.   How could I get questioned about it because nobody know

22  who did it.

23  Q.   So the only person that we have to believe or not

24  believe about whether this incident ever happened is you,

25  correct?

1    A.   Well, the fact that it happened, and it's on police

2    files, then it had to come from somewhere.  It doesn't come

3    from nowhere.  It's not made up.

4    Q.   Okay.  And you've checked the police files?

5    A.   I'm pretty sure they came there.

6    Q.   Sir --

7    A.   I'm not able to do that.

8    Q.   And you're not even sure that the police came there,

9    correct?

10   A.   I'm sure they came.

11   Q.   Sir, did you see the police there?

12   A.   We seen them coming as I was leaving.

13   Q.   You saw them coming as you were leaving, correct?

14   A.   Uh-huh.

15   Q.   As you were rolling that safe out to your car, correct?

16   A.   The safe was already in the car.  I was already down

17   Cleveland Avenue.

18   Q.   You say that there was a home invasion on the west side,

19   correct?

20   A.   Yes, sir.

21   Q.   The one that Marcus was talking about, right?

22   A.   Yes, sir.

23   Q.   But nothing was taken, correct?

24   A.   Was nothing in there.

25   Q.   So what was Marcus talking about?

TRIAL ONE - VOL. 25 -  5170

1    A.   He was talking about we went in their house.  That was

2   enough.  Somebody B knew went in their house with guns,

3   grandmother in there, baby in there, ransacked the house.  That

4   was enough.  It was B's peoples.  So Mark bragging about it.  B

5   didn't like it.

6    Q.   Mark bragging about an unsuccessful robbery?

7    A.   Mark did that a lot.

8    Q.   Now, when Paco shot at you on the street, correct?

9    A.   Yes, sir.

10    Q.   Show me again how close the guns were you to?

11    A.   Right here.  (Indicating.)

12    Q.   How bad were the powder burns?

13    A.   I didn't get no powder burns.

14    Q.   Put your hands up again and show me where those guns

15   were.

16    A.   (Indicating.)

17    Q.   So you're saying the two guns were within six inches of

18   your face, correct?

19    A.   Yes, sir.

20    Q.   And you testified that bullets were whistling by your

21   face, correct?

22    A.   And the whole neighborhood.  The scene was the talk of

23   the neighborhood, man.

24    Q.   A lot of people saw it, didn't they?

25    A.   The whole neighborhood seen it.

1  Q.  A lot of people saw you get very embarrassed, correct?

2  A.  Embarrassed?  Couldn't get embarrassed behind it.

3  Q.  So two firearms are discharged within six inches of

4  either side of your head multiple times, no powder burns.

5  That's your testimony?

6  A.  No, sir.

7  Q.  You also said that when you met up with Paco, you put

8  your hand out and shook his hand, correct, the night of the

9  shooting?

10  A.  Yes, sir.

11  Q.  And that's when Paco pulled a gun out on you, correct?

12  A.  No.  Don't try to trick me.  I said when I turned

13  around, after I shook his hand and greeted all the other guys,

14  and I turned around.

15  Q.  Okay.

16  A.  I heard a gun clink, clink.  And I turned around and he

17  had the gun pointed out me.  And he reached for my waistline,

18  took the guns off of my waistline.  Then he had both guns

19  pointed at me.  Then he started walking backwards and started

20  shooting and went into the middle of the street.

21  Q.  This was all immediately after the incident that

22  occurred at the Dream Lounge, correct?

23  A.  You could say that.

24  Q.  So Paco thought that was a pretty serious incident,

25  correct?

TRIAL ONE – VOL. 25 –  5172

1    A.   He shot at my car.  I wasn't familiar with it.  So he

2    thought I was coming to do something to him.  I had no

3    knowledge that the man shot at my car because the music was so

4    loud.  We all drinking.  I got four 12s in my car, audio system

5    loud, banging.  You can't hear nothing over it.  And we flying.

6    He shot at the car.  I ain't got no knowledge about it until

7    later on that night when he told me.

8    Q.   Paco thought it was a serious incident.  He shot at you,

9    right?

10   A.   Paco shot at a lot of people.

11   Q.   He took your gun off you?

12   A.   Paco took a lot of guns off a lot of people.

13        MR. DEVILLERS:  Objection, asked and answered.

14        THE COURT:  Sustained.

15   BY MR. BERNDT:

16   Q.   Tabby Broomfield?

17   A.   Yes, sir.

18   Q.   You say that my client paid you $1,200 to shoot up his

19   house?

20   A.   Yes, sir.

21   Q.   When did that happen?

22   A.   I want to say that was '08.

23   Q.   Do you know when it happened, or are you guessing?

24   A.   It was '08.

25   Q.   When in '08?

TRIAL ONE – VOL. 25 –  5173

1    A.   The weather had to be kind of warm because there wasn't

2    no snow out there.  The police came there, though.

3    Q.   When in '08, do you know?

4    A.   I can't go on.  It's been eight years.  I've been locked

5    up.

6    Q.   And Tabby Broomfield sold drugs, right?

7    A.   Yes, sir.

8    Q.   Who were you with?

9    A.   Me and Andre Rafford.

10   Q.   You and Andre Rafford, huh?

11   A.   Yes, sir.

12   Q.   Was this after you and Andre murdered two people out

13   there at Paco's place?

14   A.   I got shot up that night.  I was immediately in the

15   hospital, immediately incarcerated.

16   Q.   So this was before that?

17   A.   Yes, sir.

18   Q.   So you and Andre, you guys run together?

19   A.   Nah.  It started with the Paco.

20   Q.   Fire your guns together?

21   A.   Nah.  No.

22        MR. BERNDT:  Excuse me one second, Your Honor.  I

23   apologize.

24        THE COURT:  Not a problem, Mr. Berndt.

25

TRIAL ONE – VOL. 25 – 5174

1    BY MR. BERNDT:

2    Q.   Mr. Williams, sorry for bouncing around here a little

3    bit.  I want to go back to a second to Rodriccos Williams.  I

4    want to talk to you about Mario Gibbs.  You don't know Mario?

