IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Case No. 2:15-CR-080 |
| Plaintiff, | : | Case No. 2:14-CR-127 |
| | : | |
| v. | : | Judge Algenon L. Marbley |
| | : | |
| ROBERT B. LEDBETTER, *et al.* | : | |
| | : | |
| Defendants. | : | |

**OPINION & ORDER**

This matter comes before the Court to supplement three oral rulings the Court rendered during the Government's case-in-chief on Wednesday, May 25, 2016. For the reasons that follow, the Court **DENIES** Defendants' joint motion for a mistrial, **DENIES** Defendants' joint motion to strike in its entirety the testimony of a cooperating co-conspirator, Anthony Jones, and **DENIES** Defendant Clifford L. Robinson's renewed motion for severance.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

On Tuesday, May 24, 2016, the Government recalled Anthony Jones to the witness stand. Jones is an unindicted co-conspirator who testified the week before about the alleged RICO conspiracy and a host of substantive murder counts at issue in this trial. During his prior testimony, Jones claimed he was present during the "Joyce Park Shootout"—a gangland shootout that occurred after an old-school fisticuffs duel went wrong on November 20, 2006. That shootout was listed as Overt Act No. 31 in the Superseding Indictment. When Jones first testified, several defense attorneys attempted to impeach him on the ground that he was incarcerated on November 20, 2006, and, therefore, could not have been present for the Joyce Park Shootout. Jones stuck to his story, however.

Counsel for the defendants likewise attempted to impeach Jones on a litany of prior inconsistent statements he provided to law-enforcement personnel, as well as his acceptance of plea bargains in both state and federal court in exchange for his testimony. Moreover, defense counsel for Christopher A. Harris successfully impeached Jones on the ground that his trial testimony conflicted with his grand jury testimony as to whether Harris participated in the 2006 murder of Alan Johnson. When Jones testified before the grand jury (and in all other pre-February 2016 statements to law enforcement personnel), he claimed that Harris had *not* participated in Alan Johnson's murder. Accordingly, the Government never charged Harris with those substantive counts. In February 2016, however, Jones changed his story and began implicating Harris in that murder. The Government notified Harris of this fact in advance of trial and indicated the Government's intent to rely on this evidence to prove the charged RICO conspiracy—an approach the Court permitted over Harris's objection in an Opinion and Order issued on March 23, 2016. (Doc. 990).

In the wake of Jones's first round of testimony, defense counsel for Christopher Harris uncovered documentation from the Ohio prison system verifying that Jones was indeed incarcerated on November 20, 2006—the date of the Joyce Park Shootout—and, therefore, verifying that Jones lied to the jury regarding his presence at that shootout and what he claimed he observed. The Government then revoked Jones's plea agreement and, when negotiations over a potential stipulation regarding his testimony on the Joyce Park Shootout broke down, the Government made arrangements for Jones to return to Court to testify about his lie, the revocation of his plea agreement, and related matters.

The Court permitted the Government to recall Jones for this limited purpose, and he returned to Court on Tuesday, May 24, 2016.  Jones's testimony that day forms the crux of these disputes.  Although Jones's direct-examination regarding his previous lies to the jury and the revocation of his plea agreement went well enough, his frustration over losing that plea agreement and in having his lies exposed boiled over on cross-exam.  When defense counsel for Robert B. Ledbetter questioned Jones as to why anyone on the jury should believe anything he told them, Jones shot back with an unsolicited comment that seemed to implicate Ledbetter's attorney in the death of Crystal Fyffe, one of the murder victims in this case:

> Q: And now you're here to come clean on these lies, correct?
>
> A: Yeah.
>
> Q: There's no reason any reasonable person would believe a word that you say, correct?
>
> A: Would they believe [it] if I say that you gave information that probably got Crystal murdered?
>
> Q: I'm sorry?

Following an objection from defense counsel for Christopher Harris, the Court retired to a conference at sidebar, outside the presence of open court.  Mr. Harris's attorney objected to Jones's inflammatory comment as non-responsive, and Mr. Ledbetter's counsel asked for a curative instruction.  After inquiring whether the Government knew that Jones was going to make such an outrageous statement and learning that the Government had not spoken to Jones in the past week, the Court sustained defense counsel's objection and instructed the jury as follows: "Ladies and gentlemen . . . , I'm going to instruct you to disregard the previous answer as it has no basis in fact or otherwise."  The Court then permitted Mr. Ledbetter's attorney to voir dire Jones outside the presence of the jury regarding his accusation.

