**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Case No. 2:15-CR-080** |
| **Plaintiff,** | : | **Case No. 2:14-CR-127** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **ROBERT B. LEDBETTER,** *et al*. | : | |
| | : | |
| **Defendants.** | : | |

**<u>OPINION & ORDER</u>**

This matter comes before the court to supplement three oral rulings the Court rendered just before closing arguments on Tuesday, May 31st.  For reasons that follow, the Court **DENIES** Defendant Clifford Robinson's motion for a judgment of acquittal; **OVERRULES** Defendants' objections to portions of the proposed jury instructions; and **GRANTS IN PART** and **DENIES IN PART** the Government's request to include the moniker "Homicide Squad" throughout the jury instructions and verdict forms.

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

At the conclusion of the Government's case-in-chief on Thursday, May 26, 2016, all five defendants moved for a judgment of acquittal on all counts under Federal Rule of Criminal Procedure 29(a).  The Court denied those motions with respect to Mr. Ledbetter, Mr. Harris, Mr. Liston, and Mr. Usury, because the evidence, if believed, was sufficient to sustain a conviction as to those defendants and their respective counts.  The Court held Mr. Robinson's motion in abeyance, however, because he raised several legal issues that required further consideration.

On Friday May 27, 2016 the Court held a charging conference with the attorneys to review the Court's proposed jury instructions and to resolve any objections the parties may have. During the charging conference, Mr. Robinson's attorney raised several of the same legal issues from his Rule 29 motion as they relate to the Court's proposed instructions.  Attorneys for the other four defendants joined in those objections as well.

Accordingly, this Opinion and Order resolves Mr. Robinson's outstanding legal issues as they relate both to his motion for acquittal and his objections to the Court's proposed jury instructions, as well as those objections joined in by the remaining defendants.

## II.  ANALYSIS

### A.  The Government May Charge in the Conjunctive but Prove in the Disjunctive.

The first issue that Mr. Robinson raised was the Government's practice of charging the defendants in the conjunctive but proving the offenses in the disjunctive.

For example, Count 5 of the Superseding Indictment charges Mr. Robinson and Mr. Harris with committing murder in aid of racketeering for causing the death of Donathan Moon.  The murder-in-aid-of-racketeering statute, 18 U.S.C. § 1959(a)(1), contains as an element a "motive" requirement.  That is, the Government must prove that the murder was committed *either:*

(1) "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity"—the so-called "murder-for-hire" motivation; *or*

(2) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise in racketeering activity"—the so-called "positional" motivation.

*See* 18 U.S.C. § 1959(a)(1).

Here, the Superseding Indictment charged Mr. Robinson and Mr. Harris in the conjunctive—by alleging that they murdered Donathan Moon for *both* purposes described above. Yet at trial, the Government sought to prove that Mr. Robinson murdered Donathan Moon solely under the murder-for-hire prong—*i.e.*, the Government sought to prove the charge against Mr. Robinson in the disjunctive.

This approach of charging a crime in the conjunctive but proving it in the disjunctive is wholly permissible. *United States v. LaPointe*, 690 F.3d 434, 440 (6th Cir. 2012). As the Sixth Circuit has explained:

> The government's right to charge in the conjunctive and prove in the disjunctive reflects the necessary discrepancies between indictments and jury instructions. Indictments must be phrased in the conjunctive so that society can be confident that the grand jury has found probable cause for all of the alternative theories that go forward. Juries, on the other hand, may convict a defendant on *any* theory contained in the indictment. As a result, judges read jury instructions in the disjunctive.

*Id.* (emphasis added). The Sixth Circuit has described this as a "well-settled principle," *id.*, and routinely endorses the practice of charging statutes which "denounce[] the offense disjunctively" in the conjunctive—yet proving the offense in the disjunctive. *United States v. Pirosko*, 787 F.3d 358, 368 (6th Cir. 2015); *United States v. McAuliffe*, 490 F.3d 526, 534 (6th Cir. 2007). Under these circumstances, "the government may prove and the trial judge may instruct in the disjunctive form used in the statute." *Pirosko*, 787 F.3d at 368.

Here, the Government charged a variety of crimes whose statutes denounce an offense disjunctively under multiple theories of liability, including the murder-in-aid-of racketeering counts. So long as the Government introduces sufficient evidence on each theory of wrongdoing, the Court may instruct the jury on each theory disjunctively, as the Court proposed to do here, with the exception of Mr. Robinson's culpability under Count 5, which the Court will

explain below.  The defendants will suffer no prejudice under this approach and, as a result, the Court overrules their objections to charging the murder-in-aid-of-racketeering counts (or any other counts) in the disjunctive.  *See United States v. Johnson*, 576 F. App'x 572, 576 (6th Cir. 2014).  With the one exception explained below, the Court finds sufficient evidence to reach the jury on all of the Government's theories of liability.