5    A.   No, sir.

6    Q.   And you didn't know Rodriccos?

7    A.   No, sir.

8         (Audio played in open court.)

9    BY MR. BERNDT:

10   Q.   Did you hear that?

11   A.   Yes, sir.

12   Q.   So you don't know Mario, correct?

13   A.   No, sir.

14   Q.   And you don't know Rodriccos, correct?

15   A.   No, sir.

16   Q.   But you know they're in the drug game together, correct?

17   A.   I told you like I said, I knew Kevin Fowler, which was

18   Luke's half brother, and they came into the barbershop.

19   Q.   You didn't want the people at the barbershop to know

20   your involvement, did you?

21   A.   Of course not.

22   Q.   You specifically told the police to keep Luke out of it,

23   correct?

24   A.   Yes, sir.

25   Q.   Between Mario, yourself and Luke Estice, you knew

TRIAL ONE – VOL. 25 – 5175

1   Rodriccos Williams, did you not?

2     A.    No.  I never knew Rodriccos, Mario, Little Hollywood.

3   All I know is Luke and Kevin Fowler.  And I really don't know

4   Kevin Fowler.  That's just Luke's half brother that come to the

5   shop to get his car done behind the shop in the detail shop.

6     Q.    So you know Kevin Fowler, correct?

7     A.    I met him through Luke after seeing him a few times

8   coming to the barbershop.  That's about as far as our

9   relationship was.

10    Q.    Didn't you just say you learned the information about

11  Mario and Rodriccos from Kevin Fowler?

12    A.    No.  I learned that information from Ledbetter.  They in

13  the same circle.  You understand what I'm saying?  Same circle.

14  So you see these guys.  Just because you see them, don't mean

15  you know them.  They come in the shop.  I'm in the barbershop.

16  I got different circles and groups that people come in there on

17  the regular and communicate with each other.

18    Q.    Now, do you remember speaking to the police in October

19  of 2014?

20    A.    I don't remember no dates.

21    Q.    How about October 10th of 2014?

22    A.    Explain it to me, sir.

23    Q.    Okay.  Do you remember telling them about how you were

24  being hired to kill Paco Brown?

25    A.    Okay.

TRIAL ONE – VOL. 25 –  5176

1    Q.    Do you remember that?

2    A.    Okay.

3    Q.    Is that a yes?

4    A.    If it's on there and I said it, then I said it.

5    Q.    Okay.  Do you remember who you told the police hired you

6    to do that?

7    A.    What year was that?

8    Q.    October 10th of 2014.

9    A.    Yes, I remember.

10   Q.    Who did you tell them?

11   A.    You tell me.

12   Q.    You just said you remembered.

13   A.    I know Brandon Ledbetter was one of them.

14   Q.    Who else?

15   A.    What does the paper say?

16   Q.    You don't remember, do you?

17   A.    I don't remember.  Can you read it to me, sir?

18   Q.    No.

19   A.    You asked me the question.  Can you read it to me?

20   Q.    Sir, do you remember or don't you remember?

21   A.    Robert Ledbetter, Jermaine Patterson, and Parkay.

22   Q.    Okay.  So how much were you offered?

23   A.    A hundred for both of them.

24   Q.    If I said that my -- the police report that I say

25   indicates $250,000 is what you told the police, would that ring

TRIAL ONE – VOL. 25 –   5177

1   a bell to you?

2   A.   That wouldn't be -- that's for two people.  I'm telling

3   you what my end would be.

4   Q.   So the other end would be for Andre Rafford?

5   A.   Yes, sir.

6   Q.   And my information tells me that they wanted to give you

7   half the money up front.  Do you remember that?

8   A.   Okay.

9   Q.   Is that a yes?

10  A.   I'm listening to you.  You reading.

11  Q.   And that you declined the money.  Do you remember that?

12  A.   For the love of Brandon Ledbetter.  I love him like a

13  brother.  Again, he was my mans.  They threatened his family.

14  I went and got in the trenches for him, and this is how he

15  reward me.  Forgot about me.  Left me for dead.  Fucked my

16  woman.  Yeah, he did.

17  Q.   Mr. Williams, Mr. Ledbetter is not asking you questions.

18  I am.

19  A.   You asked me.

20  Q.   So you were offered a quarter of a million dollars,

21  according to you, in October 10th of 2014, to kill Paco and

22  Colvin, correct?

23  A.   Yes, sir.

24  Q.   And you told that to Mr. DeVillers, did you not?

25  A.   Yes, I did.

TRIAL ONE – VOL. 25 –  5178

1   Q.   And Mr. Kelley, correct?  The guys sitting right at this

2   table, correct?

3   A.   Yes, sir.

4   Q.   And you told them that you were offered $125,000 down,

5   correct?

6   A.   Is that what it said?

7   Q.   I'm asking you what you said, sir.

8   A.   No.  You saying it.  I'm asking you is that what it say

9   on there.

10       MR. BERNDT:  Your Honor, could the witness be

11  instructed to answer the question?

12       THE COURT:  Mr. Williams, do you understand the

13  question?

14       THE WITNESS:  I don't understand the question.

15       THE COURT:  You have a responsibility to answer his

16  question.  If you don't understand it, you can ask me to have

17  him clarify it or you can ask Mr. Berndt to clarify it.

18  Mr. Berndt, pose your question again, please.

19       MR. BERNDT:  Certainly.

20  BY MR. BERNDT:

21  Q.   You were offered half of that $250,000 in advance,

22  correct?

23  A.   He offered me money up front.

24  Q.   And you said you would have to think about it, correct?

25  A.   Correct.

TRIAL ONE – VOL. 25 –   5179

1   Q.   So what you're telling this jury is that you turned down

2   $125,000 down on a quarter of a million dollar contract murder,

3   correct?