Following that voir dire examination, the Court returned to a sidebar conference with the attorneys, at which point Mr. Ledbetter's attorney, Jeffrey Berndt, moved for a mistrial due to Jones's prejudicial remark about his character (and other perceived attacks on Mr. Berndt's character throughout this trial). Counsel for the other four defendants soon joined in this motion for a mistrial. Counsel for Christopher Harris then moved to strike Jones's testimony in its entirety due to his untruthfulness on the stand, and the other defendants joined. Finally, counsel for Clifford L. Robinson renewed his motion for severance from the other four defendants due to the potential prejudicial spillover of evidence. The Court pledged to take all three motions under advisement until the following day, but allowed the cross- and redirect-examination of Jones to continue. Nevertheless, at the conclusion of Anthony Jones's testimony, the Court issued a second curative instruction to the jury:

> Ladies and gentlemen, before we bring in the next witness, I want to reiterate to you, after Mr. Jones's testimony, that you are to completely disregard the answer that he gave to Mr. Berndt about some information somehow being related to Ms. Fyffe's murder. I want to emphasize to the court that Mr. Berndt has never, in this Court's opinion[,] and the evidentiary record will reflect, engaged in improper conduct and that any inference to that effect that was created by Mr. Jones's testimony must be completely disregarded by you as a matter of law.

The following morning (Wednesday, May 25, 2016), the Court denied the defendants' motions for mistrial, to strike Jones's testimony in its entirety, and to sever Clifford Robinson's trial by oral order. This written Opinion and Order follows.

## II. ANALYSIS

**A. The Court Will Not Grant a Mistrial Based on Attacks on Defense Counsel's Character.**

In this Circuit, the decision to grant or deny a motion for mistrial lies in the sound discretion of the trial court. *United States v. Clark*, 385 F.3d 609, 620-21 (6th Cir. 2004). A new trial is not required unless the defendants' "substantial rights" have been affected. *Id.*

Where, as here, the request for a mistrial stems from inflammatory and prejudicial comments from a government witness, courts generally look to four factors to guide their inquiry: (1) whether the remarks were pronounced and persistent, creating a likelihood that they would mislead and prejudice the jury; (2) whether there is any evidence of bad faith on the government's behalf; (3) the strength of the other evidence against the defendant(s); and (4) any curative actions taken by the district court, including striking the testimony and providing limiting instructions. *See, e.g.*, *United States v. Forrest*, 17 F.3d 916, 920-21 (6th Cir. 1994) (collecting cases); *United States v. Xavier*, 2 F.3d 1281, 1285 (3d Cir. 1993) (similar).

Indeed, the Supreme Court has held that an "ambiguous" but "prejudicial" statement which forms "but one moment in an extended trial" and which is "followed by specific disapproving instructions" does not give rise to a mistrial. *See Donnelly v. DeChristoforo*, 416 U.S. 647, 645 (1974). Rather, as the Ninth Circuit explained, "[a] cautionary instruction from the judge is generally sufficient to cure any prejudice" from a stray yet prejudicial comment and "is the preferred alternative to declaring a mistrial." *United States v. Lemus*, 815 F.3d 583, 591-93 (9th Cir. 2016). Thus, when an inflammatory comment is made, an "immediate, clear, and forceful" curative instruction from the judge often suffices to cure any prejudice. *Forrest*, 17 F.3d at 920-21.

Lower courts, including the Sixth Circuit, routinely follow suit by denying motions for a mistrial based on gratuitous yet prejudicial comments concerning defendants or their attorneys in circumstances similar to these. *See, e.g.*, *id.* at 920 (collecting cases); *United States v. Bevelle*, 437 F. App'x 399, 404-05 (6th Cir. 2011) (affirming denial of motion for mistrial where government agent made a "gratuitous" yet "improper" comment about defendant during cross-examination because comment was isolated, evidence against defendant was strong, and trial

5

judge offered to provide a curative instruction); *United States v. Hernandez*, 873 F.2d 925, 928 (6th Cir. 1989) (holding that a mistrial was not warranted where unsolicited yet prejudicial testimony was quickly sanitized by a curative instruction from trial judge and formed "only a small portion of the evidence against [defendant]"); *Lemus*, 815 F.3d at 591-93 (affirming denial of motion for mistrial where FBI agent provided unsolicited yet prejudicial testimony concerning defendant's gang affiliation because trial court struck the testimony and provided a curative instruction to jury and because trial court was in best position to assess the prejudicial effect of unsolicited comments from government witnesses); *United States v. Block*, 148 F. App'x 904, 911-12 (11th Cir. 2005) (holding that a mistrial was not warranted where prosecutor improperly attacked defense counsel because defendant's "substantial rights were not prejudiced" in light of overwhelming evidence of guilt); *United States v. Andreas*, 23 F. Supp. 2d 855, 862-63 (N.D. Ill. 1998), *aff'd*, 216 F.3d 645 (7th Cir. 2000) (denying motion for mistrial based on "attacks against defense counsel" because trial court "informed the jury that defense counsel never, in this court's opinion, engaged in improper conduct and that any inference to that effect created by the prosecution's comments must be completely disregarded").