### B.  The Murder-in-Aid-of-Racketeering Statute May Be Proved Under Either Motivational Theory.

In addition to challenging the Government's practice of charging offenses in the conjunctive yet proving them in the disjunctive—Mr. Robinson and the other defendants also challenge the Government's ability to prove the motivational element of the murder-in-aid-of-racketeering statute under *either* theory of liability.  That is, the defendants argue that the Government is restricted to proving that the murder occurred under *either* the "murder-for-hire" prong *or* the "positional" prong, without alleging alternate theories of criminal liability.  Mr. Robinson cites *United States v. Ferguson*, 49 F. Supp. 2d 321 (S.D.N.Y. 1999), for support.

The Court finds the defendants' argument partially correct and partially incorrect as a matter of law.  To be sure, the Government must prove, and the jury *unanimously* must find, that the defendant committed the murder in-question for *either* one of the motivational purposes described in 18 U.S.C. § 1959(a).  Put differently, a conviction for murder in aid of racketeering cannot stand if *some* jurors believe the defendant committed the offense under the "murder-for-hire" prong while still *other* jurors believe the defendant committed the offense to gain entrance to the enterprise or to increase his position within it.  Instead, the jury must be unanimous as to *which* motivational element the Government proved.  *See Ferguson*, 49 F. Supp. 2d at 324 & n.5 (agreeing that jury must be unanimous as to which motivational prong supported conviction), *aff'd*, 246 F.3d 129, 134-37 (2d Cir. 2001).

4

The Court has followed this point of law throughout its proposed jury instructions and will caution the jury that, where an offense may be proven under multiple theories of criminal liability—the jury must unanimously agree as to *which* form of liability, if any, they find the Government has demonstrated beyond a reasonable doubt. The defendants seem to take *Ferguson* one step further, however, by arguing that the Government may only prove the offense, and the Court may only instruct the jury, under one of the two alternate motivational prongs for the murder-in-aid-of-racketeering counts.

In truth, both *Ferguson* and follow-on cases from the Second Circuit recognize that the Government may rely on alternate theories of liability to prove an offense under § 1959, and that courts may, when the evidence supports it, instruct the jury on those alternate theories of liability. *See Ferguson*, 49 F. Supp. 2d at 324 n.5 (noting that "any of the . . . motivations would have sufficed to support defendant's § 1959 conviction" during the first trial but cautioning that, "[o]n re-trial, if the proof is insufficient on any of these . . . theories, I will decline to charge that theory"); *Ferguson*, 246 F.3d at 134-37 (assessing trial evidence under *both* the murder-for-hire prong *and* the positional/membership prong to determine whether new trial was warranted); *United States v. Whitten*, 610 F.3d 168, 178 (2d Cir. 2010) (affirming conviction where "[t]he government undertook to show that [defendant] acted for pecuniary gain *and* 'for the purpose of . . . maintaining or increasing position' within the Stapleton Crew" because evidence was sufficient to support at least one theory of liability (emphasis added)).

In this case, the Court finds that—with one exception—the Government has introduced sufficient evidence for every murder-in-aid-of-racketeering count to reach the jury under both theories of liability. That is, with the exception of Clifford Robinson's liability under Count 5, the jury may consider both motivational prongs in determining whether the defendants are guilty.

As for Mr. Robinson, however, the Court finds (and the Government rightfully concedes), that there is *no* evidence that he participated in the murder of Donathan Moon to gain entrance to the Short North Posse or to increase his position within that alleged enterprise. Instead, the only evidence as to Mr. Robinson shows that he participated in the matter, if at all, under the murder-for-hire prong.

Accordingly, the jury will be instructed that, in determining whether Mr. Robinson is guilty of Count 5, they may consider *only* whether he participated in the alleged homicide "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value" from the Short North Posse. The jury's verdict form on that count likewise will restrict their consideration to the "murder-for-hire" prong just described.

## C. The Government Introduced Sufficient Evidence Under the "Murder-for-Hire" Prong Under Count 5 with Respect to Clifford Robinson.

Having determined that the Government may proceed against Clifford Robinson *solely* under the "murder-for-hire" prong under Count 5, Mr. Robinson next argues that the evidence under that prong is lacking. Mr. Robinson contends that, under a recent decision from the District Court of Connecticut, *United States v. Johnson*, No. 3:06cr160(JBA), 2013 WL 3422016 (D. Conn. July 8, 2013), the Government must prove not only that he committed the murder for pecuniary gain as a so-called "independent contractor," but also that he did so while connected to the alleged racketeering enterprise "in some meaningful way so as to actively promote its illegal activities." *Id.* at *5, *6. In other words, Mr. Robinson argues that he must have committed the murder with both a "knowing and intentional association with the enterprise." *Id.* at *3-6.

The Court disagrees with *Johnson*, in that it erroneously blurs the lines between the two motivational prongs under 18 U.S.C. § 1959(a)(1). While the second motivational prong—the "positional" prong—certainly seems geared toward ensnaring members or would-be members of

a RICO enterprise who commit violent acts, the *first* motivational prong—the "murder-for-hire" prong—"is sufficiently inclusive to encompass the actions of a so-called independent contractor, for it reaches not only those who seek to maintain or increase their positions within a RICO enterprise, but also those who perform violent crimes as consideration [for payment] from such an enterprise." *United States v. Concepcion*, 983 F.2d 369, 384 (2d Cir. 1992).