4   A.   Let me say this to you, again.  B was my mans.  He was

5   my best friend.  He didn't need to put anything down because

6   his word was sealed.  We did everything in the streets

7   together.  I knew where his houses was.  I knew where his

8   family was.  He knew what I did for a living in the streets so

9   he would not duck me.  These are the guys I grew up with:  JP,

10  Park, Brandon Ledbetter.  These was family to me.

11        So there was no in betweens.  I didn't have to question

12  them.  I told him I'll take a look at it.  If I'm able to do

13  it, I'm going to handle it.  If I can't, I can't.  And that's

14  what happened.  And that's what it is.

15  Q.   Taron Colvin is dead, is he not?

16  A.   Yes.

17  Q.   Half the contract, correct?

18  A.   It wasn't what happened that night.

19  Q.   Half the contract was satisfied by you, correct?

20  A.   Say that again.

21  Q.   Well, the $250,000, according to you, was to kill Taron

22  Colvin and Andre Brown, correct?

23  A.   Yes, sir.

24  Q.   Taron Colvin got killed, correct?

25  A.   Yes, he did.

TRIAL ONE – VOL. 25 – 5180

1    Q.    When did you get paid your $125,000, Mr. Williams?

2    A.    When did I get paid?  Brandon Ledbetter paid that lawyer

3    and said I was snitching in the streets.  JP, Park, they both

4    said fuck me.  And in the penitentiary, that's the word coming

5    out their mouth with everybody in there.  So everybody is like

6    a threat to me.  Everybody is talking shit to me and want to

7    get at me, threatening to kill me as soon as I touch the

8    street, want to kill me in the penitentiary.  That's the truth

9    to it.  It's on the videotape and everything.

10    Q.    So you didn't get paid?

11    A.    I get paid?  He paid the lawyer.

12    Q.    That was seven thousand --

13    A.    He tried to pay you, too.  He sent you down there.  Do

14    you remember that?

15         MR. BERNDT:  Your Honor, I'd move to strike.  It was

16    unresponsive.

17         THE COURT:  Granted.  The jury is instructed to

18    disregard the response.

19    BY MR. BERNDT:

20    Q.    You've been in prison for -- you've been in prison for

21    eight years, correct?

22    A.    Yes, sir.

23    Q.    You appear to be in reasonable health, correct?

24    A.    I'm doing bad, but I'm making it.

25    Q.    And you were never taken to a medical facility for any

TRIAL ONE – VOL. 25 –   5181

1    type of threat or assault --

2            MR. DEVILLERS:  Objection.  Asked and answered.

3            THE COURT:  Sustained.

4            THE WITNESS:  I listened to that videotape --

5            MR. GATTERDAM:  Objection, Your Honor.

6            THE COURT:  Mr. Williams -- I sustain the objection.

7      BY MR. BERNDT:

8      Q.   Now, you just mentioned that I came down to see you

9    while you were locked up, correct?

10     A.   Yes, sir.

11     Q.   And you say that Mr. Ledbetter sent me down there to see

12   you, correct?

13     A.   Mr. Ledbetter told me that you made him and Denny's

14   cases go away.  They said you don't play, as far as like on the

15   right side.  So he said to me to trust you.

16     Q.   Okay.  And you didn't, correct?

17     A.   No, because you were searching.  You were searching to

18   see what I would say.  You was asking questions, but you were

19   digging to see exactly what it was, if there was more to what

20   it was.  And I seen that in you.  And I know B sent you on

21   that, because he was wondering if I was telling anyone or not.

22            MR. GATTERDAM:  Objection.

23            MR. DURDEN:  Side-bar.

24            THE COURT:  Indeed.

25

TRIAL ONE - VOL. 25 - 5182

1                        - - -

2          (The following proceeding was held at side-bar.)

3          MR. DURDEN:  I apologize.  I called the side-bar.

4          THE COURT:  I know and that was improper because only

5   he had -- this is his witness.  If he has an objection on

6   behalf of Mr. Ledbetter, because he's doing the examination, it

7   is Mr. Berndt's objection to make.  But we're here now.  Go

8   ahead, Mr. Berndt.

9          You can confer with Mr. Berndt, but it's his objection.

10         And you made an objection, too.

11         MR. GATTERDAM:  Yeah.

12         MR. BERNDT:  Your Honor, I had no objection.

13         THE COURT:  What's your objection?

14         MR. GATTERDAM:  First of all, it's nonresponsive.

15  There's foundation --

16         THE COURT:  No.  No.  No.  He asked the question.  I

17  have ruled that that -- the testimony about Mr. Berndt asking

18  inappropriate questions or making inappropriate inquiry was

19  stricken.  Everybody heard it.  Mr. Berndt, which is his

20  prerogative, made a tactical decision to go into that.  He has

21  proverbially -- or he has opened the proverbial door.  And

22  Mr. Berndt is as skilled an attorney and cross-examiner as I've

23  seen in my 20 years on the bench.  He knows what he's doing.

24  If you want to make an objection, your objection is overruled

25  because he opened the door.

TRIAL ONE - VOL. 25 - 5183

1      Does anybody else have an objection?

2          MR. DURDEN:  I will withdraw my objection.

3          THE COURT:  You can withdraw it.  Anybody?

4      Now, if you're not -- if you're not finished with your

5  argument, Mr. Gatterdam, I will allow you to make it for the

6  record.

7          MR. GATTERDAM:  No.  I just felt like he did -- I

8  wasn't objecting based on the fact that you struck it.  I don't

9  think he's -- I think he answered the question and kept going.

10         THE COURT:  You don't have standing to make that

11  objection.  You don't have standing to make an unresponsive

12  objection when he's the questioner.  If that's the basis of

13  your objection, then your objection also is overruled.

14      Now, what I will hear, though, is if there was something

15  about the question that you think impacts your client.  And on

16  some other substantive basis, you're going to make it, go

17  ahead.  I want you to preserve your record.