Here, the Court finds that any inflammatory or prejudicial comments concerning Mr. Berndt have been isolated and extremely unlikely to mislead or prejudice the jury; that there is no evidence of bad faith on the Government's behalf; that the strength of the other evidence against *all* of the defendants (not just Mr. Ledbetter) is substantial, if believed; and that the Court's actions in striking the stray remarks and issuing limiting instructions to the jury cure any risk that the defendants' substantial rights have been impaired. As such, a mistrial is unwarranted.

Despite Mr. Berndt's belief that Anthony Jones's unsolicited and unfounded comment concerning Mr. Berndt's complicity in the death of Crystal Fyffe marked the "seventh time" that his character has been impugned in this trial, the Court finds otherwise.  After a careful review of the transcript from Tuesday's sidebar conference, as well as the transcripts from previous days of trial, the Court identified the following areas of concern raised by Mr. Berndt:

(1) references that Mr. Berndt placed money on Defendant Clifford Robinson's "book" for use at the prison commissary;

(2) testimony from a cooperating co-conspirator, Earl Williams, that Mr. Berndt visited him in prison at Mr. Ledbetter's request to establish legal representation of Mr. Williams, all-the-while badgering Mr. Williams into providing information detrimental to his own defense yet favorable to Mr. Ledbetter's defense; and

(3) Anthony Jones's unsolicited yet inflammatory remark that Mr. Berndt somehow was complicit in the death of Crystal Fyffe by providing information to Mr. Ledbetter.

As to Mr. Berndt's first concern—that his client's defense (or anyone else's) is prejudiced by references to Mr. Berndt placing money on co-defendant Clifford Robinson's book—the Court finds that Mr. Berndt misstated what happened at trial on Tuesday, May 17, 2016.  In fact, the jury never heard those references, as they were brought to the Court's attention at a sidebar conference outside the hearing of open court.

On May 17, the Government notified defense counsel and the Court during a sidebar conference that prison records showed Mr. Berndt had placed money on Mr. Robinson's book. The Government hoped to introduce testimony concerning Mr. Berndt's actions to link his client to Mr. Robinson, a co-defendant in this case, and to prove the existence of the alleged RICO conspiracy.  Several defense attorneys objected on the ground that the prejudicial effect of impugning one defense attorney's character substantially outweighed the probative value of the evidence—particularly so since the Government has never alleged that Mr. Robinson was a member of the conspiracy.

7

The Court took the matter under advisement over a brief recess.  Upon conclusion of that recess, the Court decided to <u>exclude</u> any testimony from ATF Agent James Bagus concerning Mr. Berndt placing money on Clifford Robinson's book under Federal Rule of Evidence 403.  Thus, the jury never heard that testimony, and none of the defendants suffered any prejudice from this perceived slight.  The *only* evidence the jury heard concerning someone placing money on any of the defendants' prison books related to Jada Wilson (the mother of a now-deceased co-defendant) placing money on Clifford Robinson's books in 2014 and 2015.

As to Mr. Berndt's second concern—that a mistrial is warranted because Earl Williams testified that Mr. Berndt visited him in prison at Mr. Ledbetter's request and asked "detective-like" questions—the Court again disagrees.  To be sure, Mr. Williams did testify on direct-exam that Mr. Berndt visited him in prison at Mr. Ledbetter's request to establish an attorney-client relationship.  Furthermore, Mr. Williams did testify that he declined Mr. Berndt's legal representation because he felt that Mr. Berndt did not have his best interests at heart but, rather, was working to glean information favorable to Mr. Ledbetter.

That said, when Mr. Berndt objected to that brief snippet of testimony, the Court agreed, after considering the matter over the noon recess, to strike that portion of Mr. Williams's testimony and to provide a curative instruction informing the jury that, in the legal profession, it is commonplace for attorneys to meet with prospective clients, to question them thoroughly on their knowledge of the accusations against them, and to test their veracity in an effort to determine whether an attorney-client relationship is possible.  This curative instruction cautioned the jury not to view Mr. Berndt negatively as a result of such commonplace occurrences and admonished the jury not to infer that Mr. Berndt somehow was a member of any conspiracy of acting in furtherance of any conspiracy.