Although this "independent contractor" scenario rarely arises, nothing in the statute suggests that a defendant charged under the murder-for-hire prong must have a "knowing and intentional association with the enterprise," or that the defendant must have acted "in some meaningful way so as to actively promote its illegal activities," as the *Johnson* Court instructed. *See* 18 U.S.C. § 1959; *see also Johnson*, 2013 WL 3422016, at *5-6. Instead, the "plain text of the statute clearly encompasses" defendants who: (1) are "member[s] of a racketeering enterprise who committed murder as consideration for the receipt of pecuniary value from the activities of the enterprise"; *or* (2) are "so-called independent contractor[s]." *See United States v. Wilson*, 493 F. Supp. 2d 491, 503 (E.D.N.Y. 2007); *see also Concepcion*, 983 F.2d at 384 ("Hence, even as an independent contractor[,] [the defendant] could have been prosecuted for a violation of the clause of § 1959 quoted here."). The *Johnson* decision blurs these lines, and requires too strong of a nexus between a so-called "independent contractor" and the alleged racketeering enterprise. As one court noted, "there is simply no element of the [statute] that require[s] the defendant to have intended to act in 'aid' of the Enterprise or even to know of the existence of the Enterprise," at least when the government employs the murder-for-hire provision. *United States v. Lugo*, No. 01-CR-022, 2005 WL 1412137, at *2 (E.D.N.Y. June 15, 2005). Rather, the government need only show "that the payment was made on behalf of the RICO enterprise and that [the] defendant's purpose in acting was as consideration for this payment." *Id.*

7

Here, the Court finds that these requirements were satisfied with respect to Mr. Robinson. The Government introduced sufficient evidence to show that Mr. Robinson participated in the robbery that led to Donathan Moon's death "as consideration for a promise or agreement to pay, anything of pecuniary value from" the Short North Posse. *See* 18 U.S.C. § 1959(a).

Depending on whose testimony one believes, Mr. Robinson either: (1) arranged for members and associates of the Short North Posse to participate in the robbery and murder because he believed the residence in which Mr. Moon was killed contained large amounts of cash; (2) was conscripted to do so by members and associates of the Short North Posse for the same purpose; or (3) arranged the robbery because the owner of the residence owed Mr. Robinson money. The Government, however, "is not required to 'exclude' a personal vendetta as a purpose for the killing." *Lugo*, 2005 WL 1412127, at *2. Mr. Robinson and four other men then armed themselves; proceeded to the residence; broke into the home; attempted to rob the owner of cash; shot and killed Mr. Moon; and then proceeded back to the Short North.

This evidence suffices for Count 5 to go to the jury, and a separate instruction requiring the Government to prove a "knowing and intentional association" between Mr. Robinson and the Short North Posse is not required. *See, e.g.*, *Concepcion*, 983 F.2d at 384 (holding that evidence showing defendant received a diamond Rolex watch and $10,000 in exchange for murder would have sufficed under the murder-for-hire prong of § 1959, had it been charged); *Lugo*, 2005 WL 1412137, at *1-2 (similar—evidence showing that payment was made on behalf of RICO enterprise and that defendant's purpose in acting was as consideration for this payment suffices under § 1959 to avoid judgment of acquittal); Ninth Circuit Pattern Criminal Jury Instruction 8.151 (omitting requirement that defendant "knowingly and intentionally associated himself with the enterprise" and citing approvingly to *Concepcion* in commentary).

**D. The Government Need Not Show a "Substantial Effect" on Interstate Commerce to Prove Any of the Racketeering Counts.**

Mr. Robinson and the other defendants next argue that the Government must prove that the alleged racketeering enterprise had a "substantial effect" on interstate or foreign commerce to prevail on the RICO-conspiracy count (Count 1) or the murder-in-aid-of-racketeering counts (Counts 4, 5, 7, 9, 11, 15, 29, and Joined Count 1). The statutes under which those counts are charged both contain a "nexus" requirement between the alleged enterprise and its effect on interstate or foreign commerce. *See* 18 U.S.C. §§ 1962(d) (RICO conspiracy), 1959(a)(1), (b)(2) (murder in aid of racketeering and related definition of "enterprise").

Mr. Robinson looks to support from *Waucaush v. United States*, 380 F.3d 251, 255-56 (6th Cir. 2004), where the Sixth Circuit held that, when the alleged enterprise had not "*itself* . . . engaged in economic activity," a de minimis impact on interstate commerce will not suffice to support a conviction under the racketeering statutes. Instead, "where the enterprise itself did not engage in economic activity," (like drug trafficking, robbery, or extortion), but, rather, engaged in "violence *qua* violence," the government must show a "substantial effect" on interstate or foreign commerce. *Id.* at 255-59.