18         MR. GATTERDAM:  Thank you.  I think this is the

19  concern I had previously about getting into lawyers -- because

20  one lawyer being part of the, quote, conspiracy, how it impacts

21  all the others that are in the conspiracy.  And I think that's

22  where we're going now.  I understand Mr. Berndt has his right

23  to ask questions, but it impacts my client now to suggest

24  that -- as Mr. Williams is going off on one of the lawyers in

25  this case, now that's impacting Christopher Harris and I renew

TRIAL ONE - VOL. 25 - 5184

1   my motion for severance.

2          MR. MEYERS:  Can I add quickly?  I join for Ussury

3   with the additional quick point of concern.  Anything the

4   government can do to successfully -- anything the evidence does

5   to cast Ledbetter as the leader and the co-conspirator and the

6   manipulator hurts Ussury.  So I want to make a distinct

7   argument here.  It isn't -- it's shrapnel to fellow lawyers, as

8   I think the phrase was stated earlier.  And I object.  I object

9   to even Mr. Berndt bringing it up.  He's casting himself now in

10  the mix as sort of arguably, to put it bluntly, Ledbetter's

11  puppet master.  And any of that kind of evidence is hurting

12  Ussury.

13         THE COURT:  Do you have a response, Mr. DeVillers?

14         MR. DEVILLERS:  I do not, Your Honor.

15         THE COURT:  Because, Mr. Meyers, you might have made

16  the best argument for the relevancy of this evidence in a

17  conspiracy case.

18         MR. MEYERS:  Well, prejudice outweighs probative, or

19  probative/prejudice.  We always knew it could happen, that the

20  five could start having to eat their own, or there would be at

21  least intentions and distinctions between five defendants in a

22  co-defendant trial.  I'm lodging the objection on that basis.

23         THE COURT:  I understand that, and I don't have a

24  problem with that.  My point is based on the substance of your

25  objection.  As you articulated it, that's a commentary on the

TRIAL ONE - VOL. 25 - 5185

1   fact that it's relevant evidence of a conspiracy because that's

2   the point of the government's case.  That is exactly what the

3   government is arguing, and that is what they're constrained to

4   argue given the nature of the charges.  That's what a

5   conspiracy is.  Now, whether they've proved it, only the jury

6   can decide.  But that is the nature of the evidence and it

7   certainly is a good narrative on whether -- you know, in

8   support of your argument for severance.

9           But, if your argument would obtain, then in every

10  conspiracy, all of the co-conspirators would have to be tried

11  separately.  And that's not what the law of severance allows.

12  But that's what the law of conspiracy allows.  So it's

13  overruled.

14          MS. DIXON:  Can I say one thing?

15          THE COURT:  Absolutely.  Please.

16          MS. DIXON:  The only thing I would be concerned about

17  is because the testimony has been that Mr. Ledbetter sent

18  him --

19          THE COURT:  Sent who?

20          MS. DIXON:  Sent Mr. Berndt, and paid for Mr. Berndt,

21  that the jurors could possibly from that think that somehow

22  Ledbetter has paid all of us to represent our respective

23  clients.  And that is not true.  And so that would be my only

24  concern with what's going on.

25          THE COURT:  But I will say to you, Ms. Dixon, the same

1    thing I said to Mr. Gatterdam.  If you can point to me evidence

2    in the record from which a juror could make that inference,

3    then I would entertain seriously your argument.  But otherwise,

4    it's speculative.  It is speculative, at best.

5         The jury will be instructed that they can make their

6    decision based on the evidence and inferences that can be made

7    from the evidence.  And the evidence is that Mr. Berndt went to

8    talk to Mr. Williams about the possibility of representation.

9    That's it.  And so I don't impute to Mr. Ledbetter the

10   ubiquitous power that this argument seems to, of necessity,

11   suggest.  So your objection – and I will treat it as one – is

12   duly noted, but overruled.

13      (The following proceeding was held in open court.)

14          THE COURT:  Mr. Berndt, please continue.

15          MR. BERNDT:  Thank you.

16    BY MR. BERNDT:

17    Q.   So Mr. Williams, I believe our meeting occurred in May

18   of 2010.  Would that seem about right to you?

19    A.   Okay.

20    Q.   You also saw a lawyer named Terry Sherman, correct?

21    A.   Yes, sir.

22    Q.   And that was after you saw me, correct?

23    A.   Yes, sir.

24    Q.   I'm sorry?

25    A.   Yes, sir.

TRIAL ONE - VOL. 25 - 5187

1  Q.   And you don't have any relationship to tell this jury

2  about Mr. Ledbetter and Mr. Sherman, correct?

3  A.   No.

4  Q.   So you saw another lawyer after you saw me, correct?

5  A.   Yes, sir.

6  Q.   You saw another lawyer after you saw me that was not

7  Mark Collins, correct?

8  A.   Yes, sir.

9  Q.   You saw another lawyer that has no relationship with

10  Mr. Ledbetter after you saw me, correct?

11  A.   I did that so I can get more time.  They told me if I

12  hired another lawyer, they'd give me more time.  That's why I

13  was looking for a second lawyer when I called Terry Sherman.

14  Q.   So you were gaming the system?

15  A.   No.  I needed more time.  I was fighting for my life.

16  Q.   So you acted like you were going to get another lawyer

17  in order to secure more time?

18  A.   I was fighting for my life.  I was fighting for my

19  freedom.  And the only way to get more time is to get another

20  lawyer.  You came down way before Terry Sherman.  You came down

21  in the beginning.  Terry Sherman came in the end.

22  Q.   If I told you that the date that I came down was

23  May 20th of 2010, and the date that Mr. Sherman came down was

24  June 18th of 2010, would you have any reason to dispute that,

25  sir?

TRIAL ONE – VOL. 25 – 5188

1   A.   If that's what you say, then you're right.

2   Q.   And then you were wrong, correct?

3   A.   Yes.

4   Q.   And you just said something false under oath, correct?

5   A.   Okay.  Then I did.

6   Q.   You know a lawyer named Gary Dicker?

7   A.   Yes.

8   Q.   He saw you in the jail, correct?

9   A.   Joseph Saunders sent him down.

10  Q.   He saw you when you were represented by Mr. Collins,

11  correct?