8

*After* the Court took these efforts to strike the relevant testimony, to explain to the jury why such a visit from Mr. Berndt to Mr. Williams would be commonplace, and to instruct the jury that they may not draw any negative inferences from what they heard, <u>*Mr. Berndt opted to open the door*</u> to his in-prison visit to Mr. Williams during cross-examination:

> Q: Now you just mentioned that I came down to see you while you were locked up, correct?
>
> A: Yes, sir.
>
> Q: And you say that Mr. Ledbetter sent me down there to see you, correct?
>
> . . .

Following an objection from Mr. Harris's attorney and a request for a sidebar conference from Mr. Berndt's own co-counsel, the Court permitted this line of questioning because Mr. Berndt quite clearly opened the door to this testimony on cross-examination—despite the Court's earlier decision to strike the testimony from Mr. Williams's direct-exam and to issue a curative instruction. Thus, any prejudice stemming from Earl Williams's testimony falls squarely on Mr. Berndt's shoulders, not the Government's, or the Court's.

Finally, the Court disagrees with Mr. Berndt's third concern—that Anthony Jones's unsolicited comment regarding Mr. Berndt's alleged complicity in Crystal Fyffe's death requires a mistrial. Here, Mr. Jones made a single, isolated, and somewhat confusing comment during Mr. Berndt's cross-examination. Upon defense counsel's objection, the Court immediately struck that portion of Mr. Jones's testimony and instructed the jury not to consider it. After further consideration, and upon the conclusion of Mr. Jones's testimony, the Court issued a second curative instruction reminding the jurors that they were to disregard Mr. Jones's stray comment and that, in this Court's estimation, Mr. Berndt's character and reputation as both an attorney and a man are beyond reproach.

In the Court's view, Mr. Jones's unsolicited comment was so nonsensical and non-responsive to the question posed that a reasonable juror would be unlikely to believe it. Nevertheless, in an abundance of caution, the Court issued both curative instructions to allay any prejudicial impact to Mr. Ledbetter or his co-defendants.

In light of this discussion, the Court cannot agree that a mistrial is warranted. Of the three concerns that Mr. Berndt identified regarding purported attacks on his character—one never occurred (at least in the presence of the jury); another occurred briefly, was stricken by the Court and sanitized by a curative instruction, only to be resurrected by Mr. Berndt on cross-examination, and a third was isolated, unbelievable in the first instance, stricken immediately by the Court, and sanitized by two separate curative instructions.

This trial is nearing the end of its second month. We have heard six weeks of testimony during the Government's case-in-chief, and well near one-hundred witnesses have testified against the defendants, including fellow co-conspirators who knew the most intimate details of the crimes alleged, victims who suffered from those crimes, law-enforcement officials who investigated them, and highly incriminating statements from the defendants themselves. One stray comment from a government witness who already had been thoroughly impeached, which was immediately stricken, and then sanitized by two separate and stern curative instructions from the Court simply does not give rise to a mistrial.

As to the four factors the Court must consider in determining whether a mistrial is warranted, the Court first finds that any comments regarding Mr. Berndt's character have not been persistent or pronounced, nor are they likely to confuse or prejudice the jury. Instead, they have been stray comments which the Court quickly instructed the jury to disregard.

The Court likewise finds no bad faith on the Government's behalf in eliciting any of these comments.  In truth, the Government brought the first matter (Mr. Berndt placing money on Mr. Robinson's book) to the Court's attention at a sidebar conference so that the Court could resolve the matter without the jury learning of it.  And while the Government did elicit testimony from Earl Williams concerning Mr. Berndt's visit to him in prison, the Government rightfully thought that the information was probative of an ongoing conspiracy.  The fact that the Court ultimately found that probative outweighed by the risk of undue prejudice under Rule 403 does not mean the questioning found its basis in bad faith or nefarious motives in the first instance.  And, in any event, it was Mr. Berndt who brought the matter back to the jury's attention after the Court told the jury to disregard it.  Finally, Anthony Jones's stray comment came out on cross-examination by Mr. Berndt, not during the Government's questioning.  And, after permitting Mr. Berndt to voir dire Mr. Jones outside the presence of the jury, the Court heard no evidence or indication that the Government met with him in between his two rounds of testimony, let alone that the Government coached him to respond in such an unresponsive, nonsensical, and inflammatory manner.

The other evidence against the defendants, if believed, is overwhelming.

And the Court has taken great care throughout this trial to strike prejudicial testimony when it occurs and to issue careful yet stern curative instructions to the jury.  At bottom, neither Mr. Ledbetter nor any of the other defendants have suffered the loss or impairment of a "substantial right."  Accordingly, a mistrial is not warranted under these circumstances.