The Court finds that *Waucaush* does not require a judgment of acquittal on any counts, nor does it require any changes to the Court's jury instructions. In the twelve years since *Waucaush* was decided, the Sixth Circuit has cited the case just twice in connection with the interstate-commerce requirement, and both times, the Court distinguished its holding and limited the case to its facts. *See Purnell v. United States*, 496 F. App'x 596, 602 (6th Cir. 2012) (limiting *Waucaush* to cases in which "the government failed to provide *any* evidence that there was an economic component to the crime charged"); *United States v. Henry*, 429 F.3d 603, 619-20 (6th Cir. 2005) (declining to apply *Waucaush* to felon-in-possession-of-a-firearm statute).

Other Circuits have gone further and expressly rejected *Waucaush*'s reasoning in light of intervening Supreme Court decisions regarding the scope of the Commerce Clause. *United States v. Cornell*, 780 F.3d 616, 621-23 (4th Cir. 2015) ("*Waucaush* is not the law in this Circuit and we have doubts about its validity, particularly in light of *Gonzales v. Raich*, 545 U.S. 1 (2005), where the Supreme Court more recently reiterated that 'when a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.'"); *United States v. Nascimento*, 491 F.3d 25, 38-39 & n.4 (1st Cir. 2007) ("[T]he *Waucaush* court did not employ any of the usual tools of statutory construction. The absence of anything in the reasoning of that court that explains how it is possible, consistent with sound canons of statutory construction, to read the word 'affect' as possessing two different meanings depending upon additional facts not mentioned in the statute itself, makes the decision suspect.").

Nevertheless, because the Sixth Circuit has never formally rejected or abandoned *Waucaush* in a published opinion, the Court will follow its edicts here and look first to whether the RICO enterprise "itself had engaged in economic activity." *Waucaush*, 380 F.3d at 255; *see also United States v. Garcia*, 793 F.3d 1194, 1210-11 (10th Cir. 2015) (questioning *Waucaush* but applying its reasoning anyway). Thus, if the Short North Posse *itself* had engaged in economic activity, then the "de minimis" connection to interstate or foreign commerce standard would control. *See Waucaush*, 380 F.3d at 255-56; *United States v. Norwood*, No. 12-CR-20287, 2014 WL 3659256, at *5-6 (E.D. Mich. July 22, 2014) ("The 'substantial effect' language of *Waucaush* was inappropriate [for the jury instructions]. As the Sixth Circuit noted, the indictment in *Waucaush* alleged only violent acts and there was no evidence of any economic enterprise.").

Here, the Government both alleged and offered evidence showing that the Short North Posse "itself" engaged in economic activity.  The Superseding Indictment listed robbery, extortion, and drug trafficking as types of predicate racketeering activity in which the enterprise routinely engaged, and the proof at trial, if believed, conformed to those allegations.  In fact, the Government introduced evidence that, during one controlled drug purchase alone, Defendant Robert Ledbetter received nearly $2 Million worth of marijuana from Mexican drug lords.  The Government also introduced a wealth of evidence concerning high-stakes robberies and the defendants' buying, selling, stealing, and destroying firearms—presumably some of which traveled in interstate commerce.  These are "quintessential illegal economic activities" that "undoubtedly" constitute "economic activity" in which the alleged enterprise engaged.  *See Garcia*, 793 F.3d at 1211 (citation omitted); *see also, e.g.*, *Waucaush*, 380 F.3d at 255-56 (collecting cases); *Norwood*, 2014 WL 3659526, at *6 (describing "numerous 'five-off-the-dub' transactions," including "shar[ing] firearms, drug clients, drugs/product, and cash," all of which supported a de minimis instruction on the interstate-commerce nexus).  Accordingly, even under *Waucaush*, the Government need only prove that the enterprise's activities had a "de minimis" effect on interstate or foreign commerce, and a judgment of acquittal on the racketeering charges or changes to the Court's proposed jury instructions are not warranted.

### E.  Count 6 Does <u>Not</u> Fail Under the Void-for-Vagueness Doctrine.

Mr. Robinson next contends that he and co-defendant Christopher Harris must receive a judgment of acquittal under Count 6, which charges them with murder through the use of a firearm during and in relation to a crime of violence—namely, a Hobbs Act conspiracy—under the District Court of Maryland's decision in *United States v. Edmundson*, --- F. Supp. 3d ---, No. PWG-13-15, 2015 WL 0311983, at *1-6 (D. Md. Dec. 23, 2015).

Mr. Robinson's argument requires several analytical steps. Nevertheless, because the Sixth Circuit recently foreclosed the very last step of his argument under the void-for-vagueness doctrine in *United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016), neither Mr. Robinson nor Mr. Harris are entitled to a judgment of acquittal on Count 6.

Mr. Robinson first argues that, to convict him for murder through the use of a firearm during and in relation to a crime of violence under 18 U.S.C. §§ 924(c) and (j), the Government must prove that he committed an underlying crime of violence—in this case, conspiracy to commit robbery under the Hobbs Act, in violation of 18 U.S.C. § 1951(a). No quarrel there: Section 924(c)(1)(A) unambiguously requires an underlying "crime of violence," which the statute separately defines at Section 924(c)(3). 18 U.S.C. § 924(c)(1); *United States v. Taylor*, 176 F.3d 331, 337 (6th Cir. 1999).