12  A.   Yes, sir.

13  Q.   Mr. Ledbetter did not send him down there, correct?

14  A.   Joseph Saunders is Ledbetter's first cousin.

15  Q.   Mr. Ledbetter did not send him down there, correct?

16  A.   I'm not for sure.

17  Q.   Now, do you remember providing law enforcement with a

18  phone number for Mr. Ledbetter, the phone number he allegedly

19  used during the Rodriccos Williams situation?

20  A.   I can't remember.  It's been so long ago.  I'm trying to

21  put all of this together.  The memory's been eight years, man.

22  Q.   Do you remember telling them that Mr. Ledbetter's phone

23  number was 843-7233?

24  A.   I can't remember no numbers.

25  Q.   Do you remember giving them a phone number based upon

TRIAL ONE – VOL. 25 –  5189

1   your allegation that Mr. Ledbetter was on the phone with

2   Rodriccos Williams's wife?

3    A.   If it was on the record that I gave them the number,

4   then I did.

5    Q.   And if it's on record that the number was 843-7233, you

6   have no reason to dispute that?

7    A.   No, sir.  B always kept two phones, so I'll tell you

8   that.

9         MR. BERNDT:  Your Honor, if I may have just a moment.

10        THE COURT:  Yes, you may, Mr. Berndt.

11   BY MR. BERNDT:

12    Q.   Mr. Williams, you talked about being in the -- in the

13   hospital with -- you talked to the police about the time when

14   you were in the hospital, correct?

15    A.   Okay.

16    Q.   Do you remember that?

17    A.   Okay.

18    Q.   And it was the time frame that you indicated, according

19   to you, that Mr. Ledbetter had a recording device on him?

20    A.   Yes, sir.

21    Q.   And you also indicated that that was shortly after the

22   shooting had occurred?

23    A.   Yes, sir.

24    Q.   Do you remember that?

25    A.   Yes, sir.

TRIAL ONE – VOL. 25 – 5190

1    Q.   And do you remember telling the police that you were

2    heavily medicated?

3    A.   Yes, sir.

4    Q.   That you were in and out of consciousness due to pain

5    medications?

6    A.   Yes, sir.

7    Q.   But in spite of that, you do remember one thing, the

8    words kill him right here?

9    A.   That didn't happen that time.  B came to see me by

10   himself and talked to me.  And then the police was next door,

11   Luke Estice's door, and when they was in the room visiting him,

12   I heard them come in.  And I heard B talking and I heard RJ and

13   Buck talking.  And I heard B saying we can't do it, the police

14   right there.  He said choke him out.

15   Q.   And that was in September of 2008, correct?

16   A.   I don't know exactly the date it was.  That was when I

17   was in the hospital.

18   Q.   Right after the shooting, right?

19   A.   Yes, sir.

20   Q.   And when you were under significant pain meds, right?

21   A.   Yes, sir.

22   Q.   And that was about eight plus -- about eight years ago,

23   correct?

24   A.   RJ told me they came and visited me in the hospital, and

25   I put everything together.  Put everything together when he

TRIAL ONE – VOL. 25 –  5191

1    told me they came and visited me in the hospital, him and RJ

2    and Buck came and visited me in the hospital.  So I know I was

3    heavily medicated when I couldn't remember that because I

4    remember the voices and I remember that time.

5    Q.   And what you're telling this jury is that at that time

6    you were about to lose your life, correct?

7    A.   It could have happened.

8    Q.   And here we are eight years later, correct?

9    A.   Yes, sir.

10   Q.   You don't have a scratch on you, do you?

11   A.   Yes, I do.

12   Q.   You have scratches on you from your shoot-out with Paco,

13   correct?

14   A.   Yes, I do.

15   Q.   You don't have a scratch on you that you can attribute

16   to Mr. Ledbetter, correct?

17   A.   This was all because of Mr. Ledbetter.  Because

18   Mr. Ledbetter paid me to try to do this.  So it all came from

19   Mr. Ledbetter.  I don't know how you can't see that clearly.

20   He's the one behind all of it.  He sent me.  He contracted me.

21   He asked me to do it.  He wanted to pay me.  He paid the

22   lawyer.  He covered his tracks.

23   Q.   You're here today unscathed, are you not?

24   A.   Say that again.

25   Q.   You're here without injury today, correct?

TRIAL ONE - VOL. 25 - 5192

1    A.    I'm injured right now.  It's hurting to sit right here.

2    I got a disk tooken out of my back.  It's been killing me all

3    day.

4    Q.    You've never been injured by Mr. Ledbetter's own hand,

5    correct?

6    A.    Yes, I was.  This was Mr. Ledbetter's hands.  If it

7    wasn't for him, it would never have happened.

8    Q.    So you blame Mr. Ledbetter for you killing Taron Colvin,

9    correct?

10   A.    If it wasn't for me loving that dude and wanting to

11   protect his family, I wouldn't be here today.

12   Q.    So is that yes?

13   A.    Yes what?

14   Q.    For Mr. Ledbetter -- for you murdering Taron Colvin?

15   A.    I'm not going to give him a hundred percent.  He partial

16   of it.  It's not just all me.  It's bigger than me.  I just did

17   a job.

18   Q.    Do you remember the telephone call that was played for

19   you?

20   A.    Which one?

21   Q.    The one that was just played for you here during direct

22   examination.

23   A.    Explain it to me.

24   Q.    The phone call where Mr. Ledbetter is speaking to

25   somebody about you?

TRIAL ONE - VOL. 25 - 5193

1    A.   Who was that?

2    Q.   I think it was somebody named Rakeisha Allen?

3    A.   It sounded like Ricky Patterson.

4    Q.   I'm sorry, Ricky Patterson.  I think you're right.

5  Thank you.  Do you remember that phone call?

6    A.   Yeah.  He was basically telling him to kill me.

7       MR. BERNDT:  Now, could we bring that up?

8       THE DEPUTY CLERK:  What's the exhibit number?

9       MR. BERNDT:  150-31.

10    (Audiotape played in open court.)