### B. The Court Will Not Strike Anthony Jones's Testimony in its Entirety.

The Court will not strike the entirety of Anthony Jones's testimony based on its perceived untruthfulness because to do so would usurp the function of the jury.

11

The Court finds, under a long line of cases dating back to *Nye & Nissen v. United States*, 168 F.2d 847 (9th Cir. 1948), that where part of a witness's testimony is obviously competent, relevant, and material—a motion to strike out all of it should be denied, even though "it appears unequivocally that the witness was mistaken in respect to a particular matter . . . or that his testimony on some matters was uncertain or vague." *Id.* at 856; *see also Zottarelli v. United States*, 20 F.2d 795, 798 (6th Cir. 1937) (holding that a witness's entire testimony concerning a conspiracy need not be stricken where part of it was admissible); *Bustamante v. Garcia*, No. 03-CV-276, 2009 WL 2912478, at *10-11 (S.D. Cal. Sept. 9, 2009) (denying petition for habeas corpus where district court declined to strike entirety of testimony, "some [of which was] inadmissible and potentially prejudicial," because "[t]he jury was admonished to disregard [those portions of the] testimony").

This is a conspiracy case. Several witnesses who testified, including Anthony Jones, are cooperating co-conspirators who, as defense counsel have amply demonstrated, have much to gain by turning on and testifying against their confederates. Moreover, as defense counsel have demonstrated, many of these witnesses' stories have changed over time from when they first began cooperating with authorities. Put simply, a veritable treasure trove of impeachment material exists in this case, as it does in any "snitch" case. And, as defense counsel have demonstrated, "garbage in" generally equals "garbage out." But the Court's role is not to weigh the credibility of the witnesses or to serve as a gatekeeper by excluding those witnesses the Court finds not credible. Those functions are reserved for the jury—as the finder of fact—and rightfully so. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[Our system] gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.").

Were the Court to indulge the defendants' request by striking the entirety of any testimony from witnesses who have been impeached or discredited as to particular matters, the role of the jury would evaporate—replaced by the whims of the trial judge and *his* perception as to the truthfulness of particular witnesses. Neither the Constitution, the United States Code, nor the Federal Rules of Criminal Procedure or Evidence envision such an arrangement. Instead, it remains up to the *lawyers* to discredit the witnesses, the *judge* to instruct the jury on how to evaluate the credibility of witnesses, and the *jury* to make those credibility determinations in reaching a verdict. The Court already has stricken the portion of Anthony Jones's testimony deemed too prejudicial and inflammatory to be admissible. The Court will strike no further.

### C. The Court Will Not Grant Clifford Robinson's Renewed Motion for Severance.

Finally, after careful review of the Court's initial Opinion and Order governing the joinder and severance of these defendants and counts for Trial I (Doc. 727), the Court declines to revisit that decision by granting Defendant Clifford Robinson's renewed motion for severance. As the Court noted last October, the potential "spillover" of evidence from one defendant to another, or a disparity in the quality and quantity of evidence against different defendants does not, standing alone, merit separate trials. *See, e.g.*, *United States v. Gardiner*, 463 F.3d 445, 473 (6th Cir. 2006); *United States v. Welch*, 97 F.3d 142, 147-48 (6th Cir. 1996); *United States v. Causey*, 834 F.2d 1277, 1288 (6th Cir. 1987). The evidence adduced at this trial aligns with what the Court anticipated when it originally approved these trial groupings last fall. And while Mr. Robinson certainly faces fewer counts and has been the subject of less damning testimony than his co-defendants, he still stands accused of two counts of murder for his role in the death of Donathan Moon, and one of those counts alleges that he murdered Mr. Moon in exchange for money from the alleged RICO enterprise.

All told, Mr. Robinson has failed to show "substantial, undue, or compelling prejudice" stemming from any "spillover" of evidence, *see United States v. Carver*, 470 F.3d 220, 238 (6th Cir. 2006), and the Court remains convinced that this jury will follow the appropriate instructions "regarding the sorting of evidence and the separate consideration of multiple defendants," *see United States v. Mays*, 69 F.3d 116, 120 (6th Cir. 1995). As such, severance is no more required today than it was last fall.

### III. CONCLUSION

For these reasons the Court **DENIES** Defendants' motion for a mistrial, **DENIES** Defendants' motion to strike the entire testimony of Anthony Jones, and **DENIES** Clifford Robinson's renewed motion for severance.

**IT IS SO ORDERED.**

    **s/ Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: June 1, 2016**