Mr. Robinson next argues that, although a conspiracy to violate the Hobbs Act qualifies as a "crime of violence" within the meaning of § 924(c), it qualifies *only* under the "residual clause" from § 924(c)(3)(B), and *not* under the "force clause" from § 924(c)(3)(A). *See Edmundson*, 2015 WL 9311983, at *2-3 (concluding that a Hobbs Act conspiracy does not fall under the "force clause" because such a conspiracy "can be committed even without the use, attempted use, or threatened use of physical force against the person or property of another"). Again, this Court agrees. The Sixth Circuit has expressly held that "a conspiracy to commit a robbery that violates the Hobbs Act is necessarily a conspiracy that, by its nature, involves a substantial risk that physical force may be used against the person or property of another, *and therefore is a crime of violence within the meaning of section 924(c)*." *Taylor*, 176 F.3d at 338 (emphasis added) (mirroring language from the "residual clause" of 18 U.S.C. § 924(c)(3)(B)); *see also United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996) (same).

12

Finally, Mr. Robinson argues that the "residual clause" from § 924(c)(3)(B) is unconstitutionally vague under the Supreme Court's recent decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), thus requiring a judgment of acquittal on any charge brought under that residual clause—including Count 6 from the Superseding Indictment. In *Johnson*, the Supreme Court held that a similarly-worded residual clause from the Armed Career Criminal Act was unconstitutional under the void-for-vagueness doctrine. *Johnson*, 135 S. Ct. at 2557. Some lower courts, including the District of Maryland, have extended *Johnson*'s holding to the residual clause from the statute at issue here—18 U.S.C. § 924(c)(3)(B). *See, e.g.*, *Edmundson*, 2015 WL 9311983, at \*5 ("[B]ased on the foregoing discussion of *Johnson*, I conclude that the § 924(c) residual clause . . . also is unconstitutionally vague.").

Mr. Robinson's argument fails at this third and final step, however, because the Sixth Circuit has expressly declined to extend *Johnson*'s holding, which dealt only with the Armed Career Criminal Act, to the residual clause from Section 924(c). *Taylor*, 814 F.3d at 375-79. In *Taylor*, the Sixth Circuit refused to overturn two convictions under the same murder-through-the-use-of-a-firearm statute at issue here, stating as follows: "Because § 924(c)(3)(B) is considerably narrower than the statute invalidated by the [Supreme] Court in *Johnson*, and because much of *Johnson*'s analysis does not apply to § 924(c)(3)(B), [defendant's] argument is without merit." *Id.* at 375-76. Therefore, as this Court previously ruled in connection with Mr. Robinson's pre-trial motion to dismiss Count 6, "this Court is bound by the Sixth Circuit's recent determination that 18 U.S.C. § 924(c)(3)(B)—which forms an essential element of Count Six—passes constitutional muster under the 'void-for-vagueness' doctrine. Accordingly, the Court cannot dismiss Count Six due to vagueness under the Due Process Clause." (Op. & Order, Doc. 990, March 23, 2016).

A decision from the District Court of Maryland cannot and does not trump a published and binding decision from the Sixth Circuit Court of Appeals. Accordingly, the Court will not grant a judgment of acquittal to Mr. Robinson or Mr. Harris on Count 6 under the reasoning of the *Edmundson* decision.

### F. Count 6 Does <u>Not</u> Fail Under the Hobbs Act's Interstate Commerce Requirement.

Sticking with Count 6, Mr. Robinson next argues that the Court must grant a judgment of acquittal because the interstate-commerce nexus for the underlying crime of violence—the Hobbs Act conspiracy—was not satisfied. Mr. Robinson argues that, although the Hobbs Act normally requires only a de minimis connection to interstate commerce, that burden is heightened where the allegations involve the robbery of a private citizen as opposed to a business entity.

Mr. Robinson finds some support in *United States v. Wang*, 222 F.3d 234, 237-40 (6th Cir. 2000), where the Sixth Circuit held that the robbery of "private citizens in a private residence" requires the government to show more than a de minimis connection to interstate commerce to sustain a conviction under 18 U.S.C. § 1951. Under this so-called "private-individual exception," the robbery of a private citizen forms a "much more attenuated" connection to interstate commerce and, therefore, requires the Government to prove something more "to demonstrate that the robbery . . . had a 'realistic probability' of affecting interstate commerce." *Id.* at 238. The Sixth Circuit has suggested that the Government can make this required showing by demonstrating that "the defendant knew of or was motivated by the individual victim's connection to interstate commerce." *Id.* at 240 (citation omitted); *see also United States v. Vichitvongsa*, --- F.3d ---, Nos. 14-6013 and 15-5037, 2016 WL 1295163, at *7 (6th Cir. Apr. 4, 2016) (quotation omitted).

14

In this case, the private-individual exception from *Wang* does not apply because the defendants did not simply conspire to rob a private citizen in his private residence. Instead, the Government introduced sufficient evidence to show that the defendants targeted Greg Cunningham's residence for the robbery *because* he housed his business, Tap Out Entertainment, there, and because he likely kept large sums of money from that business within the residence.