11  BY MR. BERNDT:

12    Q.   So my understanding of this phone call is that

13  Mr. Ledbetter is speaking to somebody about you saying that

14  Mr. Ledbetter is an informant?

15    A.   That's what they saying.

16    Q.   So when Mr. Ledbetter is speaking on this phone call,

17  he's talking about responding to your allegation that he's an

18  informant, correct?

19    A.   I don't know what Mr. Ledbetter's motives was on that or

20  why he was doing it.  All I know he was trying to do it.

21    Q.   And he was angry that you were saying something about

22  him that wasn't true, correct?

23    A.   I don't know what his motives was.

24    Q.   You were telling people that Mr. Ledbetter was an

25  informant, correct?

1    A.   Mr. Ledbetter was telling people that I was snitching.

2         MR. BERNDT:  Your Honor, I ask for him to be

3    instructed to answer my question, please.

4         THE COURT:  Mr. Williams, would you answer

5    Mr. Berndt's question.  And I'm going to have Mrs. Evans read

6    it back.  Listen to the question, Mr. Williams.  If you don't

7    understand it, I'll ask Mr. Berndt to rephrase it.  Please read

8    it back, Mrs. Evans.

9         (Thereupon, the last question was read by the court

10   reporter.)

11        THE COURT:  Do you understand the question,

12   Mr. Williams?

13        THE WITNESS:  Yes, sir.

14        THE COURT:  Please answer it.

15        THE WITNESS:  I was in Mansfield and they said they

16   dropped the murder case, Rodriccos's murder case, on

17   Mr. Ledbetter.  They said O-Dog -- because O-Dog is saying word

18   down there for one dude to hit me, and we got into it.  And

19   they start saying that the case got dropped, so now they saying

20   that B was telling.  And that was the rumor that was floating

21   around.  No, I didn't start that.  That's the rumor that was

22   coming all the way down from Ross, not from me, from Ross, from

23   O-Dog.  And that passed in the penitentiary system.  Because

24   they said how can they drop a murder case and not charge him

25   with it, and it don't go no further than that.  And he was

TRIAL ONE - VOL. 25 -  5195

1    going to the feds.

2          Does that answer your question?

3    BY MR. BERNDT:

4    Q.   So you heard from "they" that charges of murder were

5    dismissed against Robert Ledbetter, correct?

6    A.   L'il Keefee.  We got cell phones illegally in Mansfield.

7    They call him down and they telling us that they dropped the

8    charges.  I had no connection with what's going on with

9    Mr. Ledbetter out there.

10   Q.   I understand.  So you admit to the jury that you had

11   illegal cell phones in prison, correct?

12   A.   Yes.  They floating around there.

13   Q.   And you also admit that this is a rumor that

14   Mr. Ledbetter somehow got his case dismissed, correct?

15   A.   Yes, sir.

16   Q.   And you also admit that people run with that rumor,

17   correct?

18   A.   Yes, sir.

19   Q.   By saying that Mr. Ledbetter is an informant, correct?

20   A.   Yes, sir.

21   Q.   And it runs all through the prison system that

22   Mr. Ledbetter is an informant, correct?

23   A.   Yes, sir.

24   Q.   And it's totally false, correct?

25   A.   I don't know nothing about what Mr. Ledbetter's doing

TRIAL ONE - VOL. 25 -    5196

1   other than what we doing right here today.

2    Q.   And it's also the same level of information that you've

3   received in regard to almost the entirety of your testimony

4   here today, correct?

5    A.   That don't sound about right.  Everything I said here

6   today is the truth.  You might not like the truth.  I ain't up

7   here just telling no knowledge.  All these guys here is

8   killers.  I'm a killer.

9         MR. GATTERDAM:  Objection.

10        THE WITNESS:  And for me to get up here and say this,

11   it's got to be reality.  We don't lie about things like this.

12   I'm breaking a code of silence.  My family could get killed

13   behind this.  People's families had got killed behind this and

14   continue to get killed behind this.

15        THE COURT:  Mr. Williams -- sustained.  The jury is

16   instructed to disregard the response as nonresponsive.

17       You may rephrase or re-put your question.

18        MR. BERNDT:  Thank you.

19        THE COURT:  Again, Mr. Williams, listen to the

20   question.  If you don't understand the question, inform the

21   Court and I'll ask Mr. Berndt to rephrase it.

22        MR. BERNDT:  Thank you, Your Honor.

23    BY MR. BERNDT:

24    Q.   Mr. Williams, you ran with that rumor, correct?

25    A.   I heard it.

1    Q.   And Mr. Ledbetter didn't like that rumor, correct?

2    A.   No, sir.  I didn't put that rumor out on Ledbetter.  I

3    don't know where Mr. Ledbetter -- because I don't communicate

4    with him.  I ain't talked to Mr. Ledbetter since 2010 when he

5    said I was snitching on the county phone with JP, when Deval

6    (phonetic) came in the tape, and I told him what Deval told me.

7    That's the last time I talked to Ledbetter and anybody dealing

8    with Ledbetter.

9    Q.   And Mr. Ledbetter responded to this false rumor,

10   correct?

11   A.   I don't know what Mr. Ledbetter responded to.

12   Mr. Ledbetter was trying to put hits out on me in the jail,

13   inside the county.  He told everybody I'm a snitch.  I'm

14   calling on everybody saying Brandon Ledbetter saying I'm

15   snitching, and he hadn't been charged with nothing.  He's just

16   being investigated and pointing the fingers.  Mr. Ledbetter

17   wanted to get everybody out the way but himself so he wouldn't

18   have no problems with this situation.

19   Q.   Now, Mr. Williams, could you look at me, please?

20   A.   I apologize.

21   Q.   You're okay.  You are snitching, correct?

22   A.   Yes, definitely.

23   Q.   So, when Mr. Ledbetter says that you're snitching, he's

24   right, correct?