Mr. Cunningham, aka "Sir," described his business venture at length during this trial, including testimony that he hosted exotic parties for hire at clubs throughout the Eastern United States and, on several occasions, at his suburban residence in Pataskala, Ohio. During these parties, Mr. Cunningham routinely contracted with exotic dancers from Ohio, Kentucky, and nearby states to provide entertainment to his patrons. Mr. Cunningham refurbished his home so that he could, on occasion, host parties there as well. For example, he converted his living room into a hot-tub room for customers to enjoy; he converted the entire basement into a finished bar and strip-club setting, replete with mirrored walls and ceilings, pool tables, and stripper poles; and he outfitted one of the guest bedrooms as a home office from which he could control the music and security cameras for the bar and strip club below.

Mr. Cunningham hosted one such party at his Pataskala home just twenty-four hours before the robbery that led to Donathan Moon's death. Testimony revealed that he ushered in several exotic dancers from Dayton, Ohio, and Covington, Kentucky, and that the bachelor party catered to upwards of thirty or forty customers. These customers tipped the dancers individually for their services and paid Mr. Cunningham several hundred dollars for his business's hospitality. Testimony likewise revealed that it was this party, and the likelihood that Mr. Cunningham or the dancers might still have a sizeable amount of cash laying around the residence, that led to the robbery alleged in Count 6.

All told, the evidence adduced here does not fall under the "private-individual exception" from *Wang* and follow-on cases, because this was not simply the robbery of a private citizen in his private residence. In *Wang*, for example, the robbery occurred at the private residence of two restauranteurs who, during their day-to-day operation of a Chinese restaurant, engaged in interstate commerce. *See Wang*, 222 F.3d at 240. The robber absconded with $4,200 in cash— "a mere $1,200 of which belonged to [the] restaurant." *Id.* But there, "[t]he Government made no showing of a substantial connection between the robbery and the restaurant's business." *Id.* In other words, the defendant targeted and robbed two individuals he did not know, at a private residence, in which he just so happened to walk off with $1,200 that a mom-and-pop failed to deposit with the bank at the close of the business day. *Id.* at 236.

Here, in contrast, the evidence shows that the defendants targeted a business owner and sole proprietor (even if he was an illegitimate business owner who kept all profits off the books) at his home office and place of business, a mere twenty-four hours after they caught wind of a large party hosted by that business, where lots of cash was thrown around and may still have been stockpiled. Thus, this case more closely resembles instances in which Hobbs Act robberies target drug dealers or other "private citizens engaged in [illegal activity]." *See Vichitvongsa*, 2016 WL 1295163, at *8 (collecting cases). As the Sixth Circuit has explained, "[r]obbing drug dealers" or other individuals "who can be legitimately characterized as engaged in business . . . does not fall within *Wang*'s 'private individual exception,' and thus the government need only show a *de minimis* connection to interstate commerce." *Id.* (quotation omitted). Under these circumstances, the victim "[i]s the business." *Id.* (quotation omitted). So too with Mr. Cunningham—the intended target of the robbery. The Court simply cannot separate him, or his residence, from his business activity of Tap Out Entertainment.

Mr. Robinson briefly argued that he is entitled to a judgment of acquittal under Count 6 because the robbers could have obtained only a minimal value of cash for their trouble and because some of Mr. Cunningham's testimony could be read to infer that his business survived the robbery and murder. The Court agrees that Mr. Cunningham's testimony regarding the impact of the robbery on his business was contradictory. But, in any event, Mr. Robinson's points "miss the mark because when a conspiracy is charged under the Hobbs Act, the government need only prove that the scheme *would have* affected interstate commerce had it been carried out." *Id.* at *9 (emphasis added) (quotation omitted). Thus, the *actual* effect on interstate commerce plays no role in determining whether Count 6, which alleges only a Hobbs Act conspiracy, may go to the jury.

Finally, out of an abundance of caution, this Court notes that even if *Wang*'s "private-individual exception" *does* apply to Count 6, the Government nevertheless made a sufficient showing of the connection between the individual victim and a business engaged in interstate commerce "by demonstrating that the defendant[s] knew of or [were] motivated by the individual victim's connection to interstate commerce." *Wang*, 222 F.3d at 240. In other words, even if the "victim" of the conspiracy to commit robbery was Greg Cunningham and not Tap Out Entertainment, the Court finds that the conspirators targeted Mr. Cunningham because they knew of or were motivated by his connection to interstate commerce—*i.e.*, because they knew he might have large sums of cash laying around his residence from hosting a well-attended bachelor party, staffed by out-of-state dancers, the night before.

Accordingly, a judgment of acquittal under Count 6 is not warranted, and the Court's proposed jury instructions adequately state the required connection to interstate commerce with respect to the underlying Hobbs Act conspiracy.