25   A.   Correct.

TRIAL ONE - VOL. 25 - 5198

1   Q.   And you've been snitching since --

2   A.   But he said this before any paperwork, before he was

3 charged with anything, he was putting this out on me.

4   Q.   And it's all true, correct?

5   A.   It didn't come true until years later.

6   Q.   Okay.

7   A.   Because it was nothing said like you said until 2000

8 what?  What year did I get locked up?  What year did this come

9 out?  You see what I'm saying?  It took time before I said

10 anything.  Mr. Ledbetter was saying this before then on the

11 phone.  It should be recorded on there.  You got recorders the

12 day this man in the tank with me, when he was slated in the

13 county jail, that they were slated in the county jail and that

14 phone conversation we had.  Don't you all have recordings of

15 that?  Don't you have recordings like that in the county jail?

16       MR. GATTERDAM:  Objection, your Honor.  Nonresponsive.

17       THE COURT:  I'm going to overrule it for reasons set

18 forth at side-bar, Mr. Gatterdam.

19 BY MR. BERNDT:

20   Q.   So ultimately, what Mr. Ledbetter was saying was

21 accurate, correct?

22   A.   Mr. Ledbetter said I was snitching?  I hadn't said

23 nothing yet, and he said I was snitching before I even said

24 anything.  And that's what broke me all the way.  When JP told

25 him on the phone shut the fuck up; earl did everything under

TRIAL ONE - VOL. 25 -  5199

1    the sun for you, and this is how you're going repay him?

2         And JP said, I worry about it.  I'll handle it from here

3    on out.  I'll take care of him.

4         And that's when Mr. Ledbetter sent Melissa Leslie up

5    under me fishing for questions, trying to see where I stand at,

6    how I feel, what I'm doing.  He couldn't get her to do it, so

7    he got my baby momma.  I've been knowing her for three years,

8    until he came to me in Mansfield after the fact.

9    Q.   Mr. Williams, over here, okay.  Thank you.

10        You know Jermaine Patterson?

11   A.   Yes, sir.

12   Q.   You know that he's been alleged to be part of D-Block?

13   Do you know that?

14   A.   Okay.

15   Q.   Do you know that?

16   A.   Yes, sir.

17   Q.   And it's also been alleged that people from the Short

18   North don't associate with people from D-Block.  Do you know

19   that?

20   A.   Let me say this to you.  Jermaine Patterson is the Short

21   North.  And D-Block and Short North combined in together, just

22   like they combined in with the guys out east on Mount Vernon.

23   We all come in together.  It's all different types of groups.

24   All different type of killing committee, robbery groups that's

25   sliding in together, Bloods and Crips, all different

1   neighborhoods.  And JP is originally from the Short.

2   Q.    Are you aware of a shooting at Joyce Park?

3   A.    I don't know.  Nobody getting hurt.

4   Q.    I didn't ask you that.

5   A.    Yes, sir.

6   Q.    And that was a significant shoot-out, hundreds of

7   rounds, correct?

8   A.    Okay.

9   Q.    And that was between D-Block and Short North, correct?

10  A.    Okay.

11  Q.    The same people that you say are the same people?

12  A.    The same people B run with.  The same people that's

13  indicted with some of these cases right here right now today.

14  The same people.  We all got cousins and mommas and sisters and

15  uncles all joined in together.  It's almost like incest.

16        MR. BERNDT:  Your Honor, if I could just have one more

17  minute.  I'm almost done.

18        THE COURT:  Absolutely, Mr. Berndt.

19        Ladies and gentlemen, while we're waiting.  I apologize

20  for the construction.  They're doing some construction.  They

21  usually don't start until after five out of deference to what

22  we're doing.  We're running over.  It's nobody's fault.  I

23  probably should have anticipated it and made sure they wait.

24  I'm saying all that to let you know, if at any point you can't

25  hear either Mr. Berndt's questions or Mr. Williams' answers

TRIAL ONE – VOL. 25 – 5201

1    just signal.  I'll make sure that Mrs. Evans reads back the

2    question or answer or both.

3         Mr. Berndt, please continue.

4          MR. BERNDT:  Thank you.  I'm almost done.  I

5    apologize.

6          THE COURT:  Take your time.

7    BY MR. BERNDT:

8    Q.   You know who Crystal Fyffe is, do you not?

9    A.   Yes, sir.

10   Q.   And you also know who Anthony Jones is, correct?

11   A.   No, sir.

12   Q.   So you knew the -- when you spoke to the police in April

13   of 2013, you were shown a bunch of photos?

14   A.   Okay.

15   Q.   You told the police that you didn't recognize a photo

16   specifically, Photo No. 31, but you knew the name of Anthony

17   Jones?

18   A.   Can you show me that?

19   Q.   I'm sorry?

20   A.   Can you show me?  It's been many years ago.

21   Q.   Can I show it to you?

22   A.   Yes.

23   Q.   Sure.

24          MR. BERNDT:  Your Honor, may I approach?

25          THE COURT:  Yes, you may.

TRIAL ONE – VOL. 25 – 5202

1    THE WITNESS:  The picture.  You got a picture.  Not

2  the statement, a picture.

3  BY MR. BERNDT:

4    Q.    It's the statement.

5    A.    How do I know, if you ain't got the picture?

6    Q.    It says you didn't recognize the photo but you knew the

7  name of Anthony Jones?

8    A.    I knew the name Anthony Jones?

9    Q.    You went on to tell the police that there was a rumor

10  that Ledbetter had paid Anthony Jones to kill Crystal Fyffe.

11  Do you remember that?

12    A.    There was a rumor floating around in the county like

13  that.

14    Q.    So again, another rumor, correct?

15    A.    That was.

16    Q.    Right.  It's a rumor, right?

17    A.    You can say that.

18    Q.    So tell me all you know about how Anthony Jones killed

19  Crystal Fyffe?

20    A.    You got it right there in front of you.

21    Q.    That's it?  That there was a rumor?  Yes or no?

22    A.    Yes or no.  Yes.  It's right there in front of you.  I

23  don't know what you want me to say.