### G.  Mr. Robinson Is Not Entitled to an Acquittal Based on Inconsistencies over His Identification.

Finally, Mr. Robinson argues that he is entitled to an acquittal under Rule 29 due to a lack of sufficient evidence as to whether he is the same "Tink" that allegedly committed the crimes in Counts 5 and 6.  To obtain an acquittal on this basis, Mr. Robinson must show that, "after viewing the evidence in the light most favorable to the government, [no] rational trier of fact could [find] the essential elements of the crime."  *United States v. Damra*, 621 F.3d 474, 494 (6th Cir. 2010).  Circumstantial evidence standing alone, "if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt."  *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (quotation omitted).  Thus, defendants like Mr. Robinson bear a "very heavy burden" in challenging the sufficiency of the evidence. *United States v. Davis*, 577 F.3d 660, 671 (6th Cir. 2009) (quotation omitted).

The bulk of evidence tying Mr. Robinson to Donathan Moon's murder came by way of testimony from Ashley Ward, an ex-girlfriend to one of the other participants in the murder, and David Hurt, an unindicted co-conspirator who served as the getaway driver.  Ms. Ward testified that her then-boyfriend, Rastaman Wilson, confessed the details of the Donathan Moon murder to her on the same night that it occurred.  She testified that Mr. Wilson implicated several others in that murder, including "Tink," whom Ms. Ward claimed to have spent time with on a few occasions.  Mr. Hurt testified that he participated in the robbery and murder by serving as a driver at the request of his friend, Rastaman Wilson.  Mr. Hurt testified that, although he did not know everyone else who participated in the crime before that night, he remembered that one of the men went by the name of "Tink," and that "Tink" rode in his car that evening.  Critically, both Ms. Ward and Mr. Hurt made in-court identifications of Clifford Robinson as the "Tink" they claim participated in the Donathan Moon murder.

The Government introduced other evidence tying Mr. Robinson to the street moniker of "Tink" as well.  For example, when Detective Barbuto, who served as the lead investigator for the Moon murder, questioned Mr. Robinson—Mr. Robinson admitted that he went by the name of "Tink," and that Christopher Harris (also charged in the Moon murder) would know him by that name.  Likewise, David Hurt was able to identify "Tink's" residence as Clifford Robinson's mom's house. The Government introduced evidence that one or more of Mr. Robinson's co-defendants in this trial contained an entry for "Tink" in their cell phone directories.  In addition, prison records showed that Rastaman Wilson's mother, Jada Wilson, placed money on Mr. Robinson's prison commissary "book" on three occasions in 2014 and 2015.

Against this evidence, Mr. Robinson suggests that there could be more than one "Tink" who lived in or near Columbus, Ohio, when Donathan Moon was murdered.  Mr. Robinson also notes that both Ashley Ward and David Hurt failed, on at least one occasion, to identify his photograph out of randomly generated photo arrays that Detective Barbuto displayed to them during his investigation of the Moon homicide.  Finally, Mr. Robinson notes that, even when shown the same photo array in Court, which displayed his portrait in "Position 1," Ms. Ward denied that the individual in "Position 1" was the "Tink" whom she believed participated in the murder of Donathan Moon.

As this discussion demonstrates, the evidence, when viewed fairly, cuts both ways as to whether Mr. Robinson was the same "Tink" who participated in the murder of Donathan Moon. But under Rule 29, the Court is not tasked with viewing the evidence fairly.  Instead, the Court must view the evidence in a light most favorable to the Government and then ask, under such a light, whether *any* rational trier of fact could find the defendant guilty beyond a reasonable doubt.  *Davis*, 577 F.3d at 671.

The Court finds that a rational trier of fact could reach such a conclusion based on two in-court identifications of Mr. Robinson as the "Tink" who allegedly murdered Donathan Moon, as well as other circumstantial evidence the Government presented. Indeed, an in-court identification is not required to withstand a Rule 29 motion for acquittal, but when such an identification does occur, it only bolsters the government's case. *See United States v. Boyd*, 447 F. App'x 684, 690-91 (6th Cir. 2011) (collecting cases). Here, two witnesses who claimed that they knew the same "Tink" who participated in the murder both testified that Clifford Robinson was that "Tink." Moreover, David Hurt, who served as the getaway driver for that murder, was able to identify "Tink's" address, which proved to be the same location as Clifford Robinson's mother's house. And ample circumstantial evidence tied Mr. Robinson to the other participants in Donathan Moon's murder. To be sure, Ms. Ward and Mr. Hurt failed to identify Mr. Robinson in a photo array in 2012. But, as the Government demonstrated, Mr. Robinson had changed his appearance somewhat between the night of the murder (August 19, 2007) and the timeframe in which the photo arrays were provided to Ms. Ward and Mr. Hurt. And neither Ms. Ward nor Mr. Hurt had seen Mr. Robinson in the intervening years. Accordingly, a rational trier of fact could discount those discrepancies in light of the other evidence.

The Court is mindful of the problems that may arise when the government's factual allegations hinge on the identification of a single witness, particularly in circumstances where significant time has lapsed from the alleged crime to the first identification. *See United States v. McNeil*, 429 F. App'x 333, 335 (9th Cir. 2011) (per curiam) (warning of these dangers). Had the Government's case against Mr. Robinson boiled down to the identification of a single witness, far removed in time from when the alleged crimes occurred, the Court might have been inclined to grant a Rule 29 motion for acquittal.