24    Q.    Who told you the rumor?

25    A.    RJ.

TRIAL ONE – VOL. 25 –   5203

1    Q.   Who told RJ?

2    A.   I don't know.  RJ knew everything.  RJ in the streets.

3    Q.   RJ knows everything?

4    A.   Yeah.

5         THE COURT:  Mr. Berndt, would you clarify through the

6    witness which RJ.

7         THE WITNESS:  Robert Wilson.

8         MR. BERNDT:  Thank you, Your Honor.

9    BY MR. BERNDT:

10   Q.   So, if Robert Wilson says it, it's true?

11   A.   Majority of the time -- when the majority say something

12   from out of nowhere it happened, it's almost a hundred percent

13   accurate.  Sometimes it might be a little bit off, but the

14   whole -- the basic of like who did it or who was there, it's

15   almost about what happened, especially like in that little

16   circle right there.

17   Q.   So what I think you're saying there is is that when one

18   of your associates speaks to you about something, you don't get

19   the whole story.  But because you're one of their associates,

20   you can figure out the good stuff.  Is that about right?

21   A.   I can't -- you can say that's about right.

22   Q.   So you're reading between the lines, correct?

23   A.   Yeah, because they don't never tell you the whole thing.

24   Q.   So your testimony today is a product of your reading

25   between the lines of these rumors, correct?

TRIAL ONE - VOL. 25 - 5204

1    A.   Another thing, I gave you the best of what I knew and

2   what I can remember and what I was a part of and what I seen

3   and what I done.  That's my testimony today.  And you can take

4   it for what it is.

5        MR. BERNDT:  Your Honor, I have nothing further.

6   Thank you very much.  And again, I apologize about going to

7   5:30.

8        THE COURT:  Not a problem.

9        Thank you, Mr. Berndt.

10       Ladies and gentlemen, we're going to conclude our

11  proceedings for today.  We ran a little over.  It's close to

12  5:30.  I want to thank you for the patience you've

13  demonstrated.  We've had a number of side-bars, and lunch was

14  longer than anticipated because we had some evidentiary issues

15  to address, and we addressed them.

16       Mr. Gatterdam, I'm assuming that you have cross.

17       MR. GATTERDAM:  Yes, Your Honor.

18       THE COURT:  We will begin tomorrow morning, ladies and

19  gentlemen, with Mr. Gatterdam's cross and we'll continue with

20  the government's case in chief.

21       Ladies and gentlemen, have a very pleasant evening.  I

22  look forward to seeing everyone in the morning.

23    (Jury out at 5:26.)

24       THE COURT:  Mr. DeVillers, before you sit down, is

25  there anything further from the government?

TRIAL ONE - VOL. 25 - 5205

1      MR. DEVILLERS:  There's not, Your Honor.

2      THE COURT:  Tomorrow, Mr. DeVillers, we'll continue

3  with Mr. Williams who I imagine will at least take up the rest

4  of the morning, including any redirect that you might have

5  because everybody is going to cross-exam him except Mr. Nolder,

6  I would think.  Yeah.

7      So you have the cell phone gentleman tomorrow.

8      MR. DEVILLERS:  Yes, Your Honor.

9      THE COURT:  So will there be anyone other than those

10  two?

11      MR. DEVILLERS:  Mr. Coffman -- or Officer Coffman will

12  be pretty quick.  And then Agent Lauber will be last, if we get

13  to him.

14      THE COURT:  And will Agent Lauber be long on direct?

15      MR. DEVILLERS:  I think probably about an hour or so.

16  We do have also one of the marshals.

17      THE COURT:  Okay.  So we're still on track to maybe

18  finish your case now sometime Wednesday?

19      MR. DEVILLERS:  I think that's fair to say.

20      THE COURT:  Mr. Berndt, anything further on behalf of

21  Mr. Ledbetter?

22      MR. BERNDT:  No, Your Honor.  Thank you.

23      THE COURT:  Mr. Gatterdam, anything further on behalf

24  of Mr. Harris?

25      MR. GATTERDAM:  No, Your Honor.

TRIAL ONE – VOL. 25 – 5206

1     THE COURT:  Ms. Dixon, anything further on behalf of

2  Mr. Liston?

3     MS. DIXON:  No, sir.

4     THE COURT:  Mr. McVay, anything further on behalf of

5  Mr. Ussury?

6     MR. MCVAY:  No, Your Honor.

7     THE COURT:  Mr. Nolder, anything further on behalf of

8  Mr. Robinson?

9     MR. NOLDER:  No, sir.

10     THE COURT:  Thank you very much, everyone.  Have a

11  good evening.

12     (Proceedings concluded at 5:31.)

13                        - - -

14

15

16

17                        - - -

18                   WITNESS INDEX

19                        - - -

20  <u>WITNESSES</u>          <u>DIRECT   CROSS   REDIRECT   RECROSS</u>

21  PLAINTIFF'S:

22  Earl Williams          4981    5088

23

24

25

1             C E R T I F I C A T E

2

3          We, Shawna J. Evans, Denise N. Errett, Darla J.

4   Coulter, do hereby certify that the foregoing is a true and

5   correct transcript of the proceedings before the Honorable

6   Algenon L. Marbley, Judge, in the United States District Court,

7   Southern District of Ohio, Eastern Division, on the date

8   indicated, reported by us in shorthand and transcribed by us or

9   under our supervision.

10

11

12                         s/Shawna J. Evans
                           Shawna J. Evans, RMR
13                         Official Federal Court Reporter

14

15                         s/Denise N. Errett
                           Denise N. Errett, RMR CRR
16                         Official Federal Court Reporter

17

18                         s/Darla J. Coulter
                           Darla J. Coulter, RMR, CRR
19                         Former Official Federal Court Reporter

20

21

22                         May 23, 2016

23

24

25