But here, the Government presented ample evidence, including both eye-witness identification and circumstantial evidence, which suggest that Clifford Robinson *was* the same "Tink" who participated in the murder of Donathan Moon. As such, Counts 5 and 6 may go to the jury. The Court will, however, instruct the jury to be mindful of the means of the witnesses' identification, and in that instruction, the Court will specifically mention the testimony of Ms. Ward and Mr. Hurt as they relate to identifying Clifford Robinson as the relevant "Tink."

**H.  The Court Will <u>Not</u> Refer to the "Homicide Squad" Throughout the Jury Instructions when Referencing the Alleged Racketeering Enterprise.**

Finally, during the charging conference held on Friday, May 27th, the Government requested that the Court supplement its description of the alleged racketeering enterprise to include not only the "Short North Posse," but also the "Homicide Squad," throughout the Court's jury instructions. The Court has considered the matter and decided to leave those portions of the jury instructions largely as originally proposed.

The Superseding Indictment spans 94 pages in length and consistently refers to the Short North Posse when describing the alleged RICO enterprise, the overt acts allegedly taken in furtherance of that enterprise, and the substantive counts which incorporate racketeering sub-elements. In fact, the Superseding Indictment references the Short North Posse no fewer than seventy-five times. In contrast, the Superseding Indictment references the Homicide Squad just three times when describing the alleged enterprise and its means and methods of operation:

(1) "The defendants . . . and others, were members and associates of a criminal organization in the Short North area of Columbus, Ohio, known as the Short North Posse (SNP), also known as (a.k.a.) Homicide Squad (HS) aka Homicide, a.k.a. Cut Throat (CT), aka Cut Throat Committee . . . ."

(2) "Originally[,] members of the enterprise referred to themselves solely as the 'Short North Posse' or 'SNP.' Later[,] some members began subsets of the Short North Posse referring to themselves as 'Cut Throat' and 'Homicide Squad.'"

(3) "Still within the Short North Posse, Cut Throat and Homicide Squad specialized in murders and robberies of rival gangs, other drug dealers, and targets thought to have large sums of cash or firearms."

The Government's proof at trial largely conformed to these allegations—namely, that the "Short North Posse" was the overarching racketeering enterprise to which these defendants belonged or associated, but that some members referred to themselves as the "Homicide Squad." The Court anticipates that the next trial in this case will center on two defendants who referred to themselves as belonging to or associating with "Cut Throat" or the "Cut Throat Committee," and that the third trial may contain a mix of defendants who referred to themselves as "Cut Throat," "Homicide Squad," both, or neither.

To maintain consistency throughout these trials, to avoid confusion among the jury, and to hold the Government to its burden of proving the charges outlined in the Superseding Indictment and the Joined Indictment, the Court will instruct the jury that the enterprise alleged is the "Short North Posse." The Court will, however, reference the "Homicide Squad" when quoting directly from the Superseding Indictment in describing the enterprise and its means and methods of operation, as noted above. This approach best aligns with the Court's usual practice of reciting those portions of the indictment necessary to outline each charge, comparing those allegations to the statutory elements of the crimes alleged, and then instructing the jury regarding those elements. The Government remains the master of its indictments, and here, the Government alleged throughout that the enterprise at issue is the "Short North Posse."

To be sure, one overarching racketeering enterprise may go by different names at different times and by different members. *See United States v. Norwood*, No. 12-CR-20287, 2015 WL 2250493, at *5 (E.D. Mich. May 13, 2015). And such a change in names does not necessarily "establish the existence of several different groups," but, rather, may refer to different "monikers for the same group." *Id.* ("While the various names may have been adopted by different generations or subsections of members, the group itself—and its common purpose of defending its exclusive territory to sell drugs—remained the same."). Indeed, the Supreme Court has recognized that an enterprise need not even have a name, "let alone one that remains constant over the course of the enterprise's existence." *Id.* (citing *Boyle v. United States*, 556 U.S. 938, 948 (2009)).

Nevertheless, jury instructions are designed to clarify, not confuse. And where, as here, the Government has alleged throughout the charging documents that an enterprise went by a particular name, the jury must so find to return a conviction for RICO conspiracy. The Court finds that describing the enterprise as "the Short North Posse, aka Homicide Squad, and its associates" throughout the jury instructions and verdict forms may lead to greater confusion than necessary in an already complicated case. Accordingly, the Court will include the terms "Homicide" and "Homicide Squad" only where so included in the Superseding Indictment.

<u>CONCLUSION</u>

For these reasons, Defendant Clifford Robinson's motion for a judgment of acquittal is **DENIED**; Defendants' objections to the proposed jury instructions on the same bases are **OVERRULED**; and the Government's request to include the moniker "Homicide Squad" throughout the jury instructions and verdict forms is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

                                         **___s/ Algenon L. Marbley_____**
                                         **ALGENON L. MARBLEY**
                                         **UNITED STATES DISTRICT JUDGE**

**DATED:  June 7, 2016**